UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| IN RE: <br><br> PICCADILLY RESTAURANTS, LLC, *et al.*, <br><br> DEBTORS | CASE NO. 12-51127 <br><br> (JOINT ADMINISTRATION REQUESTED)[1] <br><br> CHAPTER 11 <br><br> JUDGE ROBERT SUMMERHAYS |

**DECLARATION OF THOMAS J. SANDEMAN IN SUPPORT OF DEBTORS'
CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, **Thomas J. Sandeman**, do hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. My name is Thomas J. Sandeman. I am over the age of twenty-one, and I am competent to make this declaration. I am the Chief Executive Officer of Piccadilly Restaurants, LLC, a Delaware limited liability company ("Piccadilly") and the Chief Executive Officer of Piccadilly Food Services, LLC, a Delaware limited liability company ("PFS"). Piccadilly Investments, LLC is a Delaware limited liability company ("Investments" and, together with Piccadilly and PFS, the "Debtors" or the "Company"). I was named Chief Executive Officer of Piccadilly in [year] and CEO in February, 2012.

2. I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases (the "Cases") on Tuesday, September 11, 2012 (the "Petition Date") and in support of: (a) the Debtors' petitions for relief under chapter 11 of the Bankruptcy Code and (b) the relief requested in the emergency motions and applications filed by the Debtors on the Petition Date (collectively, the "First Day Pleadings").

3. After the Petition Date the Debtors intend to continue to operate and manage their businesses pursuant to Bankruptcy Code §§ 1107(a) and 1108. The First Day Pleadings seek relief aimed at preserving the going concern value of the Debtors' estates and minimizing the adverse effects of the chapter 11 filings on the Debtors' businesses by facilitating an orderly transition into, and uninterrupted operations throughout, the chapter 11 process.

4. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my personal interaction with fellow members of the Debtors' senior

---

[1] Joint administration requested with *In re Piccadilly Food Service, LLC*, 12-51128 (Bankr. W.D. La.), and *In re Piccadilly Investments, LLC*, 12-51129 (Bankr. W.D. La.).

1

management and other of the Debtors' advisors, my review of relevant documents or business records, or my experience and knowledge of the Debtors' operations and financial conditions. I am authorized to submit this Declaration on behalf of the Debtors.

## BUSINESSES OVERVIEW

### Description of the Business

5. Piccadilly is a Delaware limited liability company with its headquarters in Baton Rouge, LA, and is the largest cafeteria-style restaurant in the United States, with operations in ten (10) states in the Southeast and Mid-Atlantic regions. Piccadilly and PFS also operate an institutional foodservice division through its wholly-owned subsidiary, PFS, servicing schools and other organizations.

6. With a history dating back to 1944, the Company offers quick and friendly service and a wide selection of quality, freshly-prepared vegetables, home-style favorites, and regional specialty items at an attractive price point to its customers. The concept is particularly attractive to budget-conscious consumers, families, and seniors, due in part to its low average guest check (averaging $8.20, year to date).

7. PFS, created in 2005, provides operating and purchasing leverage to several of the Company's restaurants. In addition to having [78] institutional, educational and retail accounts, the Company has established emergency foodservice contracts with a number of disaster relief agencies across the Gulf Coast region. Piccadilly utilizes its restaurant assets to serve smaller and regional accounts that either do not have or do not want to maintain on-site kitchens.

8. The Company currently operates [86] restaurants at [7] owned and [79] leased locations and employs approximately 3,464 employees, broken out into hourly wage employees (3,179) and salaried employees (285), and further into 1,360 full-time employees and an additional 2,104 part-time employees. As of fiscal year ended January 3, 2012, Piccadilly generated revenues of $165 million.

### Capital Structure

9. Investments owns 100% of the membership interests in Piccadilly, and Piccadilly owns 100% of the membership interests in PFS.

10. The Debtors are parties to that certain Amended and Restated Loan and Security Agreement, dated as of July 21, 2006 (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement," and with related documents, the "Loan Documents"), by and among Piccadilly and PFS as Borrowers, Investments as Parent, and the lenders from time to time signatory to the Credit Agreement (the "Pre-Petition Lenders") and Wells Fargo Capital Finance, Inc. ("Wells Fargo") in its capacity as administrative agent under the Credit Agreement (the "Secured Credit Facility").

11. The Secured Credit Facility consists of a $20 million revolving loan ("Revolving Facility") and a letter of credit facility ("Letter of Credit Facility") and accrues interest at an annual rate of 6%, plus 2.5% for the revolver margin leverage ratio for base rate loans. The

2
GAMDE: 1567963-2

12-51127 - #2  File 09/11/12  Enter 09/11/12 23:33:26  Main Document  Pg 2 of 16

Letter of Credit Facility is subject to an annual fee which is equal to 4.5% of the undrawn amount of all outstanding letters of credit. The Secured Credit Facility also includes a $16 million term loan ("Term Loan Facility"), under which Atalaya Funding II, LP is the lender. The Term Loan Facility accrues interest at an annual rate of 11%, with 8% payable in cash and 3% payable in kind. The Secured Credit Facility matured on [June 30, 2010]. Pursuant to a Fifth Amendment to Credit Agreement and Forbearance Agreement dated as of October 15, 2010 ("Forbearance Agreement") Wells Fargo, the prior agent, agreed on behalf of itself and the Lenders to forbear the enforcement of any of its rights or remedies under the Loan Documents during the forbearance period, which ended on January 12, 2011.

12. On or about April 9, 2012, Well Fargo (a) assigned its interests in Credit Agreement to Atalaya Funding II, LP, Atalaya Special Opportunities Fund IV LP, and Atalya Special Opportunities Fund (Cayman) IV LP (collectively, the Pre-Petition Lenders) and (b) resigned as agent under the Credit Agreement and appointed Atalaya Administrative LLC ("Pre-Petition Agent") as agent thereunder.

13. The Secured Credit Facility is secured by a lien (the "Pre-Petition Lender Lien") on substantially all of the assets of the Debtors as well as on the membership interests in Piccadilly held by Investments (the "Pre-Petition Collateral"). Pursuant to the Loan Documents, the obligations under the Term Loan Facility are subordinate to the obligations under the Revolving Facility. As of the Petition Date, the principal amount outstanding under the Revolving Facility (excluding the outstanding letters of credit) was approximately [$6.9] million; the principal amount outstanding under the Letter of Credit Facility was approximately [$2.9] million, and the principal amount outstanding under the Term Loan Facility was approximately [$16.0] million.

14. As of the Petition Date, the Debtors had approximately [$5.5] million of trade debt outstanding.

## Events Leading to Bankruptcy

15. During the years leading up to the Petition Date, factors beyond the Debtors' control – natural disasters, a severe economic recession, and even an oil spill – have had a significant detrimental impact on the Debtors' sales and profit margins. Specifically, the Debtors' businesses have been hit hard by hurricanes, tornadoes, and other natural disasters in the markets in which the Debtors operate. Since 2005, 56 of the Company's restaurants have been closed for some period of time due to these natural disasters. In addition, a number of the Company's restaurants in the gulf coast region were affected by the gulf oil spill in 2010.

16. The severe economic recession that began in 2008 has had a substantial downward affect on sales. With overall unemployment rates at historically high levels, discretionary income for customers has been severely constrained, especially for seniors who live on a fixed income and who form a large percentage of the Company's customer base. This has directly correlated with depressed restaurant sales and reduced or eliminated customer traffic. In 2011 alone, the Company reported a 3.9 percent decline in same-store sales year over year. Furthermore, the rising costs of commodities and transportation costs have reduced profit

3

margins because the Company could not pass all of these costs to its customers in the current economic environment and still expect to increase guest traffic and spending.[2]

17. Management instituted a number of strategic initiatives to improve sales – including the introduction of a new marketing campaign and new bundling strategies and revamping the Piccadilly menu – and to reduce costs and offset the high commodity and transportation costs – including price increases, selective in-sourcing of certain supplies, work force reductions, wage freezes, and reductions in other employee benefits.

18. In addition, with respect to its leased locations, management began an aggressive restructuring effort that involved subleasing unprofitable locations, negotiating more favorable lease terms, where possible, and assisting owners of certain leased locations in accomplishing sales of such properties free of the Company's lease obligations with the owners' consent. Since 2009, these efforts have resulted in an estimated savings to the Company of approximately $2.8 million on an annual basis.

19. The Company considered other restructuring options as well, including the possible merger with another nationally known cafeteria chain, all while continuing to work with its secured lenders to negotiate a forbearance agreement so that the Company could continue its restructuring efforts. On March 14, 2012, Wells Fargo, as prior agent under the Credit Facility, sent Piccadilly a Notice of Intention to Take Enforcement Action in which it proposed terms for a forbearance agreement and stated that it intended to pursue its rights and remedies under the Credit Agreement if an acceptable forbearance agreement was not reached by the close of business on April 2, 2012. No agreement was reached. Instead, Wells Fargo assigned its interests to the current Lenders and appointed the current Agent just seven days later.

20. The managing member of Investments began negotiations with the Agent in an attempt to reach an agreement on terms for a reasonable forbearance. Without notice, Atalaya (a New York-based vulture fund) effectively and unexpectedly terminated negotiations in order to gain an unfair advantage by commencing litigation on September 5, 2012 (the "Atalaya Litigation") in the 19th Judicial District Court in Baton Rouge, LA by filing a Petition for Money Judgment, Writ of Sequestration, and to Appoint Keeper, seeking (a) a judgment on the amounts allegedly due under the Credit Agreement and Loan Documents, (b) the issuance of a writ of sequestration to seize the Company's property located in Jefferson Parish and East Baton Rouge Parish upon the furnishing of a bond as required by law, and (c) the appointment of a keeper of the Company's property "to have and possess all of the rights inherent therein, including, but not limited to, the rights to immediate access to the Property.

21. In seeking the appointment of a keeper, Atalaya put in motion the process by which the Company's operations could be shut down, transforming the going concern value of the Company to a sad collection of movable property, leases that would go into default, and immovable property without business operations. The Atalaya Litigation created the prospect of destroying value and rendering the Company's assets fit only for auction house fire sale.

---

[2] By way of example, I estimate several average affiliation rate of about 8% percent average the past 12 onths from commodity costs while the average increase in sales prices for the restaurants' offerings was approximately 3 percent.

22. The Debtors did not become aware of the Atalaya Litigation until late in the evening on Friday, September 7, 2012. Given the Atalaya Litigation and its attempt to seize and take control of the Debtors' assets, the Debtors determined that seeking relief under Chapter 11 of the Bankruptcy Code was necessary to preserve the going concern value of the business. Without debtor-in-possessing financing, the Debtor would be unable to continue to operate once in Chapter 11 proceedings, which would cause significant diminution in value of the Debtors' assets and the Pre-Petition Collateral. Thus, the Debtors, over the weekend, approached the managing member of Investments to attempt to obtain a commitment for debtor-in-possession financing. Ultimately, an affiliate of the managing member of Investments, CB Investments, LLC (the "DIP Lender") agreed to provide financing on the terms set forth in the "Stipulation and Order (A) Authorizing Post-Petition Financing, (B) Granting Superpriority Security Interests and Administrative Claims Pursuant to 11 U.S.C. § 364, (C) Granting Adequate Protection to Pre-Petition Lenders; (D) Granting Limited Relief from the Automatic Stay, and (E) Granting Related Relief (the "Stipulation"). The DIP Facility proposed herein was negotiated in good faith and will allow the Debtors, with the use of Cash Collateral, to continue to operate and to preserve and maximize the value of the Debtors' assets for the benefit of all constituents.

23. As attested to below, the DIP loan is necessary to provide the Debtiors with necessary cash to maintain operations throughout the bankruptcy cases. Liquidation of the debtors' assets, which I believe would be the outcome or consequence of a seizure by a third party would render the assets of the Debtors devoid of going concern value and in fact would require liquidation sales (in all likelihood) in place, across several states. Our employees would be put out of work, our valuable trademarks would be relegated to trademarks of a dead business, and the real estate would simply be sold as stand-alone property. The food service contracts would be left unperformed, which would leave the unfortunate consequence of schools and governmental entities (not to mention businesses) to scramble to make other arrangements for provision of food. The Debtors have a future, but must maintain their value as going concern enterprises to achieve it.

24. The Debtors have retained counsel to represent them in these bankruptcy cases. Piccadilly and PFS have used the services of Gordon Arata as their general corporate counsel and have as well utilized services in attempts to work out lender relationships and to prepare for these cases.

## FIRST DAY RELIEF

1. I have read and reviewed the following First Day Pleadings (including the exhibits attached thereto) and the allegations contained in each are true and correct to the best of my knowledge, information, and belief:

    a. Motion For Order Under Bankruptcy Rule 1015(B) Directing Joint Administration Of Chapter 11 Cases;

    b. Motion For Entry Of An Order Granting Extension Of Time To File Schedules And Statements;

5

GAMDE: 1567963-2

12-51127 - #2  File 09/11/12  Enter 09/11/12 23:33:26  Main Document  Pg 5 of 16

c. Motion For An Order (i) Approving Continued Use Of Cash Management System, (ii) Authorizing Use Of Pre-Petition Bank Accounts And Business Forms, And (iii) Waiving The Requirements Of 11 U.S.C. § 345(B) On An Interim Basis;

d. Motion For The Entry Interim And Final Orders (i) Prohibiting Utility Companies From Altering, Refusing, Or Discontinuing Utility Services, (ii) Deeming Utility Companies Adequately Assured Of Future Performance, And (iii) Establishing Procedures For Determining Adequate Assurance Of Payment;

e. Motion For Entry Of An Order To (A) To Pay All Outstanding Pre-Petition Wages, Salaries, Other Accrued Compensation, Expense Reimbursements, Benefits, And Related Amounts; And (B) Continue Specified Benefit Programs In The Ordinary Course Of Business;

f. Motion For Entry Of An Order Authorizing The Debtors To Honor Pre-Petition Obligations To Customers And Otherwise Continue Customer Programs In The Ordinary Course Of Business;

g. Motion For The Entry Of An Order (1) Authorizing Debtors To Pay Certain Pre-Petition Claims Of Suppliers And Vendors Of Goods Entitled To Administrative Priority, And (2) Establishing Procedures For Resolving Reclamation Claims-=-NOTE: The Declaration will not deal with this motion as it will not be presented on the first day, and when presented will be backs by a separate Declaration;

h. Motion For The Entry Of An Order Establishing Payment Procedures For Potential PACA Claims And Granting Related Relief;

i. Motion For The Entry Of An Order Authorizing (i) Payment Of Certain Pre-Petition Taxes, And (ii) Financial Institutions To Process And Cash Related Checks And Transfers;

j. Motion For Entry Of An Order Authorizing Assumption Of Food Service Contracts;

k. Motion For Order Authorizing Debtors To File Consolidated Mailing Matrix And Consolidated List Of 30 Largest Unsecured Creditors;

l. Motion For Entry Of An Order Authorizing The Debtors To Continue Pre-Petition Insurance Coverage And Related Practices;

m. Emergency Motion For An Order (I) Authorizing The Debtors To Obtain Post-Petition Financing Pursuant To 11 U.S.C. §§ 364(c) And 364(d), (II) Authorizing The Debtors' Use Of Cash Collateral Pursuant To 11 U.S.C. § 363(c); (III) Granting Adequate Protection Pursuant To 11 U.S.C. § 361; And (IV) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001(c); and

n. Application To Employ Gordon, Arata, McCollam, Duplantis & Eagan, LLC As Attorneys For The Debtors.

25. I believe that the relief sought in each of the First Day Pleadings (a) is in the best interests of the estates and their creditors; (b) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their businesses, or loss of productivity or value; and (c) constitutes a critical element in achieving the Debtors' successful reorganization and confirmation of a plan of reorganization.

26. **Joint Administration**. The Debtors believe that many of the motions, applications, hearings and orders that will arise in these Cases will affect all Debtors. Under these circumstances, the Debtors believe that the interest of the Debtors, their estates, their creditors and other parties in interest would be best served by the joint administration of these Cases for procedural purposes only. The Debtors further believe that joint administration of these Cases will ease the administrative burden on the Court by allowing these Cases to be administered as a single joint proceeding instead of those independent Cases. Joint administration of these Cases will also create a centralized location for the numerous documents that are likely to be filed and served in these Cases and for all notices and orders entered by the Court. A single docket will make it easier for all parties in both Cases to stay apprised of the various matters before the Court. The Debtors will also likely realize substantial cost savings and reduced administrative burdens by sending notices to a single matrix or master service list, as the case may be, rather than maintaining separate notice lists. For these reasons, the Debtors submit, and I believe, that it is in the best interest of the Debtors, their estates, and their creditors, and other parties in interest that the Court grant the relief requested in the Joint Administration Motion.

27. **Extension of Time to File Schedules**. The Debtors request, pursuant to Bankruptcy Code § 521 and Bankruptcy Rule 1007, an extension of time to file their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules"). Due to the size and complexity of the Debtors' operations, and the precipitous need for immediate filings, the Debtors have been unable to complete the drafting of Schedules and do not anticipate having the Schedules ready for filing within the 15-day period prescribed by Bankruptcy Rule 1007(c). Therefore, the Debtors are requesting a 35-day extension of the applicable time period. It is my belief that no creditor will be harmed by the requested extension because the §341 meeting of creditors has not yet been scheduled. Accordingly, I submit that ample cause exists for the requested extension of time to file the Debtors' Schedules.

28. **Cash Management**. As described herein and in detail in the Cash Management Motion, the Debtors, in the ordinary course of business, maintain an automated and integrated cash management and disbursement system to collect, transfer, and disburse funds generated by their operations and to accurately record all such transactions as they are made (the "Cash Management System").

   a. The Debtors maintain current and accurate accounting records of daily cash transactions and submit that maintenance of the Cash Management System will prevent undue disruption to the Debtors' business operations while protecting the Debtors' cash for the benefit of the estates. It is critical that the Debtors be able to consolidate management of cash and centrally coordinate transfers of funds to efficiently and effectively operate their large and complex business operations.

Substantially disrupting their current cash management procedures would impair the Debtors' operations and ability to optimize their business performance.

b. I understand that the United States Trustee has established certain operating guidelines for Debtors in possession in order to supervise the administration of chapter 11 cases, including the closure of prepetition bank accounts, the opening of new accounts, and the immediate printing of new checks and businesses forms designated "debtor in possession." I believe that strict compliance with such requirements would cause significant and unnecessary disruption in the Debtors' businesses, thereby impairing their efforts to reorganize in a timely manner and pursue other alternatives to maximize the value of their estates.

c. The Debtors also request that the Court waive the requirements of Bankruptcy Code § 345(b) on an interim basis and permit them to maintain their deposits in their accounts in accordance with their existing deposit practices until such time as the Debtors obtains this Court's approval to deviate from the guidelines imposed under Bankruptcy Code § 345(b) on a final basis.

d. I have been advised that at least nine (9) of the Bank Accounts are maintained at banks that have been approved by the United States Trustee for Region 5 (the "U.S. Trustee") as an authorized depository ("Authorized Depository"). Such Authorized Depositories include Bank of America, Capitol One, SunTrust Bank, Hancock Bank, and Regions Bank. Accordingly, any funds that are deposited in these Bank Accounts are secure and, thus, it is my belief that the Debtors are in compliance with Bankruptcy Code § 345.

e. In addition, I have been advised four (4) of the Bank Accounts may be maintained at non-Authorized Depositories, specifically CB&T Bank, First Citizen Bank, South Bank, and U.S. Bank (collectively, the "Non-Approved Bank Accounts"). Upon information and belief, each of the Non-Approved Bank Accounts have daily average balances far below the insurance coverage provided by the Federal Deposit Insurance Corporation (the "FDIC"). Accordingly, any funds that are deposited in the Non-Approved Bank Accounts are secure and, thus, it is my belief that the Debtors are in compliance with Bankruptcy Code § 345. To the extent funds in the Non-Approved Bank Accounts will exceed the amounts insured by the FDIC, the Debtors seek waiver of the requirements under Bankruptcy Code § 345(b).

f. I believe that the requirements of Bankruptcy Code § 345(b) should be waived because, among other considerations, (i) the Debtors' banks are highly rated and are federally chartered banks subject to supervision by federal banking regulators, (ii) the Debtors retain the right to remove funds held at the banks and establish new bank accounts as needed, (iii) the cost associated with satisfying the requirements of Bankruptcy Code § 345(b) is burdensome, and (iv) the process of satisfying those requirements would lead to needless inefficiencies in the management of the Debtors' businesses. Moreover, strict compliance with the requirements of Bankruptcy Code § 345(b) would not be practical in these Cases,

and a bond secured by the undertaking of a corporate surety would be prohibitively expensive, if such bond is available at all.

g. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and creditors and is both necessary and appropriate to the efficient administration of those Cases and the Debtors' reorganization efforts.

29. **Utilities Motion**. The Debtors request the entry of interim and final orders pursuant to Bankruptcy Code § 366 (i) prohibiting utility companies from altering, refusing, or discontinuing utility services, (ii) deeming utility companies adequately assured of future performance, and (iii) establishing procedures for determining adequate assurance of payment (the "Utilities Motion").

   a. In the ordinary course of business, the Debtors incur expenses for gas, water, sewer, electric, telecommunications, and other similar utility services provided by approximately 630 utility providers. Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. Indeed, any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues, and profits, seriously jeopardizing the Debtors' reorganization efforts and, ultimately, value and creditor recoveries. It is critical that utility services continue uninterrupted during these Cases.

   b. I believe and am advised that the Debtors' proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance are necessary in these Cases, because if such procedures were not approved, the Debtors could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first weeks of these Cases. Moreover, a Utility Provider could blindside the Debtors by unilaterally deciding – on or after the thirtieth (30th) day following the Petition Date – that it is not adequately assured of future performance and discontinuing service or making an exorbitant demand for payment to continue service. Discontinuation of utility service could shut down operations, and any significant disruption of operations could jeopardize a successful reorganization in these Cases. The Debtors propose to leave prepetition deposits in place and to continue paying the bills of utilities in the ordinary course of business. While this will mean that certain prepetition bills for utilities will be paid, the alternative is that utilities will apply deposits to prepetition amounts leaving the Debtors in the position of having to make new deposits. The effect, money wise, will be the same, but the alternative to the proposal of the debtors would be very disruptive.

   c. I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, will enable the Debtors to continue to operate their businesses in chapter 11 without disruption, and will provide our numerous ability providers with assurance that their payments will not be interrupted and that no precipitous action need to be taken.

9

Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

30. **Employees Motion**. The Debtors seek to pay their Employees for work preformed prepetition, to honor other prepetition Employee-related obligations and benefits, including severance and termination obligations, and to continue paying their Employee obligations in the ordinary course of the Debtors' businesses. In addition, the Debtors seek authorization for applicable banks to receive, process, honor, and pay any and all checks, electronic fund transfers, and automatic payroll transfers drawn on the Debtors' payroll and/or general disbursement accounts, to the extent that such checks or transfers relate to any of the prepetition employee obligations.

   a. The Debtors request the entry of an order pursuant to Bankruptcy Code §§ 105(a), 363(b), 507(a)(4), and 507(a)(5) (i) authorizing the Debtors, in accordance with their stated policies, to (a) pay all pre-petition employee wages, salaries, and other accrued compensation; (b) reimburse all pre-petition employee business expenses; (c) make all contributions to pre-petition benefit programs and continue such programs in the ordinary course of business; (d) honor workers' compensation obligations; (e) make all payments for which pre-petition payroll withholding deductions (including, but not limited to, payroll taxes) were made; (f) pay all processing costs and administrative expenses relating to the foregoing payment and contributions; and (g) make all payments to third parties incident to the foregoing payments and contributions; (ii) authorizing the Debtor to continue payment of wages, compensation, and employee benefit programs in the ordinary course of business and to pay other costs and expenses relating to the foregoing as described more fully below; and (iii) authorizing and directing applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtors' payroll and employee benefits accounts to make the foregoing payments (the "Employees Motion").

   b. Pursuant to the Employees Motion, the Debtors are seeking authority to honor and pay all pre-petition employee wages, salaries and other accrued compensation, and to continue to honor certain other policies, programs and benefits the Debtors provide to their employees in the ordinary course of business.

   c. The Debtors have a current work force of approximately 3,464 employees ("Employees"), broken out into hourly wage employees (3,179) and salaried employees (285), and further into 1,360 full-time employees and an additional 2,104 part-time employees. The Employees possess the institutional knowledge, experience, and skills necessary to support a successful reorganization of the Debtors' business operations. The uninterrupted continuation of the Debtors' business is critically dependent upon a ·stable work force. I believe that any significant number of employee departures or deterioration in morale at this time will immediately and substantially adversely impact the Debtors' businesses and result in immediate and irreparable harm to the estates and their creditors. There is a real, immediate risk that if the Debtors are not authorized to continue to honor their pre-petition Employee Obligations in the ordinary course, the employees

would no longer support and maintain the operations of the Debtors, thereby crippling the Debtors' business operations and instantly destroying the prospects of a successful reorganization. Further, many of the Debtor's hourly wage employees frankly, will be severely affected by missing a paycheck, and causing these employees to be a source of financing of operations is just not fair. The business of the Debtors requires the workforce it has and is dependent upon its workers to maintain their work schedules. The employees simply cannot afford to be squeezed by the happenstance of a bankruptcy filing. Consequently, I strongly believe that it is critical that the Debtors be permitted to pay their employees their pre-petition wages, honor vacation and personal time off obligations, continue their workers' compensation and unemployment programs, maintain employee benefits, continue garnishment and payroll deductions, reimburse Employee's business expenses, and honor all miscellaneous Employee benefits that the Debtors have traditionally provided in the ordinary course of business (all such obligations to the Employees, collectively, the "Employee Obligations"). The Debtors' records indicate that, as of the Petition Date, no Employee is owed prepetition wages, salaries or other amounts in excess of $11,725.

31. **Customer Programs**. Pursuant to the Customer Programs Motion, the Debtors seek authority to continue honoring their marketing, sales and promotional practices, which are targeted to develop and sustain positive reputations for their restaurants in the marketplace (the "Customer Programs").[3] I believe that immediate entry of an order approving the Debtors' ability to continue to honor their Customer Programs is necessary to avoid immediate and irreparable harm to the Debtors and their estates. The short-term and long-term success and viability of the Debtors' businesses are dependent upon the loyalty and confidence of their customers. The continued support of this constituency is absolutely essential to the survival of the Debtors' businesses and the Debtors' ability to reorganize. Any delay in honoring the various Customer Programs or discontinuation of Customer Programs as a result of the commencement of these Cases will severely and irreparably impair the Debtors' customer relations at a time when the loyalty and support of those customers are extremely critical.

32. **Priority/Critical Vendors Motion**. The Debtors will be filing a motion seeking authority to pay certain claims of providers of goods and services that the Debtors have determined are so critical to the operations of the Debtors that certain prepetition claims should be paid at the front end of the case under certain conditions. This motion will not be presented a sa first day motion, but will be filed shortly.

33. **PACA Motion**. Many of the goods (the "PACA Goods") supplied to the Debtors by their vendors may be considered "perishable agricultural commodities," as such term is defined under Perishable Agricultural Commodities Act of 1930, as amended ("PACA"). The Debtors believe that many of their vendors of PACA Goods (collectively, the "PACA Claimants") will file claims against the Debtors under PACA if their claims are not paid in full.

---

[3] Although, in consultation with their professionals, the Debtors have concluded and believe that most of the Customer Programs constitute "ordinary course of business" practices and do not require court approval, out of an abundance of caution, the Debtors seek authority from the Court to honor their pre-petition Customer Programs in the ordinary course of business.

11

The holder of a PACA claim has basis to allege that the perishable agricultural commodities and proceeds from the sale are not the Debtors' property and that the Debtors hold such property in trust. The Debtors have proposed a set of procedures for assuring (i) that PACA claimants can be assured of payment, (ii) that PACA claims will properly analyzed and (iii) the best prospect of continue uninterrupted delivery of agricultural commodities products.

   a. Preservation of the Debtors' relationships with the suppliers of fresh produce is particularly critical due to the nature of the Debtors' restaurants and the highly competitive nature of the Debtors' industry. Any disruption in the supply of fresh produce would prove devastating and would greatly hinder the Debtors' ability to operate and efforts to reorganize. Due to (a) the Debtors' desire to prevent any interference with their supply of PACA Goods, and (b) the Debtors' recognition of the rights of the trust beneficiaries under PACA, the Debtors seek to have this Court authorize payment of all PACA Claims that the Debtors in their sole discretion determine to be valid.

   b. Absent the requested relief, I believe that the Debtors could be subject to an avalanche of actions from PACA Claimants seeking enforcement of their PACA Claims, which would result in the unnecessary expenditure of funds by the Debtors in responding thereto and could freeze business. Furthermore, in certain circumstances, pursuant to PACA, officers, and directors may be held secondarily liable for amounts owed to a seller of applicable goods and it is incumbent upon the Debtors to make certain that its operations do not generate personal liability for its officers.

   c. The Debtors' operations require an uninterrupted supply of fresh produce from vendors. Any delays in satisfying PACA Claims could adversely affect the Debtors' ability to obtain fresh produce in the future, thereby undercutting the Debtors' competitive posture and their ability to successfully reorganize. I understand that the relief requested in the PACA Motion may not constitute the Debtors making payment on account of pre-petition claims, because PACA Claimants would be paid from non-estate property held in trust under the PACA laws.

34. **Tax Motion**. The Debtors request the entry of an order authorizing the Debtors to remit and pay sales and use, income, franchise, property, and unemployment taxes, and business license and other similar fees (the "Tax Motion").

   a. In the ordinary course of business, the Debtors: (a) incur and/or collect taxes, including franchise, sales, use, unemployment, and miscellaneous taxes in the operation of their businesses (collectively, the "Taxes"); (b) incur business license, permit, and vehicle fees and other similar assessments (collectively, the "Fees") in connection with obtaining licenses and permits necessary to operate their businesses; and (c) remit such Taxes and Fees to various taxing, licensing, and other governmental authorities (collectively, the "Authorities").

b. The Debtors incur an assortment of sales, use, and miscellaneous similar taxes in connection with the operation of their restaurants and the distribution of their products (the "Sales and Use Taxes"). Generally, sales taxes are remitted to the Authorities in the month or quarter following acquisition or transportation of the corresponding goods. Although I believe that the Debtors are timely with respect to Sales and Use Taxes, the Debtors estimate that, as of the Petition Date, approximately $990,000 of Sales and Use Taxes have accrued and are not yet paid. The fact that this amount is accrued and unpaid does not mean the Debtors are in default of their tax obligations. This balance is the average running balance which happens to fall within the pre-petition time due to the filing date as sales and use taxes are collected and paid for the previous fiscal month not yet calculated is the amount accrued since the previous fiscal month to date, which will be payable after the filing date. This payment will be an ordinary course of business payment. Also failure to pay could result in personal liability imposed upon officers and responsible parties, which the debtors owe a duty to avoid.

c. Federal and state Authorities impose unemployment taxes for employer-funded unemployment compensation programs. The Authorities calculate the unemployment taxes based upon various tax rates assessed against the amount of wages paid in those jurisdictions in which the Debtors operate. Often, state tax liability with respect to anyone employee is capped at a certain amount. The Debtors estimate that, as of the Petition Date, approximately $95,000 of unemployment taxes have accrued and are unpaid.

d. I believe that the Debtors' payment of Taxes and Fees in the ordinary course of business is justified because, among other things, certain of the Taxes and Fees are not property of the estate pursuant to Bankruptcy Code § 541(d). In addition, it is my understanding that the Debtors' directors and officers may be held personally liable for the non-payment of certain taxes. Thus, certain Authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes, which would distract the Debtors from their efforts to complete a successful reorganization and impose an unfair burden upon the Debtors' officers and responsible persons.

e. Payment of the Taxes and Fees proposed likely will give the Authorities no more than that to which they otherwise would be entitled under a chapter 11 plan and will save the Debtors the potential interest expense, legal expense, and penalties that otherwise might accrue on the Taxes and Fees during these Cases. As well, the officers and directors will not be exposed to personal liability and the employees' tax situations will not be adversely affected.

f. It is my opinion that the Debtors' payment of the Taxes and Fees proposed to be paid is an exercise of sound business judgment and is necessary to permit a successful reorganization.

35. **Food Service Contracts.** The Debtors have developed the food service contract line of business over the last few years as an additional business line that separates the Debtors

from other restaurant companies in the industry. It is important to the debtors and to the food service contract parties that the Debtors be able to point to concrete intention that business will remain uninterrupted with respect to the food service contracts. These contracts involve schools, some governmental agencies and therefore the Debtors believe that the business verges on the public interest. Schools must be assured of their food supplies, especially as the school years have begun. Therefore the Debtors determined to bring on the first day their motions to assume the food service contracts.

36. **Consolidated Mailing Matrix and Unsecured Creditors List**. These chapter 11 cases involve three (3) affiliated debtors, and several hundred creditors and other parties-in-interest. The Debtors anticipate that there will be numerous and voluminous mailings and significant notice burdens in these chapter 11 cases. Given the potential confusion and overlap regarding creditor obligations, combined with the fact that the Debtors are all affiliates, the Debtors have determined that it is appropriate to request authority to file a consolidated mailing matrix and consolidated list of their 30 largest unsecured creditors.

37. Further, because the top 30 lists of the Debtors likely overlap, the Debtors submit that filing separate top 30 lists and mailing matrixes would be of limited utility. Moreover, as the Debtors will request the U.S. Trustee to appoint a single official committee of unsecured creditors, a consolidated list of the largest creditors is a more appropriate list of the Debtors most significant creditors. As such, the Debtors have determined that the filing single consolidated list of the 30 largest unsecured creditors and a single mailing matrix in these chapter 11 cases is appropriate.

38. **Post Petition Financing.** As mentioned above the Debtors have a post petition loan commitment subject to Court approval. Without the use of Cash Collateral and the funds to be obtained under the DIP Facility, the Debtors lack sufficient liquidity to meet ongoing obligations. Any interruption in the Debtors' business operations would be devastating and would likely result in their inability to continue as a going concern and a consequent loss of significant value with respect to estate assets. The Debtors intend to use the Cash Collateral and the proceeds of the DIP Facility to fund the payment of operating expenses incurred on and after the Petition Date, including, among others, costs relating to the purchase of inventory and the payment of rent, taxes, utilities, salaries and wages, and employee benefits and such pre-petition operating expenses as may be approved by the Court. The Debtors need immediate access to the DIP Facility and use of its Cash Collateral (as those terms are defined in the DIP Loan motion) to assure trade vendors that the Debtors have the liquidity to continue making timely payments in the ordinary course of business. If we are unable to obtain the financing under the DIP Facility or the use of Cash Collateral, the ability of the Debtors to effectively reorganize will be jeopardized.

39. The summary of terms is contained within the DIP Loan motion and the Debtors believe the terms to be reasonable under the circumstances – precipitous need for filing due to the motion to appoint a keeper (which the debtors believe would have resulted in a business shut down), and inability to seek commercial financing on such short notice.

40. The DIP Loan motion sets forth the legal basis for obtaining court approval of the DIP Facility prepared by counsel. Also, the DIP Loan motion includes a request that the Debtors

be authorized to use cash collateral and other collateral property in the operation of their businesses. The Debtors have prepared a budget forecast for the next 13 weeks, showing the needs for and uses of cash produced by operations and provided under the DIP Facility, which is attached as an exhibit to the motion.

41. I believe that the value of the Debtors' properties, leases, operations, trademarks, and operations will be enhanced by the DIP Facility. The Atalaya Litigation created the prospect of immediate shut down and liquidation, making bankruptcy a necessity, so the DIP Facility, in that it will provide the Debtors with a cash lifeline, will boost the value of the companies and their businesses so that operations can continue on a stronger footing.

42. **Insurance Motion**. The Debtors also seek the entry of an order authorizing the Debtors to (a) continue insurance coverage currently in effect and pay any pre-petition amounts related thereto and (b) enter into insurance policies and financing agreements post-petition.

43. The Debtors maintain five (5) active insurance policies that are maintained and administered by several third-party insurance carriers. Collectively, these policies provide coverage for, among other things, general commercial liability, commercial automobile liability, motor freight cargo, commercial equipment liability, fiduciary liability, directors and officers liability, commercial excess liability (umbrella), contaminated products, excess liability, and workers' compensation liability, including any new or similar policies entered into by the Debtors due to expiration or otherwise (collectively, the "Insurance Policies"). Motion are in an amount not to exceed $140,000 in the aggregate, which became due on September 1, 2012.

44. In addition to the Debtors' deductible and self-insured retention obligations, the Debtors serve as the administrator under certain of the Insurance Policies. Specifically, the Debtors self-administer their Insurance Policies relating to general liability, medical only worker's compensation, and employment practices liability claims (the "Self-Administered Policies"). Under the Self-Administered Policies, the Debtors process claims asserted pursuant to such policies and fund those claims on an accrual basis. Pursuant to this Motion, the Debtors request authority to continue to process and make payments on claims that may arise in the ordinary course of business subsequent to the Petition Date. Importantly, failure to comply with their contractual obligations under the Self-Administered Policies likely would cause a default under the Insurance Policies, resulting in increased processing and administrative costs to the Debtors' estates.

45. I believe that continuation of the Insurance Policies during these Cases is essential to the preservation of the Debtors' businesses, property, and assets. Moreover, in many cases, insurance coverage such as that provided by the Insurance Policies is required by the diverse regulations, laws, and contracts that govern the Debtors' commercial activities.

46. Additionally, the Debtors seek authorization to revise, supplement, or change their Insurance Policies, make required post-petition payments and settlements related thereto, including payments on account of deductibles or self-insured retention, as needed, and enter into new Insurance Policies in the ordinary course of business.

47. In light of the importance of maintaining insurance coverage with respect to the Debtors' business activities, I believe it is in the best interests of the Debtors' estates and all parties-in-interest to maintain the Insurance Policies pursuant to sections 105(a) and 363(b) of the Bankruptcy Code. Failure to pay premiums and related insurance expenses when due may harm the Debtors' estates in several ways. First, the Debtors' insurance companies may refuse to renew the Debtors' Insurance Policies, which will require the Debtors to obtain replacement policies and possibly to reconfigure their risk management program. This, in turn, would require the commitment of significant resources and could result in less favorable coverage or terms from the Debtors' insurers. Second, the Debtors' Insurance Carriers could attempt to terminate the Debtors' existing Insurance Policies, which could create uncertainty as to the Debtors' ability to continue operating their businesses given the myriad regulatory and contractual requirements imposed on the Debtors to maintain specific amounts and types of insurance coverage. Any purported termination of the Debtors' Insurance Policies and any material change in the terms thereof would place additional strain on the Debtors' management and employees, who benefit from the Debtors' insurance coverage.

## **CONCLUSION**

48. In conclusion, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these cases, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Baton Rouge, LA this 11 day of September, 2012.

/s/ Thomas E. Sandeman

THOMAS J. SANDEMAN,

Chief Executive Officer, Piccadilly Restaurants, LLC and Chief Financial Officer of Piccadilly Food Service, LLC

16