|  |  |
|---|---|
| IN RE:<br><br>PICCADILLY RESTAURANTS, LLC,<br>*ET AL.,*<br><br>DEBTORS | * CASE NO. 12-51127<br>*<br>* (JOINT ADMINISTRATION)<br>*<br>* CHAPTER 11<br>*<br>* JUDGE ROBERT SUMMERHAYS |

# DISCLOSURE STATEMENT FOR
# THE JOINT CHAPTER 11 PLAN OF REORGANIZATION
# OF PICCADILLY RESTAURANTS, LLC,
# PICCADILLY FOOD SERVICE, LLC,
# AND PICCADILLY INVESTMENTS, LLC,
# PROPOSED BY THE DEBTORS AND YUCAIPA
# CORPORATE INITIATIVES FUND I, L.P.,
# DATED AS OF JULY 8, 2013

**R. PATRICK VANCE (LA 13008)**
**ELIZABETH J. FUTRELL (LA 05863)**
**MARK A. MINTZ (LA 31878)**
Jones Walker LLP
201 St. Charles Avenue, 51st Floor
New Orleans, LA 70170
Telephone: (504) 582-8000
Email: pvance@joneswalker.com
Email: efutrell@joneswalker.com
Email: mmintz@joneswalker.com

**Attorneys for Piccadilly Restaurants, LLC,**
**Piccadilly Food Service, LLC and**
**Piccadilly Investments, LLC,**
**the Debtors and Debtors-in-Possession**

{N2663303.3}

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

     A.   CHAPTER 11 OF THE BANKRUPTCY CODE .................................. 1
     B.   THE JOINT CHAPTER 11 PLAN OF REORGANIZATION ............................. 1
     C.   THE DISCLOSURE STATEMENT ..................................................... 1
     D.   APPROVAL OF THE DISCLOSURE STATEMENT ......................................... 2
     E.   EXHIBITS TO THE DISCLOSURE STATEMENT .................................. 2
     F.   CONFIRMATION HEARING .................................................................. 2
     G.   VOTING FOR THE JOINT PLAN ......................................................... 2

II.   SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS UNDER THE
     JOINT PLAN ...................................................................................................... 3

     A.   SUMMARY OF CLAIMS AND INTERESTS IN THE PR CLASSES ................ 3
     B.   SUMMARY OF CLAIMS AND INTERESTS IN THE PFS CLASSES ............. 7
     C.   SUMMARY OF CLAIMS AND INTERESTS IN THE PI CLASSES ................ 8
     D.   CLAIMS' OBJECTION AND ESTIMATION PROCESSES ............................. 9

III.   STRUCTURE OF THE DEBTORS, AND DESCRIPTION AND HISTORY OF
     DEBTORS' BUSINESSES ............................................................................... 10

     A.   STRUCTURE OF THE DEBTORS ..................................................... 10
     B.   DESCRIPTION OF THE DEBTORS' BUSINESSES....................................... 11
     C.   EVENTS LEADING UP TO BANKRUPTCY ..................................... 11
     D.   THE PRE-PETITION FINANCING .................................................... 12

IV.   THE BANKRUPTCY CASES ........................................................................... 13

     A.   CERTAIN ADMINISTRATIVE MOTIONS FILED ON THE FIRST
         DAY OR SHORTLY THEREAFTER ................................................... 13
     B.   THE CREDITORS' COMMITTEE ..................................................... 15
     C.   DIP FINANCING FACILITY .............................................................. 15
     D.   OTHER MATTERS RELATED TO THE ADMINISTRATION OF THE
         BANKRUPTCY CASES ..................................................................... 17
     E.   SALES OF REAL ESTATE, PENDING OR CONCLUDED ............................. 21
     F.   RETENTION OF FTI CONSULTING, INC. ......................................... 22

V.    LITIGATION AGAINST THE DEBTORS AND CLAIMS HELD BY THE
     DEBTORS ......................................................................................................... 22

     A.   NON-BANKRUPTCY CLAIMS AGAINST THE DEBTORS .......................... 22
     B.   TAX DISPUTES ................................................................................. 24
     C.   THE DEBTORS' NON-BANKRUPTCY CLAIM, INCLUDING THE BP
         TORT CLAIM .................................................................................... 24
     D.   THE ATALAYA ADVERSARY PROCEEDING............................................. 25

VI.    THE JOINT CHAPTER PLAN OF REORGANIZATION ...............................25

       A.    UNCLASSIFIED ADMINISTRATIVE CLAIMS AND CERTAIN FEES
             AND TAXES ........................................................................................ 25
       B.    TREATMENT OF CLASSIFIED CLAIMS AGAINST PR ....................... 27
       C.    TREATMENT OF CLASSIFIED CLAIMS AGAINST PFS ..................... 31
       D.    TREATMENT OF CLASSIFIED CLAIMS AGAINST PI ........................ 33
       E.    THE YUCAIPA ADVANCE AND PAYMENT OF EFFECTIVE DATE
             PAYMENTS ......................................................................................... 35
       F.    SUBORDINATION OF MANAGEMENT SERVICES FEE CLAIM ............... 35
       G.    INTERMEDIATE HOLDCO ..................................................................... 35
       H.    THE ADMINISTRATOR............................................................................ 35
       I.    DISTRIBUTIONS UNDER THE JOINT PLAN ................................... 36
       J.    TIMING OF DISTRIBUTIONS UNDER THE JOINT PLAN .................. 37
       K.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
             LEASES ............................................................................................... 37
       L.    RE-VESTING OF PROPERTY ON THE EFFECTIVE DATE ........................ 39
       M.    DISCHARGE AND INJUNCTION ................................................. 39

VII.   MISCELLANEOUS PROVISIONS OF THE JOINT PLAN ...........................43

       A.    POST CONFIRMATION CORPORATE GOVERNANCE................................ 43
       B.    ADMINISTRATIVE CONSOLIDATION OF THE DEBTORS FOR
             JOINT PLAN PURPOSES ONLY ........................................................ 44
       C.    STIPULATIONS REGARDING THE AMOUNT AND NATURE OF
             THE CLAIMS ...................................................................................... 44
       D.    RETENTION OF JURISDICTION............................................................ 44
       E.    EXEMPTION FROM TRANSFER TAXES.......................................... 44
       F.    DISSOLUTION OF CREDITORS' COMMITTEE............................................ 44
       G.    PAYMENT OF STATUTORY FEES .................................................... 45
       H.    MODIFICATION OF THE JOINT PLAN ................................................. 45
       I.    REVOCATION OR WITHDRAWAL OF THE JOINT PLAN.......................... 45
       J.    BINDING EFFECT ............................................................................ 45
       K.    GOVERNING LAW................................................................................ 45
       L.    SUBSTANTIAL CONSUMMATION .................................................... 45
       M.    NO INTEREST AFTER THE PETITION DATE UNLESS OTHERWISE
             PROVIDED ......................................................................................... 46

VIII.  CONFIRMATION AND CONSUMMATION PROCEDURE ........................46

       A.    THE CONFIRMATION HEARING ........................................................ 46
       B.    CONFIRMATION.................................................................................... 46
       C.    CONSUMMATION OF THE JOINT PLAN ....................................... 48

IX.    FINANCIAL INFORMATION DURING THE BANKRUPTCY CASES ....................49

X.     CERTAIN RISK FACTORS TO BE CONSIDERED ........................49

A.      CERTAIN BANKRUPTCY CONSIDERATIONS ............................................. 49

B.      RISKS RELATING TO THE BUSINESSES OF THE REORGANIZED DEBTORS AFTER THE EFFECTIVE DATE ................................................... 50

C.      OTHER BUSINESS RISKS ................................................................................ 51

XI.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE JOINT PLAN .................................................................................................52

A.      U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS ........ 53

B.      U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS .......................................................................................................... 53

XII.    VOTING BY HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE .........................................................................................................................55

XIII.   CONCLUSION AND RECOMMENDATION ...................................................56

# I.    INTRODUCTION

## A.    CHAPTER 11 OF THE BANKRUPTCY CODE

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. The commencement of a chapter 11 case creates an estate comprised of all the legal and equitable interests of the debtor as of the date of filing of the bankruptcy petition. The Bankruptcy Code provides that the chapter 11 debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession." Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The principal objective of a chapter 11 case is the confirmation and consummation of a plan of reorganization. A plan sets forth the means for satisfying claims against and equity interests in a debtor. Confirmation of a plan binds, among others, the debtor, any issuer of securities under the Joint Plan, any entity acquiring property under the plan and any creditor or equity interest holder of the debtor. Subject to certain limited exceptions, the order approving confirmation of a chapter 11 plan discharges a debtor from any debt that arose before the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan. Certain holders of allowed claims against and equity interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of a proposed plan, however, section 1125 of the Bankruptcy Code, 11 U.S.C. §1125, requires approval by the bankruptcy court of a disclosure statement containing adequate information of a kind and in sufficient detail to enable a hypothetical reasonable investor to make an informed judgment regarding the plan.

## B.    THE JOINT CHAPTER 11 PLAN OF REORGANIZATION

On July 8, 2013, Piccadilly Restaurants, LLC ("Piccadilly Restaurants" or "PR"), Piccadilly Food Service, LLC ("PFS") and Piccadilly Investments, LLC ("PI"), the debtors and debtors-in-possession herein (collectively, the "Debtors"), and Yucaipa Corporate Initiatives Fund I, L.P. ("Yucaipa"), jointly proposed a Joint Chapter 11 Plan of Reorganization (as the same may be amended, modified, or supplemented the "Plan") for the resolution of the outstanding claims against and equity interests in the Debtors. The Plan includes (a) with respect to Piccadilly Restaurants, LLC ("PR"), the treatment of the claims against and equity interests in PR (the "PR Plan"), (b) with respect to Piccadilly Food Services, LLC ("PFS"), the treatment of the claims against and equity interests in PFS (the "PFS Plan"), and (c) with respect to Piccadilly Investments, LLC ("PI"), the treatment of the claims against and equity interests in PI (the "PI Plan"). The Plan, together with the provisions of the PR Plan, the PFS Plan and the PI Plan, shall be collectively referred to in this Disclosure Statement as the "Joint Plan." *Unless otherwise noted herein, capitalized terms used in this Disclosure Statement have the meaning ascribed to them in the Joint Plan.* The Joint Plan (attached as **Exhibit A**) sets forth the manner in which Claims against and Interests in the Debtors are treated under the Joint Plan.

## C.    THE DISCLOSURE STATEMENT

In compliance with section 1125 of the Bankruptcy Code, the Debtors submit this Disclosure Statement for the Joint Plan (the "Disclosure Statement"). The Disclosure Statement is submitted in connection with (i) the solicitation of acceptances or rejections of the Joint Plan, and (ii) the hearing to consider approval of the Joint Plan (the "Confirmation Hearing") scheduled for _____, 2013. The Disclosure Statement (as amended, modified or supplemented) describes certain aspects of the Joint Plan, the Debtors' businesses and related matters.

## D. APPROVAL OF THE DISCLOSURE STATEMENT

On _____, 2013, after notice and hearing, the Bankruptcy Court approved, among other things, the Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical reasonable investors typical of the Holders of Claims against and Interests in the Debtors to make an informed judgment in voting to accept or reject the Joint Plan (the "Confirmation Procedures Order") (Docket #___). APPROVAL OF THE DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE JOINT PLAN.

## E. EXHIBITS TO THE DISCLOSURE STATEMENT

Attached as exhibits to the Disclosure Statement are the following:

\* The Joint Plan and the Plan Exhibits (**Exhibit A**)

\* The Confirmation Procedures Order (**Exhibit B**)

\* Financial Projections (**Exhibit C**)

\* Liquidation Analysis (**Exhibit D**)

\* Reserved Causes of Action and Reserved Bankruptcy Causes of Action (**Exhibit E**)

The Debtors have approved the information included in the Disclosure Statement, which is derived from the Debtors' books and records.

## F. CONFIRMATION HEARING

Pursuant to section 1128 of the Bankruptcy Code and the Bankruptcy Court's Order, the Confirmation Hearing on the Joint Plan will commence on _____, 2013, at _____ _.m., Prevailing Central Time, before the Honorable Judge Robert Summerhays, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Western District of Louisiana, 214 Jefferson Street, Suite 100, Lafayette, Louisiana 70501-7050 (Docket #___).  Objections, if any, to Confirmation must be served and Filed so that they are received no later than _____, 2013, in the manner described below in Article VIII of the Disclosure Statement.  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court, without further notice, except for announcement of the continuation date made at the Confirmation Hearing.

## G. VOTING FOR THE JOINT PLAN

The Confirmation Procedures Order (**Exhibit B**) sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Joint Plan, and Filing written objections to Confirmation, the record date for voting purposes (the "**Voting Record Date**"), the applicable standards for tabulating Ballots, and the date of the hearing to consider Confirmation of the Joint Plan. In addition, detailed voting instructions accompany each Ballot.  Before voting on the Joint Plan, each Holder of a Claim or Interest that may be entitled to vote should read in its entirety the Disclosure Statement, the Confirmation Procedures Order, including the instructions accompanying the Ballots, and other exhibits attached to the Disclosure Statement. These documents contain, among other things, important information concerning the classification of Claims and Interests, voting and the tabulation of votes.  No solicitation of votes on the Joint Plan may be made except pursuant to this Disclosure Statement and section 1125 of the

Bankruptcy Code. (For a full discussion of the procedures for voting and Confirmation of the Joint Plan, see the attached Confirmation Procedures Order and Article XII of the Disclosure Statement, entitled, "Voting By Holders of Claims Entitled to Vote.")

FOR THE REASONS DISCUSSED HEREIN, THE DEBTORS URGE ALL HOLDERS OF CLAIMS AND INTERESTS IN VOTING CLASSES TO VOTE TO ACCEPT THE JOINT PLAN.  THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR PURPOSES OF SOLICITING VOTES ON THE JOINT PLAN. THE INFORMATION MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE JOINT PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THE DISCLOSURE STATEMENT, REGARDING THE JOINT PLAN OR THE SOLICITATION OF VOTES ON THE JOINT PLAN.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THE JOINT PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE JOINT PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE JOINT PLAN, THE EXHIBITS ATTACHED TO THE JOINT PLAN, AND ANY PLAN SUPPLEMENT DOCUMENTS THAT MAY BE FILED IN THE BANKRUPTCY CASES. THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.

AS TO ANY CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THE DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE.  THE DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE JOINT PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS.

## II.    SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS UNDER THE JOINT PLAN

### A.    SUMMARY OF CLAIMS AND INTERESTS IN THE PR CLASSES

The following table briefly summarizes the classification and treatment of Claims against and Interests in PR. The Debtors believe that the following chart contains a reasonable estimate of the Claims against PR:

| PR CLASS | CLAIMS OR INTERESTS | TREATMENT |
|---|---|---|
| Unclassified | Administrative Claims (Excluding Professional Fee Claims and Administrative Trade Claims) | Each Holder of an Administrative Claim will receive Cash equal to the Allowed amount of such Administrative Claim. <br><br> As of August 27, 2013, the estimated, approximate amount of the Allowed Administrative Claims, excluding the Professional Fee Claims: $-0- (excluding the Yucaipa Expense Claim). |

| PR CLASS | CLAIMS OR INTERESTS | TREATMENT |
|---|---|---|
| | | Percentage recovery: 100%.<br><br>Entitled to vote:  No. Not Classified. |
| Unclassified | Professional Fee Claims | Professionals or other Entities asserting a Professional Fee Claim for services rendered to PR before the Effective Date must File and serve on the Reorganized PR and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other Order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claims within sixty (60) days after the Effective Date; *provided, however*, that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court review or approval, pursuant to the Ordinary Course Professionals Order.<br><br>As of August 27, 2013, the estimated, approximate amount of the Allowed Professional Fee Claims:  $803,000.<br><br>Percentage recovery: 100%. |
| Unclassified | DIP Financing Claim | On the Effective Date, the Allowed DIP Financing Claim will be paid, in full, in Cash, unless otherwise agreed in a written agreement by and among the DIP Agent, the Debtors and Yucaipa.<br><br>As of August 27, 2013, the estimated, approximate amount of the Allowed DIP Financing Claim:  $989,000.<br><br>Percentage recovery:  100%.<br><br>Entitled to vote:  No.  Unimpaired. |
| Unclassified | Priority Tax Claims | Unless otherwise agreed in a written agreement by and among the Holder of a Priority Tax Claim, the applicable Debtor and Yucaipa, in full satisfaction of the Holder's Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will be paid, at the option of the applicable Reorganized Debtor and Yucaipa, (a) Cash in an amount equal to the such Holder's Allowed Priority Tax Claim on the later of the Effective Date or when such Allowed Claim becomes due, or (b) in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code, equal quarterly Cash payments in arrears in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the rate(s) specified in, and accordance with, applicable federal or state law, over a period through the fifth anniversary of the Petition Date, with the first such payment being made on the earlier of the Effective Date or when such Allowed Claim becomes due. No Holder of an Allowed Priority Tax Claim will be entitled to any payments on account of any pre-Effective Date interest accrued on or penalty arising after the Petition Date with respect to or in connection with any Allowed Priority Tax Claim.<br><br>As of August 27, 2013, the estimated, approximate amount of the Allowed Priority Tax Claims:  $237,307.<br><br>Percentage recovery: 100%.<br><br>Entitled to vote:  No.  Unimpaired. |
| PR Class 1 | Other Priority Claims | Unless otherwise agreed in a written agreement by and among the Holder of an Other Priority Claim, PR and Yucaipa, in full satisfaction of the Holder's Other Priority Claim, each Holder of an Other Priority Claim will receive Cash in an amount equal to the Allowed amount of such Holder's Other Priority Claim.<br><br>As of August 27, 2013, the estimated, approximate amount of the Allowed Other Priority Claims in PR Class 1:  in an amount not to exceed $2,438,000.<br><br>Percentage recovery: 100%.<br><br>Entitled to vote:  No. Unimpaired. |

| PR CLASS | CLAIMS OR INTERESTS | TREATMENT |
|----------|---------------------|-----------|
| PR Class 2 | Atalaya Secured Claim | On the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for the Atalaya Secured Claim, the New Atalaya Secured Note will be executed and delivered to Atalaya by the Debtors. The New Atalaya Secured Note will provide for interest, commencing on the Effective Date, at the rate of 4.75% per annum, payable quarterly in Cash. The New Atalaya Secured Note will mature on the fifth anniversary of the Effective Date. The New Atalaya Secured Note shall be secured by the Atalaya Collateral.<br><br>As of September 11, 2012, the estimated, approximate amount of the Allowed Atalaya Secured Claim in PR Class 2: approximately $24,185,000.<br><br>Percentage recovery: 100%.<br><br>Entitled to vote: Yes. Impaired. |
| PR Class 3 | Other Secured Claims | Except as otherwise agreed, in writing, by the Holder of an Other Secured Claim, PR and Yucaipa, on the Effective Date, each Holder of an Allowed Other Secured Claim will be entitled to receive treatment on account of such Allowed Other Secured Claim in the manner set forth in either Option A or B below, at the election of PR and Yucaipa. PR and Yucaipa will be deemed to have elected Option B, except with respect to any Allowed Other Secured Claim as to which PR and Yucaipa elect Option A in a certification Filed within fifteen (15) days before the commencement of the Confirmation Hearing.<br><br>Option A: Each Holder with an Allowed Claim in Option A will receive, in satisfaction of its Allowed Claim, Cash equal to the Allowed amount of such Claim, and will release all Liens on any Collateral in exchange for the receipt of such Cash.<br><br>Option B: Each Holder with an Allowed Claim in Option B will be otherwise Unimpaired within the meaning of section 1123 of the Bankruptcy Code.<br><br>As of August 27, 2013, the estimated, approximate amount of the Allowed Other Secured Claims in PR Class 3: $-0-.<br><br>Percentage recovery: 100%.<br><br>Entitled to vote: No. Unimpaired. |
| PR Class 4 | Convenience Claims | A Convenience Claim is an Allowed General Unsecured Claim or Allowed Litigation Claim that (a) is equal to or less than $2,500, or (b) exceeds $2,500 and the Holder thereof elects, in writing on its Ballot or otherwise in writing before the Confirmation Hearing, to reduce such Claim to $2,500. On the later of the Effective Date and the date on which the Claim is Allowed, each Holder of a Convenience Claim will be entitled to receive Cash equal to 100% of the Allowed amount of such Claim; *provided*, however, the aggregate Allowed amount of Convenience Claims shall not exceed $500,000 (or a higher amount determined by Yucaipa in its sole discretion).<br><br>As of August 27, 2013, the estimated, approximate amount of the Allowed Convenience Claims in PR Class 5: $364,000 to $500,000.<br><br>Percentage recovery: 100%.<br><br>Entitled to vote: Yes. Impaired. |
| PR Class 5 | General Unsecured Claims | Unless otherwise agreed in a written agreement by and among the Holder of an Allowed General Unsecured Claim and the Plan Sponsors, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed General Unsecured Claim, each Holder of a General Unsecured Claim will receive the following:<br><br>*(i) General Unsecured Claim Note*. On the Effective Date, the Reorganized Debtors shall execute the General Unsecured Claim Note, in an amount equal to 100% of the face amount of the Allowed General Unsecured Claims in PR Class 5, PFS Class 4 and PI Class 4. The General Unsecured Claim Note shall bear interest at the fixed per annum rate of |

| PR CLASS | CLAIMS OR INTERESTS | TREATMENT |
|---|---|---|
| | | 9%, until paid in full, and shall mature and become due and payable twenty-four (24) months after the Effective Date. Accrued interest on the General Unsecured Claim Note shall be payable to the Administrator, on behalf of the Allowed General Unsecured Claims in PR Class 5, PFS Class 4 and PI Class 4, on the first Business Day of each quarter after the Effective Date, until repaid in full. On the first Business Day of each quarter after the Effective Date, the Reorganized Debtors shall deposit into the General Unsecured Distribution Account an amount equal to the accrued interest on the Allowed General unsecured Claims in PR Class 5, PFS Class 4 and PI Class 4, which the Administrator shall immediately distribute to the Holders of Allowed General Unsecured Claims (based on such Holders' Pro Rata Share).

(ii) *General Unsecured Claim Effective Date Payment*. On the Effective Date, the Reorganized Debtors shall deposit the General Unsecured Claim Effective Date Payment of $700,000 into the General Unsecured Distribution Account, from which the Administrator shall (a) pay the reasonable and documented expenses of the Administrator in performing its duties (as may be limited by Section 7.3 of the Joint Plan) and (b) thereafter pay to each Holder of an Allowed General Unsecured Claim in PR Class 5, PFS Class 4 and PI Class 4 an amount of Cash that is equal to each such Holder's Pro Rata Share of the balance.

(iii) *Security for the General Unsecured Claim Note*. On the Effective Date, the Reorganized Debtors shall also execute the General Unsecured Claim Note Documents, pursuant to which the General Unsecured Claim Note shall be secured by (a) a first priority Lien on the Intermediate Holdco Equity Interests, (b) a first priority Lien on the BP and Other Tort Claims and the proceeds thereof, to the extent such BP and Other Tort Claims are not encumbered by the Atalaya Secured Claim, as determined by Final Order or by consensual resolution of the Atalaya Adversary Proceeding, (c) Liens on any other property of the Reorganized Debtors that do not serve as Collateral for the New Atalaya Secured Note, and (d) Liens on any property of the Reorganized Debtors that serves as Collateral for the New Atalaya Secured Note, which Liens shall be junior to (1) the Liens that secure the New Atalaya Secured Note, (2) the Liens that secure the Yucaipa Advance, and (3) any Liens that may be granted on the Effective Date to secure the Allowed Merchants 503(b)(9) Claim.

(iv) *Proceeds of the BP Tort Claim*. To the extent the BP Tort Claim and proceeds thereof are not encumbered by the Atalaya Secured Claim, as determined by Final Order or by consensual resolution of the Atalaya Adversary Proceeding, then if the proceeds of the BP Tort Claim are made available to the Reorganized Debtors prior to the full payment of the General Unsecured Claim Note, such proceeds shall be used to prepay the General Unsecured Claim Note.

(v) *Excess Cash Flow Sweep*. Beginning on the first Business Day of each quarter after the Effective Date, in the event that the Reorganized Debtors have unapplied Cash that exceeds the aggregate amount of $1.5 million, the Reorganized Debtors will deposit such excess into the General Unsecured Distribution Account.

(vi) *Maturity of the General Unsecured Claim Note*. Upon the earlier of (a) 24 months after the Effective Date or (b) the accumulation of sufficient funds in the General Unsecured Distribution Account, the Administrator shall make a lump sum payment on account of each Allowed General Unsecured Claim in an amount sufficient to pay the balance due on the General Unsecured Claim Note.

(viii) *Minimum Liquidity Covenant*. The General Unsecured Claim Note shall contain the Minimum Liquidity Covenant; *provided, however,* failure by the Reorganized Debtors to comply with the Minimum Liquidity Covenant shall not confer any default-related rights or remedies upon the Administrator or the Holder of any General Unsecured Claim so long as the Reorganized Debtors are in compliance with their obligations to make payments to the Administrator, on behalf of the Allowed General Unsecured Claim Note, as and when such payments come due pursuant to the Joint Plan. |

| PR CLASS | CLAIMS OR INTERESTS | TREATMENT |
|---|---|---|
|  |  | As of August 27, 2013, the estimated, approximate amount of Allowed General Unsecured Claims in PR Class 5: range from $4.5 to $5.8 million<br><br>Percentage recovery: 100%.<br><br>Entitled to vote: Yes. Impaired. |
| PR Class 6 |  | The Litigation Claims (listed on **Plan Exhibit 1.76**) will not be discharged, and the Joint Plan will not alter the legal, equitable and contractual rights to which such Litigation Claim are entitled under applicable non-bankruptcy law.<br><br>As of August 27, 2013, the Allowed amount of Litigation Claims in PR Class 7: $-0-.<br><br>Estimated percentage recovery: 100%.<br><br>Entitled to vote: No. Unimpaired. |
| PR Class 7 | Interests | PI is the sole Holder of the Interests in PR. On the Effective Date, PI, the sole Holder of the Interests in PR, will transfer those Interests to Intermediate Holdco in exchange for the Intermediate Holdco Equity Interests, as provided in Section 7.2 of the Joint Plan.<br><br>Entitled to vote: Yes. Impaired. |

For a more detailed discussion of the treatment of Claims against and Interests in PR, see Article VI.B of the Disclosure Statement, and Article V of the Joint Plan.

### B. SUMMARY OF CLAIMS AND INTERESTS IN THE PFS CLASSES

The following table briefly summarizes the classification and treatment of Claims against and Interests in PFS. The Debtors believe that the following chart contains a reasonable estimate of the Claims against PFS:

| PFS CLASS | CLAIM OR INTEREST | TREATMENT |
|---|---|---|
| Unclassified | Priority Tax Claims | Unclassified. The unclassified Priority Tax Claims against PFS, if any, will have the same treatment as the unclassified Priority Tax Claims against Piccadilly Restaurants.<br><br>As of August 27, 2013, the estimated amount of the Allowed Priority Tax Claims against PFS: $-0-.<br><br>Percentage recovery: 100%.<br><br>Entitled to vote: No. Unimpaired. |
| PFS Class 1 | Other Priority Claims | Unimpaired. The Other Priority Claims against PFS in PFS Class 1, if any, will have the same treatment as the Other Priority Claims in PR Class 1 (Other Priority Claims against Piccadilly Restaurants).<br><br>As of August 27, 2013, the estimated amount of the Allowed Other Priority Claims in PFS Class 1: $-0-.<br><br>Percentage recovery: 100%.<br><br>Entitled to vote: No. Unimpaired. |
| PFS Class 2 | Atalaya Secured Claim | The Atalaya Secured Claim against PFS in PFS Class 2 will have the same treatment as the Atalaya Secured Claim in PR Class 2 (Atalaya Secured Claim against Piccadilly Restaurants).<br><br>As of September 11, 2012, the estimated amount of Allowed Atalaya Secured Claim in PFS Class 2: Duplicative of PR Class 2. |

| PFS CLASS | CLAIM OR INTEREST | TREATMENT |
|---|---|---|
| | | Percentage recovery: 100%.<br><br>Entitled to vote: Yes. Impaired. |
| PFS Class 3 | Other Secured Claims | Unimpaired. The Other Secured Claims against PFS in PFS Class 3, if any, will have the same treatment as the Other Secured Claims in PR Class 3 (Other Secured Claims against Piccadilly Restaurants).<br><br>As of August 27, 2013, the estimated amount of Allowed Other Secured Claims in PFS Class 3: $-0-.<br><br>Percentage recovery: 100%<br><br>Entitled to vote: No. Unimpaired. |
| PFS Class 4 | General Unsecured Claims | The General Unsecured Claims against PFS, if any, in PFS Class 4, will be treated as if they are Claims against PR, and will receive the same treatment afforded to Claims in PR Class 5 (General Unsecured Claims against PR), under Section 4.5 of the Joint Plan.<br><br>As of August 27, 2013, the estimated amount of Allowed General Unsecured Claims in PFS Claims 4 of the Joint Plan: $-0-.<br><br>Percentage recovery: 100%.<br><br>Entitled to vote: Yes. Impaired. |
| PFS Class 5 | Interests | The Joint Plan will not alter any of the legal, equitable or contractual rights of the Holder of the Interests in PFS.<br><br>Estimated percentage recovery: 100%.<br><br>Entitled to vote: No. Unimpaired. |

For a more detailed discussion of the treatment of Claims against and Interests in PFS, see Article VI.C of the Disclosure Statement, and Article VI of the Joint Plan.

### C.  SUMMARY OF CLAIMS AND INTERESTS IN THE PI CLASSES

The following table briefly summarizes the classification and treatment of Claims against and Interests in PI. The Debtors believe that the following chart contains a reasonable estimate of the Claims against PI:

| PI CLASS | CLAIM OR INTEREST | TREATMENT |
|---|---|---|
| Unclassified | Priority Tax Claims | The unclassified Priority Tax Claims against PI, if any, will have the same treatment as the unclassified Priority Tax Claims against Piccadilly Restaurants.<br><br>As of August 27, 2013, the estimated amount of Allowed Priority Tax Claims: $-0- Percentage recovery: 100%.<br><br>Entitled to vote: No. Unimpaired. |
| PI Class 1 | Other Priority Claims | The Other Priority Claims against PI in PI Class 1, if any, will have the same treatment as the Other Priority Claims in PR Class 1 (Other Priority Claims against Piccadilly Restaurants).<br><br>As of August 27, 2013, the estimated amount of Allowed Other Priority Claims in PI Class 1: $-0-.<br><br>Percentage recovery: 100%. |

| PI CLASS | CLAIM OR INTEREST | TREATMENT |
|---|---|---|
| | | Entitled to vote: No. Unimpaired. |
| PI Class 2 | Atalaya Secured Claim | The Atalaya Secured Claim against PI in PI Class 2 will have the same treatment as the Atalaya Secured Claim in PR Class 2 (Atalaya Secured Claim against Piccadilly Restaurants). |
| | | As of September 11, 2012, estimated amount of Allowed Atalaya Secured Claim in PI Class 2:  Duplicative of PR Class 2. |
| | | Percentage recovery: 100%. |
| | | Entitled to vote:  Yes. Impaired. |
| PI Class 3 | Other Secured Claims | The Other Secured Claims against PI in PI Class 3, if any, will have the same treatment as the Other Secured Claims in PR Class 3 (Other Secured Claims against Piccadilly Restaurants). |
| | | As of August 27, 2013, the estimated amount of Allowed Other Secured Claims in PI Class 3:  $-0-. |
| | | Percentage recovery: 100%. |
| | | Entitled to vote:  No. Unimpaired. |
| PI Class 4 | General Unsecured Claims | The General Unsecured Claims against PI, if any, in PI Class 4, will be treated as if they are Claims against PR, and will receive the same treatment afforded to Claims in PR Class 5 (General Unsecured Claims against PR), under Section 4.5 of the Joint Plan. |
| | | As of August 27, 2013, the estimated amount of Allowed General Unsecured Claims in PI Class 4:  $-0-. |
| | | Percentage recovery: 100%. |
| | | Entitled to vote:  Yes. Impaired. |
| PI Class 6 | Interests | The Joint Plan will not alter any of the legal, equitable or contractual rights of the Holder of the Interests in PI. |
| | | Estimated percentage recovery: 100%. |
| | | Entitled to vote:  No. Unimpaired. |

For a more detailed discussion of the treatment of Claims against and Interests in PI, see Article VI.D of the Disclosure Statement, and Article VI of the Joint Plan.

### D.    CLAIMS' OBJECTION AND ESTIMATION PROCESSES

The deadline to File Proofs of Claim was March 15, 2013 (the "Bar Date") (Docket #477). More than 450 Proofs of Claim were Filed against PR, including more than twenty Proofs of Claim that were Filed after the Bar Date. Those Proofs of Claim assert an aggregate face amount of approximately $46,250,000, including the Proof of Claim Filed by Atalaya in the amount of $28,104,722.20 (POC #398). Only one Proof of Claim remains Filed against PI, which is the Proof of Claim Filed by the DIP Agent in the amount of $28,104,722.20 (POC #2), after an additional Proof of Claim against PI was withdrawn (POC #2-1). Only three (3) Proofs of Claim were Filed against PFS, including the Proof of Claim Filed by Atalaya in the amount of $28,104,722.20 (POC #2). Five (5) Proofs of Claims against PR, aggregating approximately $360,000, have been withdrawn or amended to zero by the Holders of the Claims.

Any Holder of a Claim against any of the Debtors in an Impaired Class who wishes to vote on the Joint Plan must have an Allowed Claim. Either the Debtors or the Holder of a Disputed Claim may seek an Order of the Bankruptcy Court estimating the Allowed amount of the Disputed Claim for voting purposes. A Holder of a Claim that was listed on the Debtors' Schedules and whose Claim was not listed as Disputed, contingent or unliquidated, is considered to have an Allowed Claim in the amount shown on the Schedules (unless such Holder Filed a Proof of Claim, in which case the Proof of Claim will supersede the scheduled Claim if an objection is not Filed). Before the Effective Date, unless otherwise agreed by the Plan Sponsors and the Holder of the Claim, a Claim that is the subject of a properly Filed Proof of Claim will be deemed Allowed in the amount shown in the Proof of Claim.

The Joint Plan permits objections to Claims to be Filed until the Effective Date (or such later date as the Bankruptcy Court may Order). The Debtors reserve the right for themselves, Yucaipa, and any other party in interest, to File objections until the Effective Date. The Debtors are reviewing Proofs of Claim, and are preparing to File objections to various Proofs of Claim. Thus far, the Debtors have pending objections to certain duplicate Proofs of Claim (Docket #897). The Joint Plan also permits (but does not require) the Debtors or Reorganized Debtors, as applicable, before or after the Effective Date, to request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Joint Plan (including for purposes of Distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate Distribution with respect to such Claim.

## III.   STRUCTURE OF THE DEBTORS, AND DESCRIPTION AND HISTORY OF DEBTORS' BUSINESSES

### A.   STRUCTURE OF THE DEBTORS

PR is a Delaware limited liability company, with its headquarters in Baton Rouge, Louisiana. When formed on March 1, 2004, the principal business purpose of PR was to acquire the assets of Piccadilly Cafeterias, Inc., a Louisiana corporation ("PIC"), from a bankruptcy case that was pending in the Bankruptcy Court for the Southern District of Florida, case no. 03-27976, and to operate PIC's business on a day-to-day basis. PR is the only one of the Debtors with any employees. Thomas J. Sandeman ("Sandeman") is PR's Chief Executive Officer. PI, also a Delaware limited liability company, owns 100% of the membership interests in PR, and is the sole managing member of PR. The managing member of PI is Yucaipa Corporate Initiatives Fund I, LLC, a Delaware limited liability company, or its assignee and affiliate, California Management Associates, LLC (the "PI Managing Member"). Yucaipa, a proponent of the Joint Plan, controls the majority of the Interests in PI.

The PI limited liability agreement provides that the PI Managing Member was owed a fee for its services in administering PR in a sum equal to 17.5% basis points (0.00175) of PR gross sales, payable monthly on the 25th day of each month, based on gross sales from the prior month (the "Management Services Fees"). PR has not paid any Management Services Fees to the PI Managing Member since November 16, 2010. The Debtors calculate that, as of the Petition Date, the unpaid Management Services Fees total $452,791.18, as listed on the Schedules. The Management Services Fees that accrued before the Petition Date constitute an Allowed General Unsecured Claim that is treated in PR Class 5, and the Management Services Fees that accrued on and after the Petition Date through the Confirmation Date constitute an Allowed Administrative Claim; *provided, however*, the payment of such Allowed Claims are

subordinated to the payment of Allowed General Unsecured Claims pursuant to Section 7.1(c) of the Joint Plan.

PFS, formed in 2006, is also a Delaware limited liability company. PR owns 100% of the membership interests in PFS. PFS operates as a division of PR. PFS has not and does not conduct business as a separate entity. Sandeman was named as one of two initial managers of PFS in the limited liability agreement for PFS, and he remains a current PFS manager. Sandeman is also the Chief Financial Officer of PFS.

## B.    DESCRIPTION OF THE DEBTORS' BUSINESSES

PR is the largest cafeteria-style restaurant in the United States, with operations in ten (10) states in the Southeast and Mid-Atlantic regions. PR also operates institutional foodservices to schools and other organizations, as well as emergency feedings. PR's predecessors have a history that dates back to 1944. Piccadilly offers quick and friendly service and a wide selection of quality, freshly prepared vegetables, home-style favorites, and regional specialty items at an attractive price point to its customers. The concept is particularly attractive to budget-conscious customers, families and seniors, due in part to its low average guest check (averaging $8.20, for year ended 2012).

The foodservices division, which began in 2005, provides operating and purchasing beverage to several of the Debtors' restaurants. In addition to having forty-four (44) institutional, educational and retail accounts as of June 12, 2013, the Debtors have established emergency foodservice contracts with a number of disaster relief agencies across the Gulf Coast region. The Debtors utilize their restaurant assets to serve smaller and regional accounts that either do not have or do not want to maintain on-site kitchens.

PR currently operates sixty-six (66) restaurants, and PR owns four (4) locations. PR currently employs approximately 3,000 employees.

## C.    EVENTS LEADING UP TO BANKRUPTCY

During the years leading up to the Petition Date, factors beyond the Debtors' control, such as natural disasters, a severe economic recession, and an oil spill, had a significant detrimental impact on the Debtors' sales and profit margin. Specifically, the Debtors' businesses were hit hard by hurricanes, tornadoes, and other natural disasters in the markets in which they operate. Since 2005, fifty-six (56) of the Debtors' restaurants had to close for some period of time due to these natural disasters. In addition, a number of the Debtors' restaurants in the Gulf Coast region were affected by the BP oil spill in 2010.

The severe economic recession that began in 2008 had a substantial downward effect on sales. With overall unemployment rates at historically high levels, discretionary income for customers was severely constrained, especially for seniors who live on a fixed income and who form a large percentage of the restaurants' customer base. This directly correlated with depressed restaurant sales and reduced or eliminated customer traffic. In 2011, PR reported a 3.9% decline in same-store sales year over year. Furthermore, the rising costs of commodities and transportation costs reduced profit margins in 2011, because PR could not pass all of these costs to customers in the economic environment that existed.

Management instituted a number of strategic initiatives to improve sales, including the introduction of a new marketing campaign and new building strategies and revamping the restaurant menu, to reduce costs and offset the high commodity and transportation costs, including price increases, selective in-sourcing of certain supplies, work force reductions, wage freezes, and reductions in other employee benefits. In addition, with respect to leased cafeteria locations, management began an aggressive restructuring effort that involved negotiating more favorable lease terms, where possible, and

assisting owners of certain leased locations in accomplishing consensual sales of properties free of PR's lease obligations. From 2009 through the Petition Date, these efforts resulted in an estimated savings to PR of approximately $2.8 million on an annual basis.

Before the Petition Date, the Debtors also considered other restructuring options, including a possible merger with another nationally known cafeteria chain, while continuing to work with secured lender, Wells Fargo Capital Finance, Inc. (formerly known as Wells Fargo Foothill, Inc.) ("Wells Fargo"), who preceded Atalaya as the Debtors' secured lender (as more fully discussed below). On March 14, 2012, Wells Fargo, as prior agent, sent PR a Notice of Intention to Take Enforcement Action. In that Notice, Wells Fargo warned that it would pursue its rights and remedies under the applicable loan documents if an acceptable forbearance agreement was not reach by the close of business on April 2, 2012. No agreement was reached by that deadline. Instead, seven (7) days later, the Debtors were informed that Wells Fargo assigned its interests to Atalaya.

PR and the PI Managing Member began negotiations with Atalaya in an attempt to reach an agreement on terms for a reasonable forbearance. Those negotiations were unsuccessful. On September 5, 2012, Atalaya commenced a foreclosure action in the 19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana, and sought the appointment of a "keeper" of certain properties located in Jefferson Parish and East Baton Rouge Parish. The Bankruptcy Cases were filed shortly thereafter.

### D.    THE PRE-PETITION FINANCING

Before the Petition Date, the Debtors entered into the Atalaya Loan Documents, including that certain Amended and Restated Loan and Security Agreement, dated as of July 21, 2006, in favor of Wells Fargo, as amended from time to time through that certain Fifth Amendment, dated as of October 15, 2010, by and among PR, as grantor (and others). The Atalaya Collateral includes all of PR's restaurant equipment and inventory, as well as PR's real property located in Florida, Georgia and Louisiana. (For a discussion of PR properties that have sold or that are pending, see "Sales of Real Estate, Pending or Concluded," at Section IV.E of this Disclosure Statement.) In each of the Proofs of Claim that Atalaya Filed against the Debtors (collectively, the "Atalaya Proofs of Claim"), Atalaya states that its Secured Claim is in an amount "**not less than** $28,104,722.20," including Atalaya's calculation of principal and interest as of the Petition Date, together with attorneys' fees and all other expenses chargeable to the Debtors in accordance with the Atalaya Loan Documents, "all documents related thereto, and applicable law, which obligations are secured by Atalaya's collateral." The Creditors' Committee Filed the Atalaya Adversary Proceeding, in which it has challenged whether Atalaya has a properly perfected Lien on a number of the Debtors' assets, including the BP and Other Tort Claims. (See discussion of the Atalaya Adversary Proceeding at Section V.D of this Disclosure Statement.)

Before the Petition Date, Wells Fargo issued a letter of credit that was renewed from time to time (the "L/C") in order to provide financial assurances for PR's obligations related to certain legacy workers' compensation liabilities owed to its former workers' compensation insurer. The current LC is in the principal amount of $2,920,000, and remains undrawn at this time. Atalaya's Proof of Claim includes an alleged liability for the L/C, although Atalaya did not issue the current or any former L/C. Instead, Atalaya has represented that it is now obligated to reimburse Wells Fargo for any draw or other liabilities related to the L/C. In the Atalaya Adversary Proceeding, the Creditors' Committee has alleged that any obligation to Atalaya related to the L/C is not secured by the Debtors' property. In the Joint Plan, the Debtors propose that interest and fees directly related to the L/C be treated as part of the Atalaya Secured Claim. The Debtors ascribe no liability to the L/C principal amount, however, because the L/C is undrawn and, therefore, contingent.

The Debtors' financial consultant, FTI Consulting, Inc. ("FTI"), has reconciled the Revolver and the Term Note (as defined below), based on the information available to FTI. More particularly, the Atalaya Secured Claim includes amounts due under (a) a revolving note (the "Revolver") and (b) a term loan (the "Term Note"). Based on FTI's reconciliation of amounts owed as of the Petition Date, the Debtors believe that Atalaya's Proofs of Claim overstate the amounts that are owed on both the Revolver and the Term Note. The Debtors' books and records reflect that the amounts owed on the Revolver, including principal and interest as of the Petition Date, total approximately $6,280,000. This represents a variance between the Debtors' books and records and Atalaya's Proofs of Claim of approximately $700,000. The Debtors' books and records reflect that the amounts owed on the Term Note, including principal and interest as of the Petition Date, total approximately $17,907,000. This represents a variance between the Debtors' books and records and Atalaya's Proofs of Claim of approximately $195,000. Finally, the Debtors cannot identify the source of the fees listed in Atalaya's Proof of Claim, in the amount of $96,718.68, and, therefore, cannot reconcile those fees as being due Atalaya.

## IV.    THE BANKRUPTCY CASES

On September 11, 2012, the Debtors Filed their voluntary bankruptcy petitions seeking relief under the provisions of chapter 11 of the Bankruptcy Code. The Debtors continue to operate and manage their properties as debtors-in-possession.

### A.    CERTAIN ADMINISTRATIVE MOTIONS FILED ON THE FIRST DAY OR SHORTLY THEREAFTER

On the Petition Date or shortly thereafter, the Debtors Filed motions in the Bankruptcy Court that were designed to minimize any disruptions of their operations and to facilitate their reorganization, as follows:

- **Joint Administration Motion**

On the Petition Date, the Debtors Filed a motion to jointly administer, for procedural purposes, the Bankruptcy Cases of PR, PI, and PFS (Docket #5), which was granted on September 13, 2012 (Docket #43).

- **The Cash Management Motion**

On the Petition Date, the Debtors Filed a *Motion For Order (I) Authorizing Continued Use Of Cash Management System, (II) Authorizing Use of Pre-Petition Bank Accounts and Business Forms, and (III) Waiving Requirements of 11 U.S.C. § 345(b)* (Docket #5), which was granted on September 14, 2012 (Docket #52).

- **The Utility Motion**

On September 12, 2012, the Debtors Filed a *Motion for Interim and Final Orders (1) Prohibiting Utility Companies from Altering, Discontinuing or Disconnection Utility Services, and (2) Establishing Procedures for Adequate Assurance* (the "Utility Motion") (Docket #6). A Final Order was entered granting the Utilities Motion on September 21, 2012 (Docket #109).

- **The Wage and Benefit Motion**

On September 12, 2012, the Debtors Filed a *Motion for Entry of an Order to (A) Pay All Outstanding Pre-Petition Wages, Salaries, Other Accrued Compensation, Expense Reimbursements,*

*Benefits, and Related Amounts; and (B) Continue Specified Benefit Programs in The Ordinary Course of Business* (Docket #7), which was granted on September 14, 2012 (Docket #50).

- **The Customer Programs' Motion**

On September 12, 2012, the Debtors Filed a *Motion for Entry of an Order Authorizing the Debtors to Honor Pre-Petition Obligations to Customers and Otherwise Continue Customer Programs in the Ordinary Course of Business* (Docket #8), which was granted on September 14, 2012 (Docket #49). Pursuant to that Order, the Debtors are authorized to honor certain prepetition customer marking practices in the ordinary course of business, including gift cards, discount programs, vouchers, and various local cafeteria marketing programs, and continue to honor such customer and marketing practices after the Petition Date.

- **The PACA Procedures' Motion**

On September 12, 2012, the Debtors Filed a *Motion for the Entry of an Order Establishing Payment Procedures for Potential PACA Claims and Granting Related Relief* (Docket #9), which was granted on September 21, 2012 (the "PACA Procedures' Order") (Docket #110). Pursuant to the PACA Procedures' Order, the Bankruptcy Court authorized the Debtors to institute certain procedures for processing, reconciling and paying claims asserted under the Perishable Agricultural Commodities Act ("PACA").

All reconciled PACA Claims have been paid by the Debtors pursuant to the PACA Procedures' Order. The Debtors have paid a total of twenty-six (26) different creditors who held valid PACA Claim a total of $512,297.70. Additionally, as reflected on the Debtors' Second PACA Report the Debtors paid certain valid PACA claims with checks that were issued by the Debtors before Petition Date, but were paid from the Debtors' bank account after the Petition Date. The aggregate amount of that portion of the reconciled PACA claim, total $44,902.08. (First PACA Reports, Docket #420 (Exhibit 3 thereto) and Second PACA Report, Docket #645.)

- **The Tax Order**

On September 12, 2012, the Debtors Filed a *Motion to Pay Certain Pre-Petition Taxes and Fees, and Financial Institutions to Process and Cash Related Checks and Transfers* (Docket #11), which was granted on September 14, 2012 (the "Tax Order") (Docket #54). The Tax Order, however, did not include the comprehensive relief sought in the Tax Motion, which expressly included authority to pay (but not the direction to pay) real estate and personal property taxes. Therefore, to grant this additional relief, and at the request of the Debtors, the Bankruptcy Court entered an amended Tax Order on January 31, 2013 (Docket #480).

- **Insurance and Related Practices Motion**

On September 12, 2012, the Debtors Filed a *Motion for Entry of an Order Authorizing the Debtors to Continue Pre-Petition Insurance Coverage and Related Practices* (Docket #11), which was granted on September 14, 2012 (Docket #46).

- **Motion to Limit Notice**

In September 21, 2012, the Debtors Filed a *Motion to Limit Notice* (Docket #106), which was granted on the same day (Docket #108).

- **Fee Order for Estate Professionals**

On September 25, 2012, the Debtors Filed a *Motion for an Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Committee Members* (Docket #139), which was granted on October 22, 2012 (Docket #231) (the "Fee Order"). Pursuant to that Fee Order, the Bankruptcy Court authorized the Debtors to establish an orderly, regular process for the allowance and payment of compensation and reimbursement for attorneys and other Professionals utilized by the Debtors, the Creditors' Committee or paid by the Estates.

- **Debtors' Counsel, Jones Walker and Gordon Arata as Special Counsel**

The Debtors' initial bankruptcy counsel was Gordon, Arata, McCollam, Duplantis & Eagan, LLC ("Gordon Arata") (Application to Employ, Docket #14). On September 19, 2012, Gordon Arata Filed a *Motion to Withdraw as Counsel of Record for Debtors after Email Notice of Termination by Debtors* (Docket #91). On September 21, 2012, the Debtors Filed *an Application to Employ Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L.L.P. as Counsel for Debtors Nunc Pro Tunc to September 19, 2012* (Docket #104). An Interim Order granting that Application was entered on September 21, 2012 (Docket #110), and a Final Order was entered granting that Application on October 24, 2012 (Docket #245). As of September 19, 2012, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L.L.P., now known as Jones Walker LLP, has acted as the Debtors' bankruptcy counsel.

On September 25, 2012, the Debtors Filed an *Application for Order Authorizing the Employment of Gordon, Arata, McCollam, Duplantis & Eagan, LLC and Peter A. Kopfinger as Special Counsel, Nunc Pro Tunc, to the Petition Date, Pursuant to Section 327(e) of the Bankruptcy Code* (Docket #140). An Interim Order granting that Application was entered on September 26, 2012 (Docket #148), and a Final Order was entered granting that Application on October 22, 2012 (Docket #230).

**B.      THE CREDITORS' COMMITTEE**

Pursuant to section 1102 of the Bankruptcy Code, as soon as possible after the commencement of a chapter 11 case, the Office of the U.S. Trustee must appoint an official committee of unsecured creditors. On October 23, 2012, the following members were appointed to the Creditors' Committee: Peter A. Mayer Advertising, Inc.; Crescent Business Machines; The Coca-Cola Company; Chandler's Parts & Service; Andrews Sport Co., Inc.; Calcasieu Mechanical Contractors; and New & Associates. The Creditors' Committee is represented by David B. Kurzweil and Shari L. Heyen of Greenberg Traurig, LLP. On January 8, 2013, the Creditors' Committee Filed an application (Docket #453) to retain, effective November 16, 2012, Protiviti, LLC ("Protiviti"), as a financial consultant to the Creditors' Committee, for a monthly fee of $25,000 for the first two months, and $20,000 a month thereafter. The Bankruptcy Court granted the application (Docket #574), and Protiviti has acted as the financial advisor to the Creditors' Committee since November 2012.

**C.      DIP FINANCING FACILITY**

**1.      Obtaining Court Approval**

On the Petition Date, the Debtors Filed an *Emergency Motion for an Order (I) Authorizing the Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 364(c) and 364(d), (II) Authorizing the Debtors' Use of Case Collateral Pursuant to 11 U.S.C. § 363(c); (III) Granting Adequate Protection Pursuant to 11 U.S.C. § 361; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c)* (Docket #15) (the "DIP Financing and Cash Collateral Motion"), pursuant to which the Debtors would borrow money, on a priming and priority basis, from CB Investments, LLC ("CB Investments"). As

stated in the DIP Financing and Cash Collateral Motion, CB Investments is an affiliate of the PI Managing Member. Atalaya objected to the DIP Financing and Cash Collateral Motion, and offered (acting as a proposed DIP Agent) to provide the post-petition financing, up to $3.0 million, under the same basic terms and conditions as were offered by CB Investments (the "DIP Financing Facility"). On September 18, 2012, the Bankruptcy Court entered an Order (Docket #84) that granted, on an interim basis, the DIP Financing and Cash Collateral Motion, as modified, to provide (among other things) that Atalaya (acting as DIP Agent) would provide the DIP Financing Facility, pursuant to that certain *Stipulation and Order (a) Authorizing Post-Petition Financing, (b) Authorizing Use of Cash Collateral, (c) Granting Superpriority Security Interests and Administrative Claims Pursuant to 11 U.S.C. § 364, (d) Granting Adequate Protection to Pre-Petition Lenders, (e) Granting Limited Relief from the Automatic Stay and (f) Granting Related Relief* (the "Interim DIP Stipulation") (Docket #83).

### 2.      The DIP Financing Final Stipulation

The Court entered a Final Order on December 19, 2012 (the "DIP Financing Final Stipulation") (Docket #418) that finally approved the DIP Financing Facility by Atalaya, as DIP Agent. Under the DIP Financing Final Stipulation, the Debtors may only use cash collateral pursuant to an "Approved DIP Cash Projection," which means 13-week cash flow projections, "in form and substance satisfactory to the DIP Agent in its sole discretion, which set forth the Debtors' projected cash receipts, cash balances, and operating disbursements, payroll disbursements, non-operating disbursements; *provided, however,* if the Creditors' Committee does not approve the cash flow projections, such projections will only become Approved DIP Cash Projections upon further order of the Bankruptcy Court." The DIP Financing Final Stipulation also provides that "[a]s of the last day of each week during the period of the Approved DIP Cash Projections, aggregate cash receipts actually received, calculated on a cumulative basis, will not be less than 75% of cumulative cash receipts projected to be received on or before such date, except as set forth herein and the Final Order; and . . . [a]s of the last day of each week during the period of the Approved DIP Cash Projections, aggregate cash outlays actually made, calculated on a cumulative basis, will not be more than 125% of cumulative cash outlays projected to be received on or before such date." The DIP Financing Final Stipulation terminates on the earlier of the effective date of a plan or September 11, 2013.

### 3.      Borrowings Under the DIP Financing Facility

Shortly after entry of the Interim DIP Stipulation, the Debtors borrowed $500,000 (the minimum draw permitted under the DIP Financing Facility) under the DIP Financing Facility. The first 13-Week "Approved DIP Cash Projections" Filed on December 7, 2012 (Docket #380) projected that the Debtors would borrow an additional $750,000 on January 29, 2012, as well as an additional $750,000 on February 19, 2013. Based on better than anticipated operations, however, the Debtors did not borrow *any* additional funds from the DIP Agent during the first 13-Week "Approved Cash Projections." On February 22, 2013, the Debtors Filed a new "Approved DIP Cash Projections" for the 13-Week period ending May 21, 2013 (the "Second 13-Week Projections") (Docket #504). The Second 13-Week Projections showed that the Debtors would not borrow any money under the DIP Financing Facility for that 13-week period. Consistent with the Second 13-Week Projections, during that period, the Debtors did not borrow any money under the DIP Financing Facility. In fact, the Debtors applied proceeds from the sale of the Debtors' Ocala, Florida property to reduce the outstanding balance of the DIP Financing Facility to $39,000. On May 21, 2013, the Debtors Filed a new "Approved DIP Cash Projections" for the 13-Week period ending August 20, 2013 (the "Third 13-Week Projections") (Docket #826). The Third 13-Week Projections show that the Debtors will borrow approximately $1,850,00 under the DIP Financing Facility for that 13-week period.  As of the Filing of this Disclosure Statement, the balance due on the DIP Financing Facility is $889,000 in principal and $2,000 in accrued interest.  As of August 27, 2013, the Debtors project that the balance due on the DIP Financing Facility will be $989,000.

### D. OTHER MATTERS RELATED TO THE ADMINISTRATION OF THE BANKRUPTCY CASES

#### 1. Employee-Related Matters

The Debtors Filed motions requesting authorization with respect to a variety of employee-related matters, including Wage and Benefit Motion (Docket ##11 and 46) and the Insurance and Related Practices Motion (Docket ##7 and 50).

Before the Petition Date, PR had an incentive plan for certain eligible participants (the "Incentive Plan"), as more fully described in the Debtors' *Motion for Authority, in Accordance with Local Bankruptcy Rule 2016-2, (1) to Pay Incentive Compensation, as Part of the Debtors' Established Pre-Petition Incentive Plan, to Certain Eligible Participants, and (2) to Continue to Pay Base Compensation and Benefits to the same Eligible Participants, Nunc Pro Tunc to the Petition Date* (Docket #481) (the "Incentive Plan Motion"). Under the Incentive Plan, the certain participants are eligible to receive incentive compensation on a semi-annual basis if and only if PR meets certain pre-set EBITDA targets. After the Petition Date, PR's EBITDA target called for a doubling of EBITDA from 2011. Because the actual results exceeded the EBITDA target for the six month period after the Petition Date, the Bankruptcy court granted the Incentive Plan Motion. (Docket #505.) For next six-month period, however, PR failed to meet the EBITDA target and no incentive compensation will be paid under the Incentive Plan for that six-month period.

On March 5, 2013, the Debtors Filed a *Motion for Authority to (1) Assume the Amended and Restated Employment Agreement, as Modified, with Sandeman, Pursuant to Section 365(a) of the Bankruptcy Code, and (2) Pay Incentive Compensation that Has Been Earned Thereunder, Pursuant to Section 365(a) of the Bankruptcy Code and Local Bankruptcy Rule 2016-2* (the "Sandeman Motion") (Docket #524). Pursuant to the Sandeman Motion, the Debtors sought and were granted authority to pay Sandeman, PR's Chief Executive Officer, incentive compensation based on the fact that PR exceeded the same EBITDA target established for the 2012 Incentive Plan. Under the formula established in the employment agreement with Sandeman, Sandeman's incentive compensation for the six month period was $68,750. The Debtors also sought and were granted authority to assume an employment agreement with Sandeman. Sandeman, on the other hand, waived any right to assert an administrative expense claim under section 503 of the Bankruptcy Code for compensation based on the "change of control" provisions contained in Section 3 of the employment agreement, and instead reserved only the right to File an unsecured non-priority Claim based on these provisions of his employment agreement. (Docket #673.) The Sandeman employment agreement expires on February 8, 2014. Under the employment agreement, Sandeman was granted, as part of his overall compensation package, an option to acquire up to 3.5% of the Interests in PI, subject to the terms and conditions of an equity incentive plan. Sandeman has not earned the right to acquire any Interests in PI under the employment agreement, and is not likely to do so before the expiration of his employment agreement.

With the exception of Sandeman, none of the Debtors entered into any retention agreements with any employees, officers or directors before the Petition Date. None of the Debtors have entered into any retention agreements with any employees, officers or directors since the Petition Date. The Plan Sponsors do not have any current intention of entering into any such agreements as part of the consummation of the Joint Plan.

#### 2. Motions To Extend Exclusivity

On November 30, 2013, the Debtors Filed their *Motion for (i) an Increase of the Exclusive Period in which the Debtors May File a Plan in Order to Maintain the Exclusive Period, (ii ) an increase of the*

*Time in which the Debtors Have Been Ordered to File a Plan, and (iii) an Increase of the Period in which the Joint Plan Must Be Accepted in Order to Maintain the Exclusive Period* (Docket #351) (the "First Extension Motion"). The First Extension Motion was granted by Order entered on December 19, 2012 (Docket #417). On March 4, 2013, the Debtors Filed their *Second Motion for (i) an Increase of the Exclusive Period in Which the Debtors May File a Plan in Order to Maintain the Exclusive Period, (ii) an increase of the Time in which the Debtors Have Been Ordered to File a Plan, and (iii) an Increase of the Period in which the Joint Plan Must Be Accepted in Order to Maintain the Exclusive Period* (the "Second Extension Motion") (Docket #526). The Second Extension Motion was granted by Order entered on March 28, 2013 (Docket #683), thereby: (a) extending for ninety (90) days the date by which the Debtors have been ordered to File a plan, or up to and including July 8, 2013; (b) extending for ninety (90) days the exclusive period for the Debtors to File a plan, or up to and including July 8, 2013; and (c) extending for ninety (90) days the time that the Debtors have to gain acceptance of a plan, or up to and including September 9, 2013.

### 3. Merchants Food Service

The Merchants Company d/b/a Merchants Foodservice, and its affiliates ("Merchants"), is the supplier of approximately ninety percent (90%) of the Debtors' food and supplies. On the Petition Date, Merchants operated without a written agreement with the Debtors. After strenuous and protracted negotiations with Merchants, as well as certain of Merchants' competitors, the Debtors reached a very favorable agreement with Merchants. As a result, on December 3, 2012, the Debtors Filed their *Emergency Motion for an Order, Pursuant to Sections 503(b)(9), 363(b), and 105(a) of the Bankruptcy Code, (1) Granting Critical Vendor Status, (2) Authorizing Debtors to Enter Into a Distribution Agreement with the Merchants Company, d/b/a Merchants Foodservice, and its Affiliates, (3) Authorizing the Immediate Cash Payment of a Portion of the Pre-Petition Claim of Merchants, (4) Authorizing the Reapplication of Certain of the Debtors' Post-Petition Payments to Certain Pre-Petition Invoices of the Merchants Company, (5) Allowing Merchants' Section 503(b)(9) Claim and PACA Claims, and (6) Granting Related Relief* (Docket #365), which was granted by Order entered on December 19, 2013 (Docket #412) (the "Merchants' Order"). The Merchants' Order was a major milestone in the Debtors' restructuring efforts. Pursuant to the Merchants' Order, Merchants and the Debtors entered into a distribution agreement that governs the sale and delivery of food and supplies at prices that are generally equal to or lower than the pre-petition prices charged by Merchants to the Debtors, (a) is for a term of two years from the effective date, (b) is terminable by the Debtors on 120-days' notice to Merchants, and (c) gives the Debtors' credit line of up to $1.4 million, pursuant to Section 15.02 of the distribution agreement. Thus, the distribution agreement has provided stability to the Debtors, lower prices for the vast majority of their food and supplies, and provides a substantial line of credit. As of the Effective Date, the outstanding balance on the Merchants' credit line is estimated to be $1.4 million. Pursuant to the Merchants Order, the Bankruptcy Court recognized the Allowed Merchants 503(b)(9) Claim in the amount of $2,323,585. As part of the Joint Plan, the Debtors have been in negotiations with Merchants regarding the treatment of its Allowed Merchants 503(b)(9) Claim, but have not yet reached an agreement regarding an alternative treatment of the Merchants' Allowed 503(b)(9) Claim.

### 4. PR's Cafeteria Leases

Section 365 of the Bankruptcy Code provides generally that a debtor may assume, assume and assign, or reject an executory contract or unexpired lease at any time before the confirmation of a plan of reorganization, but the Bankruptcy Code, on the request of a party in interest, may order the debtor to determine whether to assume or reject a particular executory contract within a specified period of time. As a debtor in possession, the Debtors have the right under section 365 of the Bankruptcy Code, subject to approval of the Bankruptcy Court, to assume, assume and assign, or reject Executory Contracts and Unexpired Leases.

PR is a lessee under numerous nonresidential real property leases for its cafeterias. Since the Petition Date, as part of their ongoing restructuring efforts, PR worked diligently to identify those nonresidential real property leases that are not necessary to its ongoing business operations and beneficial to its estate. To assist in this process, after the Petition Date, on December 6, 2012 (Docket #377), the Debtors obtained Bankruptcy Court authority to engage the services of a real estate advisor, GA Keen & Company (the "Consulting Company"), a company with significant experience in commercial real estate matters, to assist PR in evaluating the real property leases and renegotiating those leases. Among other factors, PR and the Consulting Company considered: (a) the suitability of each leased property to PR's anticipated future business needs; (b) the rent and other material terms of each lease; (c) the market rent for similar properties; and (d) other miscellaneous consideration. As part of the evaluation process, the Debtors and the Consulting Company contacted certain lessors and obtained consensual extensions of the deadline to assume or reject, and continued to engage in negotiations to obtain lease concessions, such as rent reductions, contributions to capital improvements, and in some instances extensions to the terms of the leases.

> a.      The Circus Master Leases Covering 15 Locations

A major opportunity remains to restructure PR's Estate because of its costly master leases with Circus Property I, LLC ("Circus I") and Circus Property II, LLC ("Circus II"). Before the Petition Date, on March 30, 2001, PR entered into that certain Master Lease Agreement ("Circus I Master Lease") with Circus I, through March 31, 2021. Under the terms of Circus I Master Lease, PR currently leases nine (9) different cafeteria properties (collectively, the "Current Circus I Properties") that are located in the states of Louisiana, Alabama, Tennessee, Texas, Virginia and Missouri. PR has been informed that CEF Funding II, L.L.C. (the "Circus Lender") holds first-ranked and properly perfected Liens on the Current Circus I Properties. On July 31, 2001, PR entered into that certain Master Lease ("Circus II Master Lease") (collectively, with Circus II Master Lease, the "Circus Master Leases") with Circus II through August 31, 2021. Under the terms of Circus II Master Lease, PR leases six (6) different cafeteria properties located in the state of Georgia. PR has been informed that the Circus Lender holds first-ranked and properly perfected Liens on the Current Circus II Properties. Pursuant to the applicable loan documents, the Circus Lender receives rents under the Circus Master Leases directly for application to debt service owed by Circus I and Circus II.

Three (3) of the Current Circus I Properties are highly unprofitable cafeteria locations, while the remaining Current Circus I Properties are profitable. Correspondingly, three (3) of the Current Circus II Properties are highly unprofitable cafeteria locations, while the remaining Current Circus II Properties are Profitable. Two locations covered by Circus II Master Lease are so unprofitable that, by letter dated April 30, 2013, Circus II, through its property manager, waived the requirement in the Circus II Master Lease that required PR to maintain business operations at those two locations. In May 2013, the Debtor ceased operations at one of those locations. PR has the option of rejecting one or both of the Circus Master Leases. The obvious drawback to such a rejection is that the profitable cafeterias locations covered by Circus Master Lease I or Circus Master Lease II would be lost in the rejection. For this reason, an exchange of some of the current Circus I Properties for some of the current Circus II Properties would be far more beneficial to PR. In an effort to restructure the Circus Master Leases, PR has been in negotiations with the landlords, Circus I and Circus II (collectively, "Circus"), Circus Lender, and the holders of a remainder fee interests in the properties covered by the Circus Master Leases (collectively, the "Circus Parties"). PR believes that it has reached an agreement in principal with the Circus Parties regarding an exchange of properties (the "Circus Transaction"), as specified by a Master Agreement by and among the Circus Parties and PR (the "Master Agreement"). Closing the Circus Transaction will have substantial and quantifiable benefits for PR and its Estate.

PR is continuing to work with the Circus Parties, with the goal of Filing a *Motion for a Final Order (I) Approving and Authorizing the Debtor's Execution of the Master Agreement Governing the Restructuring of Certain Master Leases with Circus Property I, LLC and Circus Property, II, LLC, (II) Subject to the Conditions Contained therein being Satisfied, Approving and Authorizing the Execution of All Documents Contemplated in the Master Agreement, and the Implementation of the Transactions Contemplated Therein, (III) Subject to and Effective as of the Closing of the Transactions Contemplated in the Master Agreement, Authorizing and Approving the Assumption of the Circus I Master Lease, as Amended, and the Rejection of the Circus II Master Lease, as Amended, and (IV) Granting Related Relief* (the "Circus Motion"). Pursuant to the Circus Motion, PR will seek entry of a Final Order that approves and authorizes the execution of the Master Agreement and delivery of all documents contemplated in the Master Agreement, and the implementation of the transactions contemplated in the Master Agreement. Further, subject to the satisfaction of the conditions contained therein, the Debtors will seek the following additional relief:  (i) subject to and effective as of the closing of the transactions contemplated in the Master Agreement (the "Closing Date"), and without the necessity of any further motion, notice or hearing, the Debtors' will seek the entry of a Final Order that (a) authorizes and approves the assumption of the Circus I Master Lease, as amended, (b) authorizes and approves the rejection of Circus II Master Lease, as amended, and (c) requires PR, within thirty (30) days of the Closing Date, or such other date as the parties may otherwise agree, to pay the appropriate cure amount with respect to the assumption of the Circus I Master Lease, as amended.  On June 26, 2013, Circus I and Circus II each executed a Second Stipulation Extending the Section 365(d)(4) Deadline (Docket ##901 and 902), which Stipulation extends the assumption deadline through and including the earlier of (a) confirmation of any chapter 11 plan, and (b) August 31, 2013, on the terms and conditions set forth therein.  The Bankruptcy Court approved the Stipulations on July 8, 2013 (Docket ## 918 and 919).

### b.    The Assumed Cafeteria Leases

As of the Filing of this Disclosure Statement, the Debtors have Filed six (6) motion to assume Unexpired Leases of nonresidential properties, including its headquarters' lease.  The first such motion was the Debtors' *Motion for an Order, Pursuant to Section 365 of the Bankruptcy Code, Authorizing the Debtors to (1) Assume Certain Unexpired Leases of Nonresidential Real Property, and (2) Satisfy Cure Amounts in Respect Thereof* (Docket #532) (the "First Assumption Motion"). An Order authorizing the assumption of twenty-one (21) cafeteria leases and the Debtors' headquarters lease, and granting the First Assumption Motion, was entered (Docket #684).  The second was the Debtors' *Second Motion for an Order, Pursuant to Section 365 of the Bankruptcy Code, Authorizing the Debtors to (1) Assume Certain Unexpired Leases of Nonresidential Real Property, and (2) Satisfy Cure Amounts in Respect Thereof* (Docket #676) (the "Second Assumption Motion"). An Order authorizing the assumption of six cafeteria leases, as prayed for in the Second Assumption Motion was entered (Docket #677).  The third was the Debtors' *Third Motion for an Order, Pursuant to Section 365 of the Bankruptcy Code, Authorizing the Debtors to (1) Assume Certain Unexpired Leases of Nonresidential Real Property, and (2) Satisfy Cure Amounts in Respect Thereof* (the "Third Assumption Motion") (Docket #733). Orders authorizing the assumption of six (6) additional cafeteria leases, and granting the Third Assumption Motion were entered (Docket ##816 and 817).  The fourth was the Debtors' *Fourth Motion for an Order, Pursuant to Section 365 of the Bankruptcy Code, Authorizing the Debtors to (1) Assume Unexpired Leases of Nonresidential Real Property, and (2) Satisfy Cure Amounts in Respect Thereof* (the "Fourth Assumption Motion") (Docket #803). An Order authorizing the assumption of two (2) additional leases, and granting the Fourth Assumption Motion, was entered (Docket #872). The fifth was the Debtors' *Fifth Motion for an Order, Pursuant to Section 365 of the Bankruptcy Code, Authorizing the Debtors to (1) Assume Unexpired Leases of Nonresidential Real Property, and (2) Satisfy Cure Amounts in Respect Thereof* (the "Fifth Assumption Motion") (Docket #803). The Court entered Orders authorizing the assumption of six (6) additional leases, and granting the Fifth Assumption Motion (Docket ##893, 894 and 895).  The sixth was the Debtors' Sixth *Motion for an Order, Pursuant to Section 365 of the Bankruptcy Code, Authorizing the*

Debtors to (1) Assume Unexpired Leases of Nonresidential Real Property, and (2) Satisfy Cure Amounts in Respect Thereof (the "Sixth Assumption Motion") (Docket #899), seeking the assumption of three (3) Unexpired Leases used for cafeteria operations. A hearing on the Sixth Assumption Motion is scheduled for July 23, 2013.

<div align="center">

*c.*      *Rejected Leases and Closed Cafeterias After the Petition Date*

</div>

Since the Petition Date, PR has rejected a number of leased cafeterias and closed a number of underperforming cafeterias. More particularly, on October 2, 2012 PR Filed its first such motion with respect to nine (9) then open and underperforming cafeterias, when PR Filed its *Motion for an Order Approving the Rejection of Certain Unexpired Leases of Nonresidential Real Property for Certain Closed or Underperforming Cafeterias, and the Rejection of Certain Unexpired Leases of Personal Property, Executory Contracts and One Unexpired Sublease Related to those Closed or Underperforming Cafeterias* (Docket #167). Since then, the Debtors have Filed three additional motions to reject, as follows: (i) the *Motion for an Order Approving the Rejection of an Unexpired Lease of Nonresidential Real Property of an Underperforming Cafeteria* Filed on December 23, 2012 (Docket #438), which was granted by Order entered on January 31, 2013 (Docket #478); (ii) the *Motion for an Order (I) Approving the Rejection of an Unexpired Lease of Nonresidential Real Property of an Underperforming Cafeteria Located in Jacksonville, Florida, and (2) the Rejection of One Executory Contract Related Thereto* Filed on January 30, 2013 (Docket #470), which was granted by Order entered on March 1, 2013 (Docket #513); and (iii) the *Motion for an Order Approving the Rejection of an Unexpired Lease of Nonresidential Real Property of an Underperforming Cafeteria Located in Miami, Florida* Filed on February 28, 2013 (Docket #512), which was granted by Order entered on March 28, 2013 (Docket #681). PR has rejected, therefore, twelve (12) leases of nonresidential real property that were operating cafeterias since the Petition Date. Additionally, PR has closed one additional cafeteria that is leased from Circus under one of the Circus Master Leases, as discussed above.

<div align="center">

*d.*      *The Cafeteria Leases and Cafeterias on or near the Effective Date*

</div>

As of the Effective Date, the Debtors currently intend to assume two (2) additional Unexpired Leases of cafeterias pursuant to Article IX of the Joint Plan, in addition to (i) those Unexpired Leases that are the subject of the Sixth Assumption Motion, and (ii) the Circus II Master, as amended. Based on the previous and contemplated assumptions, on or near the Effective Date, the Debtors anticipate that PR will operate sixty-one (61) cafeterias, four (4) of which PR owns.

**E.**      **SALES OF REAL ESTATE, PENDING OR CONCLUDED**

After the Petition Date, the Debtors continued their efforts to sell three (3) properties that were formerly operated as cafeterias. The Debtors obtained Orders that authorize the sales of these properties to purchasers, each of which were encumbered by first ranked Liens and security interests in favor of Atalaya as of the Petition Date (Docket #378, 513 and 573). Two of these properties are located in Florida, including a property in Ocala, Florida (the "Ocala Property"), and a property in Tamarac, Florida (the "Tamarac Property"). Another is located in Warner Robins, Georgia (the "Warner Robins Property"). To date, only the Ocala Property has sold, and the net proceeds were paid to Atalaya on account of the DIP Financing Facility, as ordered by the Bankruptcy Court. (Docket #378.) The net sale proceeds from the Ocala Property were in the approximate amount of $480,000. The Debtors anticipate that the closing on the Warner Robins Property will occur mid-August 2013, and that the net sale proceeds will be roughly $890,000. If the Tamarac Property sale closes, which is less certain than the sale of the Warner Robins Property, the Debtors anticipate that the closing will occur on or before October 15, 2013, and that the net sale proceeds will be roughly $1.6 million. The Orders approving the sales of the Warner Robins Property and Tamarac Property provide that the net sale proceeds will be distributed to

Atalaya to first reduce any balance due on the DIP Financing Facility and, if no balance is outstanding on the DIP Financing Facility, then to the balance due on the Atalaya Secured Claim (Docket ##378 and 573).

### F.    RETENTION OF FTI CONSULTING, INC.

On January 29, 2013, the Debtors' Filed an *Application for an Order authorizing the Debtors to employ and retain of FTI Consulting, Inc., pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, as Financial Consultants to the Debtors* (the "Original FTI Application") (Docket #469), for a monthly fee of $75,000 in addition to expenses.  Atalaya Filed an objection to the Original FTI Retention Application (Docket #503), as did the Creditors' Committee (Docket #915). The Bankruptcy Court granted the Original FTI Application, but limited the period of the employment to four (4) months from the date of the Order, or until July 5, 2013 (Docket #536). On May 24, 2013, the Debtors Filed an Application to continue and expand the scope of employment and retention of FTI, pursuant to sections 327(a) and 328(a) (Docket #848) (the "Second FTI Application"). In the Second FTI Application, the Debtors seek authority to continue FTI's employment as a financial advisor, and to retain FTI for additional financial consulting services not covered in the Original FTI Application, including:

- Work with the Debtors to develop a long term budget model focusing on, including variance tracking and analysis, preparation of sensitivity analysis;
- Business plan preparation;
- Assist the Debtors with various initiatives and analyses required by the restructuring process including claims identification, reconciliation and analysis, analyses and support for negotiations related to its master lease agreements and other real estate support, executory contract review; and, other restructuring related requirements; and
- Prepare an enterprise valuation of the business and provide testimony (both at deposition, contested matters or trial) thereon as necessary.

In addition to the fixed monthly fee of Seventy-Five Thousand Dollars ($75,000.00) (the "Monthly Fee"), that would continue as provided for the Original Engagement Contract through the expanded term of the engagement, the Debtors propose paying FTI the amount of $330,000, which would be due and payable on the Effective Date (the "Effective Date Payment"); *provided, however,* FTI would not be entitled to the Effective Date Payment in the event that (a) the current DIP Lenders are the sponsor and resulting majority equity holder under a Plan of Reorganization, or (b) there is a successful section 363 sale pursuant to which the DIP Financing Facility and prepetition secured debt is not fully satisfied.  Atalaya Filed an objection to the Second FTI Application (Docket #867). The original hearing on the Second FTI Application was continued to July 9, 2013. The Debtors are attempting to resolve the disputes concerning the retention and compensation of FTI.

## V.    LITIGATION AGAINST THE DEBTORS AND  CLAIMS HELD BY THE DEBTORS

### A.    NON-BANKRUPTCY CLAIMS AGAINST THE DEBTORS

#### 1.    PR's Disputed Workers' Compensation Litigation Claims

PR is the only Debtor with any employees and, therefore, is the only Debtor that carries any workers' compensation insurance coverage. The current workers' compensation policy is based on a "loss retro" premium, with the insurer obligated to cover 100% of the loss, and PR being obligated to reimburse the insurer up to $250,000 per claim. After thirty (30) months, however, the total incurred losses are adjusted by a factor of 1.25. If at the time of the first audit, the total incurred losses times the 1.25

development factor and PR's base premium are less than $1,276,396, PR will be due a refund from the insurer. If the audit is higher, on the other hand, an additional premium will be due to the insurer. The program will be audited annually until all claims are closed. In addition to the premium, there is an annual claim handling surcharge of $64,586. Only one workers' compensation Proof of Claim against PR was Filed under the current workers' compensation program, in the amount of $13,000. Under the Joint Plan, this Proof of Claim is treated as Litigation Claim in PR Class 6 (Litigation Claims) and is Unimpaired.

PR's former workers' compensation program (the "Legacy Workers' Compensation Program") had a $250,000 obligation to the insurer per claim, with (8) workers' compensation claims remaining outstanding as of this date (collectively, the "Legacy Workers' Compensation Claims"). To insure PR's financial obligations with respect to the Legacy Workers' Compensation Program, the insurer required PR to arrange for the issuance of the L/C, in the face amount of $2,920,000. PR estimates that the maximum amount of its liability with respect to the Legacy Workers' Compensation Claims will not exceed $816,000, based on the manner in which the coverage for such Claims functions and the money it has expended for those Disputed Claims. Under the Joint Plan, PR's obligations with respect to the Legacy Workers' Compensation Claims are treated as Litigation Claims in PR Class 6 (Litigation Claims), are listed on **Plan Exhibit 1.76**, and are Unimpaired.

## 2. PR's Disputed General Liability Litigation Claims

The Litigation Claims (listed on **Plan Exhibit 1.76**) are treated in PR Class 6 and are Unimpaired by the Joint Plan. The total amount of the Proofs of Claim Filed against PR that assert Litigation Claims is approximately $7,550,000. In addition to the Proofs of Claim, PR has liability with respect to certain Legacy Workers' Compensation Claims, each of which are listed on Plan Exhibit 1.76. PR Disputes all the Litigation Claims, and intends to vigorously defend each Litigation Claim after the automatic bankruptcy stay is modified. PR has conducted a careful assessment of the Litigation Claims. PR's projections are that its ultimate liability (net of insurance coverage) for the Litigation Claims as and when the those various Litigation Claims are resolved after the Effective Date, should not exceed the aggregate $1.3 million, including (a) the Legacy Workers' Compensation Claims discussed above, and (b) the Disputed employment discrimination Claim discussed below. The foregoing analysis is based on the assessments of PR's VP of Risk Management and VP of Benefits and Human Resources, with the assistance of various outside litigation counsel.

## 3. PR's Disputed Employment Discrimination Litigation Claim

One Disputed employment discrimination Litigation Claim was Filed (POC #202), in the amount of $1,000,000. The Proof of Claim was Filed by Vernon Watson ("Watson"), a *pro se* plaintiff who was terminated from PR's employment in 2009 after he was arrested on PR's premises and incarcerated. During his incarceration, Watson failed to contact PR regarding his inability to return to work in accordance with the PR's written policies. It was Watson's failure to follow PR policy that lead Piccadilly to his termination. Watson filed a charge with the EEOC, claiming that PR terminated his employment because of his race, and in retaliation of a prior EEOC charge that he had filed against PR. The first EEOC charge was amicably resolved through EEOC mediation. Upon receipt of his Notice of Rights from the EEOC, Watson filed suit against PR in the United States District Court for the Western District of Tennessee, again claiming that PR terminated his employment on account of his race and in retaliation of his prior EEOC charge, and in violation of Title VII. PR successfully achieved the stay of this federal suit on the grounds that Mr. Watson had signed a binding arbitration agreement as a condition of his employment with PR.

Since the stay of the federal suit, and until the Bankruptcy Cases were Filed, PR and Watson were engaged in arbitration under the auspices of the American Arbitration Association. In the arbitration, PR filed a Motion for Summary Judgment seeking the dismissal of Watson's race discrimination claim, which was granted. Therefore, at the present time, the only claim remaining is Watson's allegation that PR terminated his employment in retaliation of his prior EEOC charge.

## B.    TAX DISPUTES

PR has two sales tax disputes pending at this time. The dispute with the Florida Department of Revenue (POC #244-1) relates to a Proof of Claim Filed in the approximate amount of $69,600 for the alleged underpayment of sales and use taxes, based on a field audit. PR is in the process of appealing the audit, and disputes the claim.  The Georgia Department of Revenue Filed a Proof of Claim (POC #221-1) that totals approximately $357,000 for sales and use taxes, interest and penalties. PR also disputes that Proof of Claim (the "Georgia Tax Dispute").  An audit is currently being conducting with respect to the Georgia Tax Dispute. At the conclusion of that audit, PR anticipates that the Georgia Department of Revenue will find that PR owes no more than $30,000 in sales and use taxes. Finally, the Internal Revenue Service Filed various Proofs of Claim. The most recent Proof of Claim, however, reflects that the Debtors owe nothing to the IRS (POC #115-1).

## C.    THE DEBTORS' NON-BANKRUPTCY CLAIM, INCLUDING THE BP TORT CLAIM

The only significant Cause of Action that is owned by the Debtors is the BP Tort Claims arising out of the 2010 Deepwater Horizon explosion and oil spill in the Gulf of Mexico. The ensuing discharge remained uncontained for approximately four months. The resulting spill contaminated the Gulf and a large part of the shore lines from Texas to Florida. There have been several forms of legal action taken against the drilling company and their consolidated parent, BP. A fund and claims process was established to determine adequate compensation for the loss of business suffered by all coastal communities.  Using the established guidelines, seven cafeterias operated by PR qualified for a loss of business claim.  The accounting firm of Dempsey Partners was retained in the July of 2012 to finalize a claim.  The claim administrator, Deep Water Horizon Settlements, has been reviewing the submission. The final series of requested documentation was submitted in April 2013, and the claim is currently "under review." The gross amount of the BP Tort Claim asserted by the Debtors is approximately $2 million.

The Joint Plan provides that the BP Tort Claim will be pledged to secure the General Unsecured Claim Note, to the extent it is not encumbered by the Atalaya Secured Claim, as determined by the Bankruptcy Court or by consensual resolution of the Atalaya Adversary Proceeding. Atalaya's Proofs of Claim allege that the Atalaya Secured Claim is secured by Liens on "substantially all of the Debtors' assets," although  Atalaya provided no itemization of those assets or Liens. In Count I of the Atalaya Adversary Proceeding, the Creditors' Committee has alleged that Atalaya does not have a perfected security interest in the Debtors' commercial tort claims, because those tort claims, including the BP Tort Claim, are not described with particularity. (See discussion of the Atalaya Adversary Proceeding below.)

PR is the plaintiff in litigation in the Twenty-First Judicial Court District, Parish of Livingston, State of Louisiana,  against Regions Community Behavioral  Health Center, Inc. and its affiliates for failure to pay for goods and services. The amounts involved in the suit are approximately $70,000 to $75,000, plus interest, attorney fees and costs of the proceedings.

Pursuant to Section 7.5 of the Joint Plan, except as otherwise provided in the Joint Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Joint

Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain and may enforce any claims, demands, rights and Causes of Action that the Debtors or Estates may hold, to the extent not expressly released under the Joint Plan. The Reorganized Debtors may pursue such retained claims, demands, rights or Causes of Action and Bankruptcy Causes, as appropriate, in accordance with the best interests of the Reorganized Debtors. Further, the Reorganized Debtors retain their rights to File and pursue any adversary proceedings against any creditor or vendor related to debit balances or deposits owed to the Debtors. On and after the Effective Date, all Causes of Action will be retained by and re-vest in the Reorganized Debtors; *provided, however,* as of the Effective Date, the Reorganized Debtors shall be deemed to have waived and released any and all Bankruptcy Causes of Action against the Holders of any Allowed General Unsecured Claim. Attached as **Exhibit E** is a list of the Reserved Causes of Action and the Reserved Bankruptcy Causes of Action.

### D.  THE ATALAYA ADVERSARY PROCEEDING

On March 19, 2013, the Creditors' Committee Filed the Atalaya Adversary Proceeding, bearing docket no. 12-51127 on the Docket of the Bankruptcy Court. In the Complaint to Determine Extent, Validity and Priority of Liens and Security Interests Asserted by Atalaya Administrative LLC, the Creditors' Committee alleges the following causes of action:  (i) Count I, that Atalaya does not have a perfected security interest in the Debtors' commercial tort claims, because they were not described with particularity; (ii) Count II, that Atalaya does not have a perfected security interest in the Debtors' insurance policy because such policies prohibit assignment absent consent of the insurer; (iii) Count III, that the liens and security interests in the Debtors' deposit accounts were invalid and/or unperfected as of the Petition Date; (iv) Count IV, that any obligation due under the L/C is not secured by the Debtors' property; and (v) Count V, for an accounting and a determination of the amount of Atalaya's Secured Claim. Atalaya's Answer to the Complaint denies all substantive allegations. No discovery has been conducted in the Atalaya Adversary Proceeding, and no substantive motions have been Filed.

## VI.  THE JOINT CHAPTER PLAN OF REORGANIZATION

The Joint Plan classifies Claims and Interests separately and provides different treatment for different Classes of Claims and Interests in accordance with the provisions of the Bankruptcy Code. As described more fully below, the Joint Plan provides, separately for each Class, that Holders of certain Claims and Interests will retain or receive various amounts and types of consideration, thereby giving effect to the different rights of Holders of Claims and Interests in each Class. The Joint Plan provides that the Administrator, the Reorganized Debtors, or an Entity designated by the Reorganized Debtors, will act as the Disbursing Agent.  At this time, PR intends to act as the Disbursing Agent, except that the Administrator shall act as the Disbursing Agent as to the Holders of Allowed General Unsecured Claims, as provided in Sections 4.5 and 7.3 of the Joint Plan.

### A.  UNCLASSIFIED ADMINISTRATIVE CLAIMS AND CERTAIN FEES AND TAXES

#### 1.  Administrative Claims

Administrative Claims are Claims for costs or expenses of administration of the Bankruptcy Cases Allowed under sections 503(b), 507(a)(1) or 1114(e)(2) of the Bankruptcy Code. Such Claims include the actual and necessary costs and expenses of preserving the Estates incurred after the Petition Date, as well as the Yucaipa Expense Claim pursuant to Section 3.1 of the Joint Plan. Except as otherwise provided in the Joint Plan, or unless agreed in a written agreement by and among the Holder of an Administrative Claim, PR and Yucaipa, each Holder of an Allowed Administrative Claim will receive from the PR, in full satisfaction of its Administrative Claim, Cash equal to the Allowed amount of such

Administrative Claim either (a) on the Effective Date or as soon thereafter as practicable, or (b) if the Administrative Claim is not Allowed on or before the Effective Date, within thirty (30) days after the date on which (i) an Order that Allows such Administrative Claim becomes a Final Order, or (ii) a Stipulation of Amount and Nature of Claim is executed. Pursuant to Sections 3.1(d) and 3.2(b)(iv) of the Joint Plan, the Yucaipa Expense Claim will be Allowed on the Effective Date, without the necessity of Filing any Claim under Section 3.2 of the Joint Plan or any other application or motion. On the Effective Date, Yucaipa will receive Cash from the Reorganized Debtors in an amount equal to the Allowed amount of the Yucaipa Expense Claim.

## 2. Professional Fee Claims

Pursuant to Section 3.2(b)(i) of the Joint Plan, the Debtors will pay Professional Fee Claims for the compensation of professionals and reimbursement of expenses incurred by such professionals, the Creditors' Committee and members of the Creditors' Committee pursuant to sections 330(a), 503(b)(2), 503(b)(3), 504(b)(4), and 503(b)(5) of the Bankruptcy Code. All payments to Professionals for Professional Fee Claims be made in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court relating to the payment of interim and final compensation for services rendered and reimbursement of expenses. The Bankruptcy Court will review and determine all applications for compensation for services rendered and reimbursement of expenses. Section 3.2(b) provides that Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other Order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claims within sixty (60) days after the Effective Date; *provided, however*, that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court review or approval, pursuant to the Ordinary Course Professionals Order.

## 3. Ordinary Course Liabilities

As provided in Section 3.1(b) of the Joint Plan, Allowed Administrative Claims based on liabilities incurred by the Debtors, in the ordinary course of business (including Administrative Trade Claims, Administrative Claims of governmental units for Taxes, including Allowed Administrative Claims arising from those contracts and leases of the kind described in Section 9.5 of the Joint Plan, other than Cure Amount Claims) may be paid by the Reorganized Debtors, in the discretion of the Debtors or Reorganized Debtors (as applicable) pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, and Allowed Cure Amount Claims will be paid in accordance with Section 9.2 of the Joint Plan, in each case without any further action by the Holders of such Administrative Claims. Holders of Administrative Claims based on liabilities incurred by any one of the Debtors in the ordinary course of their businesses that are paid by the Debtors or the Reorganized Debtors (as applicable) pursuant to Section 3.1(b) of the Joint Plan will not be required to File or serve any request for payment of such Administrative Claims.

## 4. The DIP Financing Claim

Pursuant to Sections 3.1(c) and 3.2(b)(iii) of the Joint Plan, the DIP Financing Claim will be paid in full in Cash in full satisfaction, settlement, release, and discharge of the DIP Financing Claim, without any further action by the DIP Agent. As provided in Section 3.1(c) and 3.2(b)(iii) of the Joint Plan, unless Disputed by the Debtors, the Allowed amount of the DIP Financing Claim as of the Effective Date will be the amount reflected in a writing to be provided by the DIP Lender to the Debtors no later than two (2)

Business Days after receiving the Debtors' notice of proposed Effective Date. Thereafter, if the DIP Lender fails to provide such a writing to the Debtors within the two (2) Business Day period, the Allowed amount of the DIP Financing Claim shall be the amount reflected on the Debtors' books and records. The Bankruptcy Court will resolve any Dispute regarding the amount of the DIP Financing Claim; *provided, however*, that if the DIP Lender Disputes the amount of the Distribution it receives on account of the DIP Financing Claim where the Distribution is based on the Debtors' books and records, the DIP Lender must File a pleading with the Bankruptcy Court to preserve such Dispute within three (3) Business Days of receipt of such payment, unless a written extension of time is granted by the Debtors or Reorganized Debtors.

### 5.    Priority Tax Claims

The Debtors estimate the Allowed Priority Tax Claim are as follows:  $237,307 against PR; $-0- against PFS; and $-0- against PI.  Section 3.3 of the Joint Plan provides that, unless otherwise agreed in a written agreement by and among the Holder of a Priority Tax Claim, the applicable Debtor and Yucaipa, in full satisfaction of the Holder's  Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will be paid, at the option of the applicable Reorganized Debtor and Yucaipa, (a) Cash in an amount equal to the such Holder's Allowed Priority Tax Claim on the later of the Effective Date or when such Allowed Claim becomes due, or (b) in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code, equal quarterly cash payments in arrears in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the rate(s) specified in, and accordance with, applicable federal or state law, over a period through the fifth anniversary of the Petition Date, with the first such payment being made on the earlier of the Effective Date or when such Allowed Claim becomes due. No Holder of an Allowed Priority Tax Claim will be entitled to any payments on account of any pre-Effective Date interest accrued on or penalty arising after the Petition Date with respect to or in connection with any Allowed Priority Tax Claim.

### B.    TREATMENT OF CLASSIFIED CLAIMS AGAINST PR

### 1.    PR Class 1 – Other Priority Claims

PR Class 1 consists of the Other Priority Claims against PR. PR estimates that the Allowed Other Priority Claims total $2,438,000, including the Allowed Merchants Section 503(b)(9) Claim in the amount of $2,323,585.  Under the treatment proposed in Section 4.1 of the Joint Plan, unless otherwise agreed in a written document by and among the Holder of an Other Priority Claim, PR and Yucaipa, in full satisfaction of the Holder's Other Priority Claim, each Holder of an Other Priority Claim (PR Class 1) will receive Cash in an amount equal to the Allowed amount of such Holder's Other Priority Claim. If the Holder's Other Priority Claim is Allowed on or before the Effective Date, the Disbursing Agent will make the Distribution to such Holder within fifteen (15) days of the Effective Date. If, however, the Holder's PR Class 1 Claim is not Allowed on or before the Effective Date, the Disbursing Agent will make the Distribution to such Holder within fifteen (15) days after the earlier of the date on which (a) an Order allowing the Other Priority Claim becomes a Final Order, or (b) such Holder and PR or Reorganized PR execute a Stipulation Regarding the Amount and Nature of the Claim.

Under the treatment proposed in Section 4.1 of the Joint Plan, the Other Priority Claims in PR Class 1 are Unimpaired. Therefore, the Plan Sponsors will not solicit acceptances of Joint Plan from Holders of Other Priority Claims in PR Class 1.

### 2. PR Class 2 – Atalaya Secured Claim

PR Class 2 consists of the Atalaya Secured Claim against PR. On the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for the Atalaya Secured Claim, the New Atalaya Secured Note will be executed and delivered to Atalaya by the Debtors (**Plan Exhibit 1.80**). The New Atalaya Secured Note will provide for interest, commencing on the Effective Date, at the rate of 4.75% per annum, payable quarterly in Cash. The New Atalaya Secured Note shall be secured by the Atalaya Collateral. Under the treatment proposed in Section 4.2 of the Joint Plan, Atalaya Secured Claim is Impaired. Therefore, the Plan Sponsors will solicit acceptances of the Joint Plan from the Holders of the Atalaya Secured Claim in PR Class 2.

### 3. PR Class 3 – Other Secured Claims

PR Class 3 consists of the Other Secured Claims against PR, which are treated at Section 4.3 of the Joint Plan. PR has not identified any Holders of Other Secured Claims in PR Class 3 and, therefore, estimates that the Allowed Other Secured Claims in PR Class 3 are $-0-. Under the treatment proposed under Section 4.3, except as otherwise agreed, in writing, by the Holder of an Other Secured Claim in PR Class 3, PR and Yucaipa, on the Effective Date, each Holder of an Allowed Other Secured Claim in PR Class 3 will be entitled to receive treatment on account of such Allowed Other Secured Claim in the manner set forth in either Option A or B below, at the election of PR and Yucaipa. PR and Yucaipa will be deemed to have elected Option B, except with respect to any Allowed Other Secured Claim as to which they elect Option A in a certification Filed within fifteen (15) days before the commencement of the Confirmation Hearing.

Option A: Each Holder with an Allowed Claim in Option A will receive, in satisfaction of its Allowed Claim, Cash equal to the Allowed amount of such Claim, and will release all Liens on any Collateral in exchange the receipt of such Cash.

Option B: Each Holder with an Allowed Claim in Option B will be otherwise Unimpaired within the meaning of section 1123 of the Bankruptcy Code.

If the Holder's Other Secured Claim is not Allowed on or before the Effective Date, the Disbursing Agent will make the Distribution to such Holder within fifteen (15) days after the earlier of the date on which (a) an Order allowing the Other Secured Claim becomes a Final Order, or (b) a Stipulation Regarding the Amount and Nature of the Claim is executed.

Under the treatment proposed in Section 4.3 of the Joint Plan, the Other Secured Claims in PR Class 3 are Unimpaired. Therefore, the Plan Sponsors will not solicit acceptances of the Joint Plan from Holders of Other Secured Claims in PR Class 3.

### 4. PR Class 4 – Convenience Claims

PR Class 4 consists of the Convenience Claims against PR. PR estimates that the PR Class 4 Claims total approximately $363,971 to $500,000. Under the treatment proposed in Section 4.4 of the Joint Plan, on the later of the Effective Date and the date on which the Claim is Allowed, each Holder of an Allowed Claim in PR Class 5 will be entitled to receive Cash equal to 100% of the Allowed Amount of such Claim.

The Debtors estimate that there are a total of 661 Holders of Allowed Claims that are equal to or less than $2,500, which represents 52.5% percent of the total number of General Unsecured Claims against PR. Section 4.4 of the Joint Plan provides that Holders may elect, in writing on their Ballot or

otherwise in writing before the Confirmation Hearing, to be treated as a Convenience Claim; *provided, however*, the aggregate Allowed amount of Convenience Claims shall not exceed $500,000 (or a higher amount determined by Yucaipa in its sole discretion).

Under the treatment proposed in Section 4.4 of the Joint Plan, the Convenience Claims in PR Class 4 are Impaired. Therefore, the Plan Sponsors will solicit acceptances of the Joint Plan from Holders of Convenience Claims in PR Class 4.

### 5. PR Class 5 - General Unsecured Claims

PR Class 5 consists of General Unsecured Claims against PR. PR estimates that the Allowed General Unsecured Claims in PR Class 5 range from $4.5 to $5.8 million.

Pursuant to Sections 4.5 and 7.3 of the Joint Plan, an Administrator shall be shall be responsible for (a) collecting and disbursing Cash from the General Unsecured Distribution Account strictly in accordance with the Joint Plan, (b) holding Liens that secure the General Unsecured Claim Note, and (c) enforcing rights and remedies of the Holders of General Unsecured Claims under the Joint Plan. The Administrator will have the authority to retain professionals, as provided in Section 7.3(g) of the Joint Plan. Furthermore, pursuant to Section 7.3(f) of the Joint Plan, from and after the Effective Date until the full payment of the General Unsecured Claim Note, the Administrator shall receive $10,000 per quarter as compensation for the Administrator's services, including, but not limited to, service on the Board of Directors of Reorganized PR, as provided in Section 7.5(b) of the Joint Plan.

Section 4.5 of the Joint Plan also provides that, unless otherwise agreed in a written agreement by and among the Holder of an Allowed General Unsecured Claim and the Plan Sponsors, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed General Unsecured Claim, each Holder of a General Unsecured Claim will receive the following (subject to Section 13.2 of the Joint Plan):

(i) *General Unsecured Claim Note*. On the Effective Date, the Reorganized Debtors shall execute the General Unsecured Claim Note (**Plan Exhibit 1.65**), in an amount equal to 100% of the face amount of the Allowed General Unsecured Claims in PR Class 5, PFS Class 4 and PI Class 4. The General Unsecured Claim Note shall bear interest at the fixed per annum rate of nine percent (9%), until paid in full, and shall mature and become due and payable twenty-four (24) months after the Effective Date. Accrued interest on the General Unsecured Claim Note shall be payable to the Administrator, on behalf of the Allowed General Unsecured Claims in PR Class 5, PFS Class 4 and PI Class 4, on the first Business Day of each quarter after the Effective Date, until repaid in full. On the first Business Day of each quarter after the Effective Date, the Reorganized Debtors shall deposit into the General Unsecured Distribution Account an amount equal to the accrued interest on the Allowed General unsecured Claims in PR Class 5, PFS Class 4 and PI Class 4, which the Administrator shall immediately distribute to the Holders of Allowed General Unsecured Claims (based on such Holder's Pro Rata Share).

(ii) *General Unsecured Claim Effective Date Payment.* On the Effective Date, the Reorganized Debtors shall deposit the General Unsecured Claim Effective Date Payment of $700,000 into the General Unsecured Distribution Account, from which the Administrator shall (a) pay the reasonable and documented expenses of the Administrator in performing its duties (as may be limited by Section 7.3 of the Joint Plan) and (b) thereafter pay to each Holder of an Allowed General Unsecured Claim in PR Class 5, PFS Class 4 and PI Class 4 an amount of Cash that is equal to each such Holder's Pro Rata Share of the balance.

(iii) *Security for the General Unsecured Claim Note*. On the Effective Date, the Reorganized Debtors shall also execute the General Unsecured Claim Note Documents (**Plan Exhibit 1.66**), pursuant to which the General Unsecured Claim Note shall be secured by (a) a first priority Lien on the Intermediate Holdco Equity Interests, (b) a first priority Lien on the BP and Other Tort Claims and the proceeds thereof, to the extent such BP and Other Tort Claims are not encumbered by the Atalaya Secured Claim, as determined by Final Order or by consensual resolution of the Atalaya Adversary Proceeding, (c) Liens on any other property of the Reorganized Debtors that do not serve as Collateral for the New Atalaya Secured Note, and (d) Liens on any property of the Reorganized Debtors that serves as Collateral for the New Atalaya Secured Note, which Liens shall be junior to (1) the Liens that secure the New Atalaya Secured Note, (2) the Liens that secure the Yucaipa Advance, and (3) any Liens that may be granted on the Effective Date to secure the Allowed Merchants 503(b)(9) Claim.

(iv) *Proceeds of the BP Tort Claim*. To the extent the BP Tort Claim and proceeds thereof are not encumbered by the Atalaya Secured Claim, as determined by Final Order or by consensual resolution of the Atalaya Adversary Proceeding, then: (a) if the proceeds of the BP Tort Claim are made available to the Reorganized Debtors prior to the full payment of the General Unsecured Claim Note, such proceeds shall be used to prepay the General Unsecured Claim Note; and (b) to effect the foregoing, upon receipt of any of the BP Tort Claim proceeds, the Reorganized Debtors shall immediately deposit the same in the General Unsecured Distribution Account.

(v) *Excess Cash Flow Sweep*. Beginning on the first Business Day of each quarter after the Effective Date, in the event that the Reorganized Debtors have unapplied Cash that exceeds the aggregate amount of $1.5 million, as provided in the General Unsecured Claim Note Documents, the Reorganized Debtors will deposit such excess into the General Unsecured Distribution Account.

(vi) *Maturity of the General Unsecured Claim Note*. Upon the earlier of (A) twenty-four (24) months after the Effective Date or (B) the accumulation of sufficient funds in the General Unsecured Distribution Account, the Administrator shall make a lump sum payment on account of each Allowed General Unsecured Claim in an amount sufficient to pay the balance due on the General Unsecured Claim Note. Any funds remaining in the General Unsecured Distribution Account after payment of Allowed General Unsecured Claims in full shall be immediately returned to Reorganized PR.

(vii) *No Prepayments*. Until such time as the General Unsecured Claim Note is fully paid, the Reorganized Debtors shall not make any prepayment on account of any of the New Atalaya Secured Note, any other secured debt, or the Yucaipa Advance; *provided, however*, the Reorganized Debtors shall have the right to refinance the New Atalaya Secured Note on terms equal to or better than (from the perspective of the Reorganized Debtors) the terms of the New Atalaya Secured Note.

(viii) *Minimum Liquidity Covenant*. The General Unsecured Claim Note shall contain the Minimum Liquidity Covenant; *provided, however,* failure by the Reorganized Debtors to comply with the Minimum Liquidity Covenant shall not confer any default-related rights or remedies upon the Administrator or the Holder of any General Unsecured Claim so long as the Reorganized Debtors are in compliance with their obligations to make payments to the Administrator, on behalf of the Allowed General Unsecured Claims as and when such payments come due pursuant to the Joint Plan. For the avoidance of any doubt, the Minimum Liquidity Covenant shall not impose any obligation on Yucaipa to cause the Reorganized Debtors to maintain a minimum liquidity.

(ix)  *Debtors' Satisfaction of Obligations.*  The Reorganized Debtors' obligations to make payments to the Holders of Allowed General Unsecured Claims hereunder shall be satisfied upon the Reorganized Debtors' transfer of Cash into the General Unsecured Distribution Account, without regard to whether such Holders actually receive such Cash.

(x)  Fund on deposit in the General Unsecured Distribution Account shall be available only as set forth in this Section 4.5(b) of the Joint Plan and shall not be available for Distribution to the Holders of any other Claims or Interests, including but not limited to the Holders of Litigation Claims and Convenience Claims.

(xi)  If a Holder's General Unsecured Claim is not Allowed on or before the Effective Date, the Administrator will make the Distribution to such Holder within fifteen (15) days after the earlier of the date on which (a) an Order allowing the General Unsecured Claim becomes a Final Order, or (b) a Stipulation Regarding the Amount and Nature of the Claim is executed, to the extent there is available Cash in the General Unsecured Claim Distribution Account.

Under the treatment proposed in Section 4.5 of the Joint Plan, the General Unsecured Claims in PR Class 5 are Impaired. Therefore, the Plan Sponsors will solicit acceptances of the Joint Plan from the Holders of General Unsecured Claims in PR Class 5.

### 6. PR Class 6 – Litigation Claims

PR Class 6 consists of the Litigation Claims (listed at **Plan Exhibit 1.76**). PR estimates the PR Class 6 Litigation Claims are $-0- as of August 27, 2013, because each Claim in this Class is Disputed. Under the treatment proposed in Section 4.6 of the Joint Plan, no PR Class 6 Litigation Claim is discharged by the Confirmation of the Joint Plan. Further, the Joint Plan leaves unaltered any legal, equitable and contractual rights to which the Holders of such Claims may be entitled under applicable non-bankruptcy law. Under the treatment proposed in Section 4.6 of the Joint Plan, the Litigation Claims are Unimpaired. Therefore, the Plan Sponsors will not solicit acceptances of the Joint Plan from the Holders of Litigation Claims in PR Class 6.

### 7. PR Class 7 – Interests

PR Class 7 consists of the Interests in PR. Under the treatment proposed in Section 4.7 of the Joint Plan, on the Effective Date, PI, the sole Holder of Interests in PR, will transfer those Interests to Intermediate Holdco in exchange for the Intermediate Holdco Equity Interests, as provided in Section 7.2 of the Joint Plan. Under the treatment proposed in Section 4.7 of the Joint Plan, the Interests in PR Class 7 are Impaired. The Holder in PR Class 7 is entitled to vote on the Joint Plan with respect to the PR Class 7 Interests. Therefore, the Plan Sponsors will solicit acceptances of the Joint Plan from the Holder of Interests in PR Class 7.

### C. TREATMENT OF CLASSIFIED CLAIMS AGAINST PFS

### 1. PFS Class 1 – Other Priority Claims

PFS Class 1 consists of the Other Priority Claims against PFS. The Debtors believe that the Allowed Other Priority Claims are $-0-. Under the treatment proposed in Section 5.1 of the Joint Plan, unless otherwise agreed in a written document by and among the Holder of an Other Priority Claim, PFS and Yucaipa, in full satisfaction of the Holder's Other Priority Claim, each Holder of an Other Priority Claim (Class 1) will receive Cash in an amount equal to the Allowed amount of such Holder's Other

Priority Claim. If the Holder's Other Priority Claim is Allowed on or before the Effective Date, the Disbursing Agent will make the Distribution to such Holder within fifteen (15) days of the Effective Date. If, however, the Holder's PFS Class 1 Claim is not Allowed on or before the Effective Date, the Disbursing Agent will make the Distribution to such Holder within fifteen (15) days after the earlier of the date on which (a) an Order allowing the Other Priority Claim becomes a Final Order, or (b) a Stipulation Regarding the Amount and Nature of the Claim is executed. Under the treatment proposed in Section 5.1 of the Joint Plan, the Other Priority Claims in PFS Class 1 are Unimpaired. Therefore, the Plan Sponsors will not solicit acceptances of the Joint Plan from Holders of Other Priority Claims in PFS Class 1.

### 2. PFS Class 2 – Atalaya Secured Claim

The Atalaya Secured Claim against PFS is treated in PFS Class 2. On the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for the Atalaya Secured Claim, the New Atalaya Secured Note will be executed and delivered to Atalaya by the Debtors. The New Atalaya Secured Note will provide for interest, commencing on the Effective Date, at the rate of 4.75% per annum, payable quarterly in cash. The New Atalaya Secured Note shall be secured by the Atalaya Collateral. Under the proposed treatment in Section 5.2 of the Joint Plan, Atalaya Secured Claim is Impaired. Therefore, the Plan Sponsors will solicit acceptances of the Joint Plan from the Holders of the Atalaya Secured Claim in PFS Class 2.

### 3. PFS Class 3 – Other Secured Claims

PFS Class 3 consists of the Other Secured Claims against PFS. The Debtors have not identified any Holders of Other Secured Claims in PFS Class 3 and, therefore, estimate that the Allowed Other Secured Claims in PFS Class 3 are $-0-. Under the treatment proposed in Section 5.3 of the Joint Plan, except as otherwise agreed, in writing, by the Holder of an Other Secured Claim in PFS Class 3, PFS and Yucaipa, on the Effective Date, each Holder of an Allowed Other Secured Claim in PFS Class 3, if any, will be entitled to receive treatment on account of such Allowed Other Secured Claim in the manner set forth in either Option A or B below, at the election of PFS and Yucaipa. PFS and Yucaipa will be deemed to have elected Option B, except with respect to any Allowed Other Secured Claim as to which they elect Option A in a certification Filed within fifteen (15) days before the commencement of the Confirmation Hearing.

Option A: Each Holder with an Allowed Claim in Option A will receive, in satisfaction of its Allowed Claim, Cash equal to the Allowed amount of such Claim, and will release all Liens on any Collateral in exchange the receipt of such Cash.

Option B: Each Holder with an Allowed Claim in Option B will be otherwise Unimpaired within the meaning of section 1123 of the Bankruptcy Code.

If the Holder's Other Secured Claim is not Allowed on or before the Effective Date, the Disbursing Agent will make the Distribution to such Holder within fifteen (15) days after the earlier of the date on which (a) an Order allowing the Other Secured Claim becomes a Final Order, or (b) a Stipulation Regarding the Amount and Nature of the Claim is executed.

Under the treatment proposed in Section 5.3 of the Joint Plan, the Other Secured Claims in PFS Class 3 are Unimpaired. Therefore, the Plan Sponsors will not solicit acceptances of the Joint Plan from Holders of Other Secured Claims in PFS Class 3.

4.      **PFS Class 4 - General Unsecured Claims**

PFS Class 4 consists of General Unsecured Claims against PFS. The Debtors believe that the Allowed General Unsecured Claims in PFS Class 4 are $-0-. The General Unsecured Claim against PFS, if any, in PFS Class 4, will be treated as if they are Claims against PR, and will receive the same treatment afforded to Claims in PR Class 5 (General Unsecured Claims against PR), under Section 4.5 of the Joint Plan (subject to Section 13.2 of the Joint Plan).

Under the treatment proposed in Section 5.4 of the Joint Plan, the General Unsecured Claims in PFS Class 4 are Impaired. Therefore, the Plan Sponsors will solicit acceptances of the Joint Plan from Holders of General Unsecured Claims in PFS Class 4.

5.      **PFS Class 5 – Interests**

PFS Class 5 consists of the Interests in PFS. Under the treatment proposed in Section 5.5 of the Joint Plan, the Interests in PFS Class 5 are left unaltered by the Confirmation of the Joint Plan. Further, Joint Plan leaves unaltered any legal, equitable and contractual rights to which the Holders of such Interests may be entitled under applicable non-bankruptcy law. Under the treatment proposed in Section 5.5 of the Joint Plan, the PFS Class 5 Interests are Unimpaired and are not entitled to vote on the Joint Plan. Therefore, the Plan Sponsors will not solicit acceptances of the Joint Plan from the Holders of Interests in PFS Class 5.

D.      **TREATMENT OF CLASSIFIED CLAIMS AGAINST PI**

1.      **PI Class 1 – Other Priority Claims**

PI Class 1 consists of the Other Priority Claims against PI. The Debtors believe that the Allowed Other Priority Claims are $-0-. The Joint Plan provides for the following treatment of Other Priority Claims. Under the treatment proposed in Section 6.1 of the Joint Plan, unless otherwise agreed in a written document by and among the Holder of an Other Priority Claim, PI and Yucaipa, in full satisfaction of the Holder's Other Priority Claim, each Holder of an Other Priority Claim (Class 1) will receive Cash in an amount equal to the Allowed amount of such Holder's Other Priority Claim. If the Holder's Other Priority Claim is Allowed on or before the Effective Date, the Disbursing Agent will make the Distribution to such Holder within fifteen (15) days of the Effective Date. If, however, the Holder's Class 1 Claim is not Allowed on or before the Effective Date, the Disbursing Agent will make the Distribution to such Holder within fifteen (15) days after the earlier of the date on which (a) an Order allowing the Other Priority Claim becomes a Final Order, or (b) a Stipulation Regarding the Amount and Nature of the Claim is executed.

Under the treatment proposed in Section 6.1 of the Joint Plan, the Other Priority Claims in PI Class 1 are Unimpaired under the Joint Plan. Therefore, the Plan Sponsors will not solicit acceptances of the Joint Plan from Holders of Other Priority Claims in PI Class 1.

2.      **PI Class 2 – Atalaya Secured Claim**

The Atalaya Secured Claim against PI is treated in PI Class 2. On the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for the Atalaya Secured Claim, the New Atalaya Secured Note will be executed and delivered to Atalaya by the Debtors. The New Atalaya Secured Note will provide for interest, commencing on the Effective Date, at the rate of 4.75% per annum, payable quarterly in cash. The New Atalaya Secured Note shall be secured by the Atalaya Collateral. Under the proposed treatment in Section 6.2 of the Joint Plan, the Atalaya Secured Claim is

Impaired. Therefore, the Plan Sponsors will solicit acceptances of the Joint Plan from the Holders of the Atalaya Secured Claim in PI Class 2.

### 3. PI Class 3 – Other Secured Claims

PI Class 3 consists of the Other Secured Claims against PI. The Debtors have not identified any Holders of Other Secured Claims in PI Class 3 and, therefore, estimate that the Allowed Other Secured Claims are $-0-. Under the treatment proposed in Section 6.3 of the Joint Plan, except as otherwise agreed, in writing, by the Holder of an Other Secured Claim, PI and Yucaipa, on the Effective Date, each Holder of an Allowed Other Secured Claim will be entitled to receive treatment on account of such Allowed Other Secured Claim in the manner set forth in either Option A or B below, at the election of PI and Yucaipa. The PI and Yucaipa will be deemed to have elected Option B, except with respect to any Allowed Other Secured Claim as to which they elect Option A in a certification Filed within fifteen (15) days before the commencement of the Confirmation Hearing.

> Option A: Each Holder with an Allowed Claim in Option A will receive, in satisfaction of its Allowed Claim, Cash equal to the Allowed amount of such Claim, and will release all Liens on any Collateral in exchange the receipt of such Cash.

> Option B: Each Holder with an Allowed Claim in Option B will be otherwise Unimpaired within the meaning of section 1123 of the Bankruptcy Code.

Under the treatment proposed in Section 6.3 of the Joint Plan and described below, the Other Secured Claims in PI Class 3 are Unimpaired under the Joint Plan. For these reasons, the Plan Sponsors will not solicit acceptances of the Joint Plan from Holders of Other Secured Claims in PI Class 3.

### 4. PI Class 4 - General Unsecured Claims

PI Class 4 consists of General Unsecured Claims against PI. The Debtors believe that the Allowed General Unsecured Claims are $-0-. The General Unsecured Claim against PI, if any, in PI Class 4, will be treated as if they are Claims against PR, and will receive the same treatment afforded to Claims in PR Class 5 (General Unsecured Claims against PR), under Section 4.5 of the Joint Plan (subject to Section 13.2 of the Joint Plan).

Under the treatment proposed in Section 6.4 of the Joint Plan, the General Unsecured Claims in PI Class 4 are Impaired under the Joint Plan. Therefore, the Plan Sponsors will solicit acceptances of the Joint Plan from Holders of General Unsecured Claims in PI Class 4.

### 5. PI Class 5 – Interests

PI Class 5 consists of the Interests in PI. Under the treatment proposed in Section 6.5 of the Joint Plan, the Interests in PI Class 5 are left unaltered by the Confirmation of the Joint Plan. Further, Joint Plan leaves unaltered any legal, equitable and contractual rights to which the Holders of such Interests may be entitled under applicable non-bankruptcy law. Under the treatment proposed in Section 6.5 of the Joint Plan, the PI Class 5 Interests are Unimpaired and are not entitled to vote on the Joint Plan. Therefore, the Plan Sponsors will not solicit acceptances of the Joint Plan from the Holders of Interests in PI Class 5.

E.    THE YUCAIPA ADVANCE AND PAYMENT OF EFFECTIVE DATE PAYMENTS

On or before the Effective Date of the Plan, Yucaipa shall advance Cash to the Debtors in the amount of $[_____],[1] which, together with the Cash on the Effective Date held by the Debtors, shall be available to the Reorganized Debtors for the purpose of effectuating the Joint Plan. The Reorganized Debtors shall pay the principal amount of the Yucaipa Advance, together with accrued interest, on the date that is one month following the maturity date of the New Atalaya Secured Note. In accordance with the Yucaipa Advance Document (**Plan Exhibit 1.119**), the Yucaipa Advance shall accrue interest, payable in kind, at the fixed rate of nine percent (9%) per annum, and the Reorganized Debtors' obligation to repay the Yucaipa Advance shall be secured by a first priority Lien (which shall be Pari Passu with the Lien securing the New Atalaya Secured Note) on the collateral securing the New Atalaya Secured Note. Payment of the Yucaipa Advance shall be subordinated to the General Unsecured Claim Note in right of payment (but not lien priority) until such General Unsecured Claim Note is paid in full, as provided in Section 4.5 of the Joint Plan and the General Unsecured Claim Note Documents.

F.    SUBORDINATION OF MANAGEMENT SERVICES FEE CLAIM

The payment of all of the Management Services Fee Claim, whether incurred before or after the Petition Date, shall be subordinated in right of payment (but not lien priority) to the Allowed General Unsecured Claims until such General Unsecured Claim Note is paid in full, as provided in Section 4.5 of the Joint Plan and the General Unsecured Claim Note Documents.

G.    INTERMEDIATE HOLDCO

On or before the Effective Date, PI shall form a wholly-owned direct subsidiary ("Intermediate Holdco") (**Plan Exhibit 1.76**). On the Effective Date, Reorganized PI shall transfer its Interests in PR to Intermediate Holdco. As a result, on the Effective Date, Intermediate Holdco will own 100% of the Interests in Reorganized PR. On the Effective Date, the Intermediate Holdco Equity Interests will be pledged to secure the payment of the General Unsecured Claim Note, in accordance with Section 4.5 of the Joint Plan and the General Unsecured Claim Note Documents.

H.    THE ADMINISTRATOR

The Joint Plan provides that the Administrator shall be responsible for (i) collecting and disbursing Cash from the General Unsecured Distribution Account strictly in accordance with the Joint Plan, (ii) holding Liens that secure the General Unsecured Claim Note, and (iii) enforcing rights and remedies of the Holders of General Unsecured Claims under the Joint Plan. The Administrator's rights and powers shall be limited to those expressly set forth in the Joint Plan, and the Administrator shall automatically be discharged upon repayment in full of General Unsecured Claim Note. The Administrator shall have complete control and authority to make deposits and withdrawals of Cash from the General Unsecured Distribution Account in the manner provided by the Joint Plan, and shall be a signatory on the General Unsecured Distribution Account. Section 7.3(a) provides that the Administrator shall not be deemed an officer, employee, representative or agent of the Reorganized Debtors (except to the extent of its position as director of Reorganized PR), and shall have no authority to bind the Reorganized Debtors.

---

1    The amount of the Yucaipa Advance is subject to further negotiation, and will be disclosed on or before the hearing on the Disclosure Statement.

Section 7.3(b) of the Joint Plan provides that the Administrator shall be selected by Yucaipa, in Yucaipa's sole discretion, from a list of three (3) individuals reasonably acceptable to Yucaipa that will be provided by the Creditors' Committee no later than ten (10) days before the Effective Date. The identity the Administrator will disclosed in the Notice of Occurrence of the Effective Date, as provided in Section 10.3 of the Joint Plan.

As compensation for the Administrator's occupancy of a Board of Directors seat and performance of duties arising therefrom, in accordance with Section 7.5(b) of the Joint Plan, the administration of Cash and Distributions to the General Unsecured Creditors, and discharge of other duties under Section 7.3 of the Joint Plan, the Administrator shall receive $10,000 per quarter. The Administrator shall be entitled to reimbursement for its reasonable and documented out of pocket travel expenses (if any). The Administrator shall be entitled to retain professionals that the Administrator deems reasonably necessary in his or her sole discretion to carry out the Administrator's duties under the Joint Plan. The Administrator shall be entitled to reimbursement for the reasonable and documented costs of those professionals incurred in connection with (i) the exercise of rights and remedies following the Reorganized Debtors' default, if any, in their obligations to pay the General Unsecured Creditor Note under the Joint Plan, and (ii) monitoring the Reorganized Debtors' compliance with the Excess Cash Flow Sweep. The Administrator's professionals may be paid out of Cash on deposit in the General Unsecured Distribution Account and, if insufficient, shall be paid by the Reorganized Debtors.

Until the General Unsecured Claim Note is paid in full as provided for in the Joint Plan, the Reorganized Debtors shall use commercially reasonable efforts to provide financial statements to the Administrator, including a cash flow statement and balance sheet, for each accounting period, on or prior to the business day that is forty-five (45) days after the end of such accounting period; provided, the Reorganized Debtors shall provide period cash balance reports to the Administrator no later than the Reorganized Debtors provide such periodic reports to Yucaipa and Atalaya.

Section 7.3(b) provides that the Administrator shall be held harmless and indemnified by the Reorganized Debtors for harm relating to collection or the distribution of Cash by the Reorganized Debtors to the General Unsecured Distribution Account pursuant to the Excess Cash Flow Sweep, unless such harm arises from acts or omissions that constitute gross negligence and/or willful misconduct, as provided in the General Unsecured Claim Note Documents. By way of example, the Reorganized Debtors will not hold the Administrator harmless for investment decisions relating to the funds in the General Unsecured Distribution Account.

## I.     DISTRIBUTIONS UNDER THE JOINT PLAN

All Distributions under the Joint Plan will be made by PR, as Disbursing Agent, or such other Entity designated by PR as Disbursing Agent; *provided, however*, that the Administrator shall be the Disbursing Agent with respect to Distributions to General Unsecured Claims as provided in Section 4.5 and 7.3 of the Joint Plan. As provided in Article VIII of the Joint Plan, Distributions under the Joint Plan will be made (i) to the Holder of each Allowed Claim on the Distribution Record Date at the address of such Holder as listed on the Schedules, unless the Debtors or, on and after the Effective Date, the Reorganized Debtors, have been notified in writing of a change of address, including, without limitation, by the Filing of an amended Proof of Claim by such Holder that provides an address for such Holder different from the address reflected on the Schedules, or (ii) pursuant to the DIP Financing Final Order.

As of the close of business on the Distribution Record Date, the claims register will be closed, and there will be no further changes in the record Holder of any Claims or Interests. The Debtors will have no obligation to recognize any transfer of any Claim or Interest occurring after the Distribution Record Date. The Debtors will instead be authorized and entitled to recognize and deal for all purposes

of the Joint Plan with only those record Holders stated on the claims register as of the close of business on the Distribution Record Date.

## J.    TIMING OF DISTRIBUTIONS UNDER THE JOINT PLAN

Unless otherwise provided in the Joint Plan, or otherwise agreed in a written agreement by and among (i) the Holder of a Claim, and (ii) the Debtors or Reorganized Debtors, and (iii) Yucaipa, in full satisfaction of the Holder's Claim, each Holder will receive the Distribution provided for under the Joint Plan. If the Holder's Claim is an Allowed Claim on or before the Effective Date, the Disbursing Agent will make the Distribution to such Holder within fifteen (15) days of the Effective Date.  If, however, the Holder's Claim is not Allowed on or before the Effective Date, the Disbursing Agent will make the Distribution to such Holder within fifteen (15) days after the earlier of the date on which (i) an Order allowing the Claim becomes a Final Order, or (ii) the Holder and the Debtors or Reorganized Debtors execute a Stipulation Regarding the Amount and Nature of the Claim.

## K.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Bankruptcy Code grants the debtor the power, subject to the approval of the Bankruptcy Court, to assume or reject Executory Contracts and Unexpired Leases. If an Executory Contract or Unexpired Lease is rejected, the counterparty to the agreement may File a claim for damages incurred by reason of the rejection.  In the case of rejection of Unexpired Leases of Real Property, such damage claims are subject to certain limitations imposed by the Bankruptcy Code.

### 1.    Executory Contracts and Unexpired Leases in General

Except as otherwise provided in the Joint Plan or the Confirmation Order, each Executory Contract or Unexpired Lease that is listed on **Plan Exhibit 9.1** will be deemed rejected pursuant to section 365 of the Bankruptcy Code. The Confirmation Order will constitute an Order of the Bankruptcy Court approving each such rejection, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date**;** *provided, however*, the Debtors reserves the right, with the prior consent of Yucaipa, to either (a) delete any Executory Contract or Unexpired Lease listed on Plan Exhibit 9.1, thus providing for its assumption pursuant to Article IX of the Joint Plan, or (b) add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to Section 9.1(a) of the Joint Plan. Thereafter, the Debtors will provide notice of any amendments to Plan Exhibit 9.1 to the Creditors' Committee and the parties to the Executory Contracts or Unexpired Leases affected thereby.  Such notice will be sent by overnight delivery or by telecopy, and will include a Ballot and a form for Filing a Proof of Claim.

Pursuant to Section 9.1(b) of the Joint Plan, the Confirmation Order will constitute an Order of the Bankruptcy Court approving the assumption as of the Effective Date, pursuant to section 365 of the Bankruptcy Code of each Executory Contract and Unexpired Lease that (a) is not rejected under Section 9.1(a) of the Joint Plan, (b) has not been previously rejected by the Debtors by Final Order or has been rejected by Order of the Bankruptcy Court as of the Effective Date, which Order becomes a Final Order after the Effective Date, or (c) is the subject of a motion to assume or reject pending as of the Effective Date.  An Order of the Bankruptcy Court entered on or before the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Joint Plan of:  (a) the contract or lease being assumed or assumed and assigned; (b) the Cure Amount Claim, if any, that the Debtors believe they would be obligated to pay in connection with such assumption; and (c) the procedures for such party to object to the assumption of the applicable contract or lease or the amount of the proposed Cure Amount Claim.

Pursuant to Section 9.2 of the Joint Plan, to the extent that such Cure Amount Claims constitute monetary defaults, the Cure Amount Claim associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Joint Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the Debtors: (a) by payment of the Cure Amount Claim in Cash on the Effective Date; or (b) on such other terms as are agreed to by the non-Debtor party to such Executory Contract or Unexpired Lease and Yucaipa. If there is a Dispute regarding the amount of any Cure Amount Claim, or any other matter pertaining to assumption of such Executory Contract or Unexpired Lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving that Dispute and approving the assumption.

Further, notwithstanding anything in the Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease pursuant to Article IX of the Joint Plan gives rise to a Cure Amount Claim by the other party or parties to such contract or lease, such Cure Amount Claim will be forever barred and will not be enforceable against the Debtors or Reorganized Debtors unless a request for payment of Administrative Claim is Filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order or any other Order entered on the Docket within thirty (30) days after the Effective Date.

## 2. Obligations to Indemnify Directors, Officers and Employees

Section 9.2 of the Joint Plan provides that the obligations of the Debtors or Reorganized Debtors to indemnify any person who is serving or has served as one of its directors, officers, manager, or employees by reason of such person's prior or future service in such a capacity or as a director, officer, manager or employee of another corporation, partnership, limited liability company or other legal entity, to the extent provided in the applicable certificates of incorporation, certificate of formation, operating agreement, or bylaws, by statutory law or by written agreement, policies or procedures of or with the Debtors, will be reinstated, shall survive the occurrence of the Effective Date and shall be unaffected by the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before, on or after the Petition Date.

## 3. Assumption of the Pre-Petition Insurance Policies and Agreements

Section 9.6 of the Joint Plan provides that, subject to the occurrence of the Effective Date, unless specifically rejected Order of the Bankruptcy Court, all insurance policies issued to, or insurance agreements entered into by, the Debtors before the Petition Date (including, without limitation, insurance policies for directors, officers and managers maintained by the Debtors as of the Petition Date) shall be assumed by the Reorganized Debtors and shall continue in accordance with their terms. The entry of the Confirmation Order will constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, their Estates, and all parties in interest in the Bankruptcy Cases. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto before the Effective Date, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such insurance policy or agreement.

## 4. Current and Former Insurance Programs

### a. The Current Insurance Program

As previously discussed, PR's current workers' compensation policy is based on a "loss retro" premium, with the insurer obligated to cover 100% of the loss, and PR being obligated to reimburse the insurer up to $250,000 per claim. After thirty (30) months, however, the total incurred losses are adjusted

by a factor of 1.25. If at the time of the first audit, the total incurred losses times the 1.25 development factor and PR's base premium are less than $1,276,396, PR will be due a refund from the insurer. If the audit is higher, on the other hand, an additional premium will be due to the insurer. General Liability is covered by a self-insured retention of $200,000 per claim, including expenses. PR internally handles all claims with the assistance of a third party administrator, Engle Martin, for an annual fee of $30,000. The general liability policy limit is $1,000,000 per occurrence, although PR has excess coverage that includes workers' compensation and other liabilities. Loss of property or income is covered with $141,000,000 in limits for all types of risk. Typical losses, such as fire or non-named wind damage, have a $50,000 deductible. Damage from a named storm have a deductible of 2% of the stated values for each locations building, contents, and business income.

### b. The Legacy Insurance Program

The general liability self-insured retention is set at $250,000 per incident for all claims prior to May 1, 2011, and handling and adjusting those claims remain under the carrier for those claims. As for Legacy Workers' Compensation Program, as previously discussed, PR has a $250,000 reimbursement obligation to the insurer per claim, with eight (8) outstanding Legacy Workers' Compensation Claims. To protect PR's obligations, as previously discussed, PR's former insurer required PR to arrange for the issuance of the L/C, in the current face amount of $2,920,000.

### c. Compensation and Benefit Programs

Except as otherwise provided in a motion Filed before the Effective Date, all employment plans, practices, programs and policies maintained by the Debtors as of the Effective Date will remain in full force and effect following the Effective Date, subject to any and all rights of the Debtors under applicable non-bankruptcy law to amend or terminate such plans, practices, programs and policies.

### 5. Retiree Benefits

None of the Debtors have any retiree benefits that are funded by the Debtors.

### L. RE-VESTING OF PROPERTY ON THE EFFECTIVE DATE

Except as otherwise provided in the Joint Plan, all property of the Debtors' Estates, and any property acquired by the Debtors or Reorganized Debtors under the Joint Plan, will re-vest in the applicable Reorganized Debtor, free and clear of all Claims, Liens, charges, other encumbrances created prior to the Effective Date. From and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Joint Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors will pay the charges that it incurs on or after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of fee applications for such Professional) without application to the Bankruptcy Court.

### M. DISCHARGE AND INJUNCTION

### 1. Discharge of Claims

Except as otherwise expressly provided in the Joint Plan or the Confirmation Order, Section 11.1 of the Joint Plan provides that the rights afforded under the Joint Plan and the treatment of Claims under the Joint Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims

arising on or before the Effective Date. Except as provided in the Joint Plan or the Confirmation Order, as of the Effective Date, the Joint Plan will discharge the Debtors from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502 (a) of the Bankruptcy Code, whether or not (i) a Proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code, or (c) the Holder of such Claim voted to accept the Joint Plan.

In accordance with the foregoing, except as provided in the Joint Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and liabilities against any of the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against any of the Debtors at any time to the extent that such judgment relates to a discharged Claim.

Except as otherwise provided in the Joint Plan or in any contract, instrument, release or other agreement or document entered into or delivered, Section 11.4 of the Joint Plan provides that, on the Effective Date, all mortgages, deeds of trust, Liens or other security interests or encumbrances of any kind against the property of the Estates will be fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens or other security interests, including any rights to any collateral thereunder, will revert to the Reorganized Debtors and their successors and assigns, and the former Holder thereof will, upon request of the Debtors, execute such documents evidencing such release and discharge as the Debtors may reasonably request.

The Reorganized Debtors shall not be responsible for any Claims against the Debtors except (a) those payments and Distributions expressly provided for or due under the Join Plan, or (b) Claims that pass through the Joint Plan Unimpaired pursuant to specific and express provisions of the Joint Plan. All Entities shall be precluded and forever barred from asserting against the Debtors, the Reorganized Debtors, or their assets, properties, or interests in property, any Claims based upon any act or omission, transaction, or other activity, event, or occurrence of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date, except for (a) the payments and Distributions expressly provided for or due under the Joint Plan and (b) Claims that pass through the Joint Plan Unimpaired pursuant to specific and express provisions of the Joint Plan. The discharge and release of the Debtors as provided in the Joint Plan, and the re-vesting of property in the Reorganized Debtors, will not diminish or impair the enforceability of any insurance policies that may cover Litigation Claims against any Debtor or other Entity.

  2.  **Injunction**

**Except as otherwise expressly provided in the Joint Plan or the Confirmation Order, Section 11.2 of the Joint Plan provides that, as of the Effective Date, any Entity that has held, currently holds or may hold a Claim or other debt or liability or Interest that is discharged, released, waived, settled or deemed satisfied in accordance with the Joint Plan will be permanently enjoined from taking any of the following actions on account of any such Claims, debts, liabilities, Interests or rights:  (a) commencing or continuing in any manner any action or Cause of Action or other proceeding against the Debtors, the Reorganized Debtors, or the property of either of them, other than to enforce any right that does not comply with, or is inconsistent with, the provisions of the Joint Plan; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, the Reorganized Debtors, or the property of any of them, other than as permitted pursuant to (a) above; (c) creating, perfecting or enforcing any Lien or encumbrance of any kind against the Debtors, the Reorganized Debtors, or the properties of either of them, other than as permitted pursuant to (a) above; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors**

**or Reorganized Debtors; and (e) commencing or continuing any action or Cause of Action, in any manner, in any place that does not comply with or is inconsistent with the Joint Plan.**

3.      **Releases**

The Joint Plan provides as follows with respect to releases by the Debtors and the Reorganized Debtors, at Section 11.6(a):

**AS OF THE EFFECTIVE DATE, THE DEBTORS, ON THEIR OWN BEHALF AND ON BEHALF OF THE REORGANIZED DEBTORS AND THEIR ESTATES, RELEASE, WAIVE AND DISCHARGE ALL OF THE OTHER RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION (INCLUDING BANKRUPTCY CAUSES OF ACTION), AND LIABILITIES HELD BY THE DEBTORS OR THEIR ESTATES, ASSERTABLE ON BEHALF OF THE DEBTORS OR THEIR ESTATES, OR DERIVATIVE OF THE DEBTORS', OR THEIR ESTATES' RIGHTS, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, DISPUTED OR UNDISPUTED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, IN ANY WAY RELATING TO THE DEBTORS, THE BANKRUPTCY CASES, THE DISCLOSURE STATEMENT, THE JOINT PLAN, THE SUBJECT MATTER OF OR THE TRANSACTIONS OR EVENTS GIVING RISE TO ANY CLAIM OR INTEREST THAT IS TREATED UNDER THE JOINT PLAN, THE TREATMENT OF ANY CLAIM OR INTEREST UNDER THE JOINT PLAN, THE DEBTORS' BUSINESSES OR CONTRACTS WITH ANY OF THE OTHER RELEASED PARTY, ANY NEGOTIATIONS CONCERNING THE JOINT PLAN, THE DEBTORS' MANAGEMENT OR OPERATIONS, THE NEGOTIATION OR CONSUMMATION OF THE JOINT PLAN, OR ANY OTHER EVENTS TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.**

The Joint Plan also provides as follows with respect to releases by the Holders of Claims, at Section 11.6(b):

**EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE JOINT PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, EACH HOLDER OF A CLAIM WHO HAS VOTED TO ACCEPT THE JOINT PLAN SHALL BE DEEMED TO HAVE UNCONDITIONALLY RELEASED THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE THAT IS IN ANY WAY RELATED TO THE DEBTORS, THEIR PROPERTIES, THE BANKRUPTCY CASES, THE DISCLOSURE STATEMENT OR THE JOINT PLAN;** *PROVIDED, HOWEVER,* **THAT NOTHING IN SECTION 11.6 OF THE JOINT PLAN WILL OPERATE TO WAIVE OR RELEASE (A) THE RIGHTS OF ANY PARTY TO ENFORCE THE JOINT PLAN AND THE CONTRACTS, INSTRUMENTS AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN**

**CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE JOINT PLAN, OR (B) ANY CLAIM OR RIGHT AGAINST A RELEASED PARTY THAT IS BASED ON THE GROSS NEGLIGENCE, FRAUD OR WILLFUL MISCONDUCT OF SUCH RELEASED PARTY AS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT OR OTHER COURT OF COMPETENT JURISDICTION.**

        4.        **Term of Injunctions or Stays**

Unless otherwise provided in the Joint Plan or the Confirmation Order, Section 11.3 of the Joint Plan provides that all injunctions or stays set forth in section 362 of the Bankruptcy Code will remain in full force and effect until the Effective Date rather than the Confirmation Date. Nothing in Section 11.3 of the Joint Plan, however, will be construed as a limitation of the permanent discharge and injunction provisions provided for in the Joint Plan.

        5.        **Exculpation**

**AS OF THE AND SUBJECT TO THE OCCURRENCE OF THE CONFIRMATION DATE, THE EXCULPATED PARTIES (A) SHALL BE DEEMED TO HAVE NEGOTIATED THE JOINT PLAN IN GOOD FAITH AND NOT BY ANY MEANS FORBIDDEN BY LAW, AND (B) SOLICITED ACCEPTANCES OF THE JOINT PLAN IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING SECTION 1125(a) AND (e) OF THE BANKRUPTCY CODE AND ANY APPLICABLE NON-BANKRUPTCY LAW, RULE OR REGULATION GOVERNING THE ADEQUACY OF DISCLOSURE IN CONNECTION WITH THE SOLICITATION. ADDITIONALLY, NONE OF THE EXCULPATED PARTIES SHALL BE LIABLE TO ANY ENTITY FOR ANY ACTION TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR RELATED TO THE FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION, OR CONSUMMATION OF THE JOINT PLAN, THE DISCLOSURE STATEMENT, EARLIER VERSIONS OF THE SAME, OR ANY CONTRACT, INSTRUMENT, RELEASE, OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO, OR ANY OTHER ACTION TAKEN OR OMITTED TO BE TAKEN, IN CONNECTION WITH THE JOINT PLAN OR THIS BANKRUPTCY CASES; PROVIDED, HOWEVER, THAT NOTHING IN SECTION 11.6 OF THE JOINT PLAN WILL OPERATE TO WAIVE OR RELEASE (A) THE RIGHTS OF ANY PARTY TO ENFORCE THE JOINT PLAN AND THE CONTRACTS, INSTRUMENTS AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE JOINT PLAN OR ASSUMED PURSUANT TO THE JOINT PLAN, OR (B) ANY CLAIM OR RIGHT AGAINST AN EXCULPATED PARTY THAT IS BASED ON THE GROSS NEGLIGENCE, FRAUD OR WILLFUL MISCONDUCT OF SUCH EXCULPATED PARTY AS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT OR OTHER COURT OF COMPETENT JURISDICTION.**

### 6. No Successor Liability

Section 11.5 of the Joint Plan provides that the Reorganized Debtors will have no responsibilities for any Claims against or liabilities or obligations of the Debtors relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Confirmation Date; *provided, however*, that the Reorganized Debtors shall have the obligations specifically and expressly provided in the Joint Plan.

### 7. General Settlement of Claims

Section 7.10 of the Joint Plan provides that, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases and other benefits provided under the Joint Plan, upon the Effective Date, the provisions of the Joint Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Joint Plan.

### 8. Cancellation of Notes, Instruments, Certificates and other Documents

` Pursuant to Section 7.11 of the Joint Plan, on the Effective Date, except as otherwise specifically provided for in the Joint Plan: (a) the obligations of the Debtors under the DIP Financing Claim, the Atalaya Loan Documents, and any other agreement, note, bond, indenture or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of the Debtors shall be cancelled; (b) the obligations of the Debtors under the DIP Financing Claim, the Atalaya Loan Documents shall be fully released, settled, and compromised as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (c) the obligations of the Debtors and the Reorganized Debtors, pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing any agreement, note, bond, indenture or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised.

## VII. <u>MISCELLANEOUS PROVISIONS OF THE JOINT PLAN</u>

### A. POST CONFIRMATION CORPORATE GOVERNANCE

Section 7.5(a) of the Joint Plan provides that the following (which will occur and be deemed effective as of the date specified in the documents effectuating the same or, if no date is so specified, the Effective Date) will be deemed authorized and approved in all respects and for all purposes without any requirement of further action by the Holders of Interests, or the directors of one of the Debtors or Reorganized Debtors or any other person or entity: (a) the reinstatement of current limited liability agreements for each of the Reorganized Debtors, including the selection of the current managing members of each of the Reorganized Debtors; (b) the selection of officers and the Board of Directors of the Reorganized Debtors and Intermediate Holdco, all as disclosed in <u>Plan Exhibit 7.5</u>; and (c) the other matters provided for under the Joint Plan involving the corporate structure of the Debtors, Reorganized Debtors, Intermediate Holdco, or corporate action to be taken by, or required of, the Debtors, Reorganized Debtors, or Intermediate Holdco. Pursuant to Section 7.5 (a), the Administrator shall serve on the Board of Directors of Reorganized PR until the General Unsecured Claim Note is paid in full.

### B. ADMINISTRATIVE CONSOLIDATION OF THE DEBTORS FOR JOINT PLAN PURPOSES ONLY

Subject to the occurrence of the Effective Date, solely for the purposes of voting and Distribution under the Joint Plan, Section 13.2 of the Joint Plan provides that the Debtors will be administratively consolidated. As a result, with the exception of the Atalaya Secured Claim: (a) each and every Claim Filed or to be Filed against any of the Debtors will be deemed Filed against the administratively consolidated Debtors and will be deemed one Claim against, and one obligations of, the Debtors; (b) any and all guarantees executed by one or more of the Debtors with respect to the obligation of any other Debtor or Debtors will be of no force and effect; (c) all duplicative Claims (identical in amount and subject matter) Filed against one or more of the Debtors will be automatically expunged so that only one Claim survives against the consolidated Debtors; and (d) the consolidated Debtors will be deemed, for purposes of determining the availability of the right of set-off and recoupment under section 553 of the Bankruptcy Code and applicable non-bankruptcy law, to be one Entity, so that, subject to other provisions of section 553 of the Bankruptcy Code, the debts due to a particular Debtor may be offset or recouped against the Claims against other Debtor or Debtors. Such administrative consolidation, however, will not affect (a) the legal and organizational structure or control of the Debtors, (b) any guarantees, Liens, and security interests that are required to be maintained in connection with executory contracts or unexpired leases that were entered into during the Bankruptcy Cases, or that have been or will be assumed pursuant to the Joint Plan, or (c) distributions out of any insurance policies or proceeds of such policies.

### C. STIPULATIONS REGARDING THE AMOUNT AND NATURE OF THE CLAIMS

From and after the Effective Date, the Reorganized Debtors (with Yucaipa's consent) will have authority to enter into a Stipulation Regarding the Amount and Nature of the Claim, without the necessity of obtaining approval of the Bankruptcy Court.

### D. RETENTION OF JURISDICTION

As provided in Article XII of the Joint Plan, until the entry of a final decree in accordance with Bankruptcy Rule 3022, the Bankruptcy Court will retain jurisdiction of all matters arising under, arising out of or relating to the Bankruptcy Cases.

### E. EXEMPTION FROM TRANSFER TAXES

As provided in Section 7.9 of the Joint Plan, and pursuant to section 1146(c) of the Bankruptcy Code, the following will not be subject to a stamp tax, real estate transfer tax, sales or use tax or similar Tax: (i) the creation of any mortgage, deed of trust, Lien or other security interest; (ii) the making or assignment of any lease or sublease; or (iii) the making or delivery of any deed, bill of sale or other instrument of transfer or assignment or any plan of merger, consolidation, liquidation or dissolution under, in furtherance of or in connection with the Joint Plan.

### F. DISSOLUTION OF CREDITORS' COMMITTEE

Section 13.1 of the Joint Plan provides that the Creditors' Committee shall continue to exist until the Effective Date. On the Effective Date, the Creditors' Committee shall dissolve automatically, and its members shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Bankruptcy Cases; *provided, however*, that the Creditors' Committee shall be deemed to remain in existence solely with respect to the final fee applications Filed in connection with

Section 3.2(b)(i) of the Joint Plan, and the Creditors' Committee shall have the right to be heard on all issues relating to such final fee applications

### G.     PAYMENT OF STATUTORY FEES

As provided in Section 3.1(e) of the Joint Plan, on or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid by the Debtors or the Disbursing Agent in Cash. All fees payable pursuant to 28 U.S.C. § 1930(a)(6) will be paid by the Reorganized Debtors in accordance therewith until the closing of the Bankruptcy Cases pursuant to section 350(a) of the Bankruptcy Code.

### H.     MODIFICATION OF THE JOINT PLAN

Section 13.3 of the Joint Plan provides that, subject to the restrictions on modification set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3019, the Debtors or Reorganized Debtors as the case may be, reserve the right to alter, amend or modify the Joint Plan before its substantial consummation; provided, however, the prior written consent of Yucaipa will be required for any such alterations, amendments or modifications.

### I.     REVOCATION OR WITHDRAWAL OF THE JOINT PLAN

As provided in Section 13.4 of the Joint Plan, the Debtors and Yucaipa each reserve the right to revoke or withdraw the Joint Plan at any time before the Confirmation Date by Filing a notice of withdrawal or revocation. If the Joint Plan is revoked or withdrawn, or if the Effective Date does not occur, then the Joint Plan and all settlements and compromises set forth herein and not otherwise approved by Final Order shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Entity, or prejudice in any manner the rights of the Plan Sponsors or any other Entity in any other further proceedings, or to constitute an admission, acknowledgment, offer or undertaking by the Plan Sponsors as to any matter or thing.

### J.     BINDING EFFECT

As provided in Section 13.8 of the Joint Plan, the Joint Plan will be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, and the Holders of Claims and Interests, together with their respective successors and assigns.

### K.     GOVERNING LAW

As provided in Section 13.12 of the Joint Plan, except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under the Joint Plan will be governed by, and construed and enforced as provided in the laws of the State of Louisiana; *provided, however,* that any documents executed in connection with the Joint Plan, including, but not limited to the Plan Exhibits, shall be governed by the laws of the state chosen therein.

### L.     SUBSTANTIAL CONSUMMATION

Pursuant to Section 13.9 of the Joint Plan, substantially consummation within the meaning of sections 1101 and 1127(b) of the Bankruptcy Code will be deemed to have occurred upon the Debtors' deposit of the General Unsecured Claim Effective Date Payment into the General Unsecured Distribution Account.

**M.   NO INTEREST AFTER THE PETITION DATE UNLESS OTHERWISE PROVIDED**

Pursuant to Section 2.3 of the Joint Plan, no Holder of a Claim shall be entitled to interest after the Petition Date on any Claim or right unless otherwise specifically provided for in the Joint Plan or the Confirmation Order.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## VIII.   CONFIRMATION AND CONSUMMATION PROCEDURE

### A.   THE CONFIRMATION HEARING

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing with respect to the accompanying Plan.  The Confirmation Hearing in respect of the Joint Plan has been scheduled for _____, 2013.  Any objection to Confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or a description of the interest in the Debtors held by the objector, and must be made in accordance with any pre-trial or scheduling orders entered by the Bankruptcy Court. Any such objection must be Filed with the Bankruptcy Court, and served so that it is received by the Bankruptcy Court, on or before _____, 2013.

### B.   CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will confirm the Joint Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of the Joint Plan are that the Joint Plan is (i) accepted by all Impaired Classes or, if rejected by an Impaired Class, that the Joint Plan "does not discriminate unfairly" and is fair and equitable" as to such Class, (ii) feasible and (iii) in the "best interests" of Holders of Claims that are Impaired under the Joint Plan.

To obtain nonconsensual Confirmation of the Joint Plan, the Plan Sponsors must demonstrate to the Bankruptcy Court that the Joint Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired, non-accepting Class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  In addition, the "cramdown" standards of the Bankruptcy Code prohibit "unfair discrimination" with respect to the Claims of an Impaired, non-accepting Class.  While the existence of "unfair discrimination" under a plan of reorganization depends upon the particular facts of a case and the nature of the claims and interests at issue, in general, courts have interpreted the standard to mean that the Impaired, non-accepting Class must receive treatment under a plan of reorganization which allocates value to such Class in a manner that is consistent with the treatment given to other classes with similar legal claims against or interests in the debtor.  The Debtors believe that the Joint Plan, and the treatment of all Classes of Claims under the Joint Plan, satisfy the requirements for nonconsensual Confirmation of the Joint Plan. The Bankruptcy Code establishes "cramdown" tests for Claims, as discussed below.

#### 1.   Secured Claims

In order to satisfy the "cramdown test," each Holder of an Impaired Secured Claim will receive "fair and equitable" treatment. Examples of such treatment (although not necessarily the "fair and equitable" treatment to be provided by the Debtors under the Joint Plan) include the following: (i) each Holder of an Impaired Secured Claim retains its Liens securing its Secured Claim and receives on account

of its Secured Claim deferred cash payments (x) totaling at least the allowed amount of the secured claim and (y) having a present value at least equal to the value of the collateral that secures the Claim, (ii) each Holder of an Impaired Secured Claim realizes the "indubitable equivalent" of its Allowed Secured Claim, or (iii) the property securing the Claim is sold free and clear of Liens with such Lien attaching to the proceeds of the sale and such Lien on proceeds is treated in accordance with clause (i) or (ii) of this subparagraph. The Debtors further believe that the treatment afforded the Holders of Impaired Atalaya Secured Claim under the Joint Plan permits Confirmation even if the Joint Plan is not accepted. The Other Secured Claims, if any, in PR Class 3, PFS Class 3 and PI Class 3 are Unimpaired.

### 2. Unsecured, Non-Priority Claims

In order to satisfy the "cramdown test," either (a) each Holder of an Impaired Unsecured Claim receives or retains under the Joint Plan property of a value equal to the amount of its Allowed Claim, or (b) the Holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive any property under the Joint Plan. The Debtors believe that PR Class (Litigation Claims) is Unimpaired, and that all Claims in this Class are Disputed, non-Priority Unsecured Claims. The Debtors also believe that the following Classes of Unsecured, non-Priority Claims are Impaired under the Joint Plan: PR Class 4 (Convenience Claims); PR Class 5 (General Unsecured Claims); PFS Class 4 (General Unsecured Claims); and PI Class 4 (General Unsecured Claims). The Debtors believe, however, that the treatment afforded those Holders of Claims in the foregoing Classes permit Confirmation even if the Joint Plan is not accepted by those Classes.

### 3. Interests

In order to satisfy the "cramdown test," each Holder of an Interest will receive "fair and equitable" treatment. Examples of such treatment (although not necessarily the "fair and equitable" treatment to be provided by the Debtors under the Joint Plan) include the following: (a) each Holder of an Interest will receive or retain under the Joint Plan property of a value equal to the greatest of the fixed liquidation preference to which such Holder is entitled, the fixed redemption price to which such Holder is entitled, or the value of the Interest, or (b) the Holder of an Interest that is junior to the non-accepting Class will not receive or retain any property under the Joint Plan. The Debtors believe that PFS Class 5 (Interests in PFS), and PI Class 5 (Interests in PI) are Unimpaired under the Joint Plan. The Debtors believe that PR Class 7 (Interests in PR) is Impaired, but the treatment afforded the Holder of Interests in PR Class 7 permits Confirmation even if that Holder does not accept the Joint Plan.

### 4. Feasibility

The feasibility test requires the Bankruptcy Court to determine that Confirmation of the Joint Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors, unless such liquidation or financial reorganization is proposed in the Joint Plan. For purposes of determining whether the Joint Plan meets this requirement, the Debtors have analyzed their ability to meet its obligations under the Joint Plan. Based upon the Financial Projections, the Debtors believe that the Joint Plan meet the feasibility requirement of the Bankruptcy Code. The Financial Projections also show that the Debtors will have enough Cash on the Effective Date to pay their obligations under the Joint Plan provided they receive the Yucaipa Advance, as described in the Joint Plan at Section 7.1(a) and (b).

### 5. Best Interests Test

With respect to each Impaired Class, Confirmation of the Joint Plan requires that each Holder of such a Claim or Interest either (a) accept the Joint Plan, or (b) receive or retain under the Joint Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or

retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To determine what Holders in each Impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The Cash amount that would be available for satisfaction of Claims and Interests would consist of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation case. Such Cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from the termination of the Debtors' businesses and the use of chapter 7 for the purposes of liquidation. A Liquidation Analysis is attached to this Disclosure Statement as **Exhibit D**.

To determine if the Joint Plan is in the best interests of each Impaired Class, the present value of the distributions from the proceeds of the liquidation of the Debtors' unencumbered assets and properties (after subtracting the amounts attributable to the chapter 7 and chapter 11 administrative claims described in the preceding paragraph), are then compared with the value of the property offered to such Classes of Claims under the Joint Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Bankruptcy Cases, including (a) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (b) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (c) the substantial increases in claims that would be satisfied on a priority basis or on parity with creditors in the Bankruptcy Cases, the Debtors have determined that Confirmation will provide each Holder of an Allowed Claim with a recovery that is not less than what such Holder would receive pursuant to the liquidation of the Debtors under chapter 7.

## C.    CONSUMMATION OF THE JOINT PLAN

The Joint Plan will be consummated on the Effective Date. The Effective Date will not occur until each of the following conditions has been satisfied, or duly waived pursuant to Section 10.2 of the Joint Plan:

(a)  The Confirmation Order shall have been entered by the Bankruptcy Court in form and substance that is satisfactory to the Debtors and Yucaipa on or before [DATE], 2013, shall be in full force and effect and shall be a Final Order;

(b)  The Debtors receive the Yucaipa Advance, as described in Section 7.1(a) of the Joint Plan;

(c)  No Material Adverse Change will have occurred from and after the Confirmation Date;

(d)  The Plan and Plan Exhibits, including any amendments, modifications or supplements thereto, shall be in form and substance satisfactory to Yucaipa; and

(e)  All consents, actions, documents, certificates and agreements necessary to implement the Joint Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with the applicable laws.

12-51127 - #920   File 07/08/13   Enter 07/08/13 19:06:45   Main Document   Pg 52 of 122

Pursuant to Section 10.2 of the Joint Plan, one or more of the foregoing conditions to the Effective Date may be waived, in whole or in part, jointly by the Debtors and Yucaipa at any time and without any Order of the Bankruptcy Court.

As provided in Section 10.3 of the Joint Plan, the Debtors will File a notice of occurrence of the Effective Date within three (3) Business Days of the Effective Date, and such Notice must state that all conditions to the Joint Plan becoming effective have been satisfied, and state the date of the Effective Date, and the identity of the Administrator. Section 10.4 of the Joint Plan provides that if consummation of the Joint Plan does not occur (including, without limitation, if the Confirmation Order is vacated pursuant to a Final Order), then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Joint Plan will be null and void in all respects, and nothing contained in the Joint Plan or Disclosure Statement shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

## IX.     FINANCIAL INFORMATION DURING THE BANKRUPTCY CASES

The Debtors are required to File monthly operating reports with the Bankruptcy Court. The monthly operating reports may be reviewed through the website maintained by the Bankruptcy Court at https://ecf.lawd.uscourts.gov/, or at the Document Website, http://www.bmcgroup.com/piccadilly. The monthly operating reports are Filed under the following docket numbers: September 2012 (Docket #327); October 2012 (Docket #341); November 2012 (Docket #421); December 2012 (Docket #466); January 2013 (Docket #501); February 2013 (Docket #650); March 2013 (Docket #747), April 2013 (Docket #819); and May 2013(Docket #886).

## X.     CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH IN THE DISCLOSURE STATEMENT, THE JOINT PLAN, ALL PLAN EXHIBITS (AND ANY DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), BEFORE VOTING TO ACCEPT OR REJECT THE JOINT PLAN. ANY RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE JOINT PLAN AND ITS IMPLEMENTATION.

### A.     CERTAIN BANKRUPTCY CONSIDERATIONS

#### 1.     The Debtors Might Not Be Able to Obtain Confirmation

Although the Debtors believe that the Joint Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can also be no assurance that modifications of the Joint Plan will not be required for Confirmation, that such modifications would not adversely affect the Holders of Claims, or that such modifications would not necessitate the re-solicitation of votes.

#### 2.     The Bankruptcy Court Might Not Confirm the Joint Plan

Even if one or more Classes of Claims or Interests entitled to vote does not vote to accept the Joint Plan, the Debtors reserve the right to amend the Joint Plan or request confirmation pursuant to the "cramdown" provisions under section 1129(b) of the Bankruptcy Code. The Bankruptcy Court may confirm the Joint Plan if (a) at least one Class of Claims that has been Impaired has accepted the Joint Plan (such acceptance being determined without including the votes of any "insider" in such Class), and

(b) as to each Impaired Class that has not accepted the Joint Plan, if the Bankruptcy Court determines that the Joint Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Classes. The Debtors believe that the Joint Plan satisfies these requirements; however, there can be no assurance that the Bankruptcy Court will find that these requirements have been satisfied. If it does not, the Joint Plan cannot be confirmed and become effective unless it has been accepted by each Impaired Class of Claims that is entitled to vote.

### 3. Allowed Claims May Not Be Finalized Until After the Effective Date

Approximately 450 Proofs of Claim were Filed against PR, with only one (1) remaining Proof of Claim against PI and two (2) against PFS. The Debtors have analyzed the Schedules and the Proofs of Claim, and have used their best judgment to estimate the value of such Schedules and Proofs of Claim. To prepare estimates for the Disclosure Statement, the Debtors have considered the strengths and weaknesses of their positions and the respective positions of Holders of Claims under applicable law. Despite the Debtors' efforts, those estimates could prove incorrect.

### 4. Objections to Classifications

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other Claims or Interests in such class. The Debtors believe that the classification of Claims and Interests under the Joint Plan complies with the requirements set forth in the Bankruptcy Code. However, the Bankruptcy Court may reach a different conclusion.

### 5. The Debtors May Object to the Amount or Classification of a Claim

The Debtors reserve the right to object to the amount or classification of any Claim. The estimates set forth in the Disclosure Statement cannot be relied on by any Holder of Claim whose Claim is subject to an objection.

### B. RISKS RELATING TO THE BUSINESSES OF THE REORGANIZED DEBTORS AFTER THE EFFECTIVE DATE

### 1. Financial Projections

In conjunction with the development of the Joint Plan and to determine the feasibility of the Joint Plan, Debtors' management analyzed the ability of the Reorganized Debtors to meet its post-Effective Date obligations with sufficient liquidity and capital resources to conduct their businesses. These Financial Projections, attached as **Exhibit C**, are based on certain assumptions that reflect the terms of the Joint Plan, as well as other assumption that the Debtors believe are reasonable under the circumstances.

The Financial Projections included in Exhibit C assume the successful implementation of the Joint Plan and consist of the following unaudited projected financial information: (a) projected income statement summary through 2017; (b) projected balance sheet as through December 31, 2017; and (c) projected cash flow statement through December 31, 2017. The Financial Projections should be reviewed in conjunction with the assumptions, notes and qualifications that are included in Exhibit C. Neither the Debtors nor their advisors make any representations regarding the accuracy of the projections for the Reorganized Debtors or the ability of the Reorganized Debtors to achieve forecasted results.

The Debtors' management prepared the Financial Projections with the assistance of their professionals, FTI. The Financial Projections have not been compiled or examined by independent

accountants. The Financial Projections were prepared solely for the purpose of providing "adequate information" under section 1125 of the Bankruptcy Code to enable the Holders of Claims entitled to vote under the Joint Plan to make an informed judgment about the Joint Plan and should not be used or relied upon for any other purpose. Holders Claims should not rely on the Financial Projections as a representation or guarantee of future performance. Although every effort was made to be accurate and the Debtors consider them reasonable when taken as a whole, the Financial Projections are subject to significant business, economic and competitive uncertainties beyond the Debtors' control  The actual financial results of the Reorganized Debtors may differ materially from the Financial Projections.  In addition, the uncertainties which are inherent in the Financial Projections increase for later years in the projection period due to increased difficulty associated with forecasting levels of economic activity and expected performance in more distant points in the future. Consequently, the projected information included in this Disclosure Statement should not be regarded as representations by the Debtors or their advisors, or any other person, that the projected results will actually be achieved. The Debtors caution that not representations can be made or are made as to the accuracy or completeness of the Financial Projections or to the Reorganized Debtors' ability to achieve the projected results. Some assumptions inevitably will prove incorrect. Moreover, events and circumstances occurring subsequent to the date on which the Debtors prepared these Financial Projections may be different from those assumed or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in either a material adverse or material beneficial manner.  By way of example, it is difficult to predict the inevitable wide swings in the costs of food products and the ability of the Debtors to pass on cost increases to their customers. Based on their analysis of the current demand, however, the Debtors believe the performance of the Reorganized Debtors will be sufficient to fulfill their obligations under the Joint Plan.

### 2. Litigation Risks

PR is involved in the ordinary course of business in a number of lawsuits involving employment, commercial, and personal injuries issues. Judges and juries have demonstrated a willingness to grant large verdicts, including punitive damages, to plaintiffs in personal injury, property damage, and business tort cases.  PR uses legal and appropriate means to contest litigation threatened or filed against them, but the litigation environment in poses a significant business risk, especially since the Debtors' self-insured retention per claim is currently $200,000. Further, with respect to workers' compensation claims, the Debtors have certain obligations with respect to the first $250,000 per claim.

## C. OTHER BUSINESS RISKS

### 1. Competition

PR faces stiff competition in the business segments in which it operates.  Not only does PR compete directly with other restaurants, it also competes with grocery and convenience stores for the takeout market. The food services division competes with large national chains as well as local companies to provide custom food-service at customer locations. In the Emergency Feeding segment, the company faces competition from local and national firms during disaster situations.

### 2.   Economic Downturns

PR faces significant risks when the national and local economies become distressed. Many of PR's customers are middle-income who cut back on discretionary spending for meals away from home and takeout during economic downturns.

### 3.   Weather Issues

A large number of PR's locations operate in a geographic footprint subject to hurricanes and severe storms.  While PR has business interruption and property damage insurance, it is  not feasible to insure for all of loss caused by severe weather.

### 4.   Commodity Prices

PR serves many food items that are subject to wide swings in cost.  Commodities such as chicken, beef, fish and vegetables make up a large portion of the menu. When these items increase in cost the Company may have difficulty passing on the cost to the customer. In addition, PR's "fresh" menu reputation makes product substitution difficult.

### 5.   Food Safety Issues

Because PR's menu offerings are prepared from scratch and subject to strict holding times, food safety is the most important aspect of PR's operations. PR's reputation and survival can be jeopardized by even one significant breakdown in food safety.

## XI.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE JOINT PLAN

The following discussion summarizes certain factors that may affect the anticipated U.S. federal income tax consequences of implementation of the Joint Plan to the Debtors and Holders of Claims.  It does not, however, summarize the U.S. federal income tax consequences to Holders of Interests in the Debtors. Counsel for the Debtors has not, and will not render any opinion concerning the tax consequences of confirmation of the Joint Plan to the Debtors, Reorganized Debtors, Holders of Claims and Interests, or any other Entity. This discussion does not address the U.S. federal income tax consequences to Holders of Claims and Interests who (a) are Unimpaired under the Joint Plan or (b) are otherwise not entitled to vote under the Joint Plan. Moreover, the discussion assumes that each Holder of a Claim holds such Claim only as "capital assets" within the meaning of section 1221 of the Tax Code, and the various debt and other arrangements to which the Debtors and Reorganized Debtors are or will be parties will be respected for U.S. federal income tax purposes in accordance with their form.

The description of the U.S. federal income tax consequences of implementing the Joint Plan is based on interpretation of the applicable provisions of the Internal Revenue Code of 1986 (the "Tax Code"), the Treasury Regulations promulgated thereunder and other relevant authority, including all amendments and revisions to the Tax Code. This interpretation, however, is not binding on the IRS or any court. The Debtors have not obtained, nor does it intend to obtain, a ruling from the IRS, nor have they obtained an opinion of counsel with respect to any of these matters.

The discussion does not apply to a Holder of a Claim that is not a "United States person," as such term is defined in the Tax Code.  Moreover, this discussion does not address U.S. federal taxes other than income taxes or any state, local, or non-U.S. tax consequences of the Joint Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to United States persons in light

of their individual circumstances or to United States persons that may be subject to special tax rules, such as persons who are related to the Debtors within the meaning of the Tax Code, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, beneficial owners of pass-through Entities, subchapter S corporations, employees, persons whose Claims relate to the provisions of services or who otherwise received their Claims as compensation, persons who are Holders who are themselves in bankruptcy.

If a partnership or other pass-through Entity is a Holder, the tax treatment of any partner or other owner of such Entity generally will depend upon that status of the partner (or other owner) and the activities of the Entity. Partners (or other owners) of pass-through Entities that are Holders should consult their own independent tax advisors regarding the tax consequences of the Joint Plan.

**FOR THESE REASONS, ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE TAX CONSEQUENCES OF IMPLEMENTATION OF THE JOINT PLAN TO THEM UNDER APPLICABLE U.S. FEDERAL, STATE AND LOCAL TAX LAWS.**

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE JOINT PLAN ARE COMPLEX. THE SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS, THE REORGANIZED DEBTORS, OR HOLDERS. THE TAX CONSEQUENCES TO EACH CLAIM OR INTEREST HOLDER WILL VARY BASED ON THE HOLDER'S CIRCUMSTANCES. ACCORDINGLY, EACH CLAIM OR INTEREST HOLDER SHOULD CONSULT WITH HIS OR HER TAX ADVISOR AS TO THE SPECIFIC TAX CONSEQUENCES TO SUCH HOLDER OF THE JOINT PLAN, INCLUDING THE APPLICATION AND EFFECT OF U.S. FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX LAWS.**

**IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSE BY THE IRS, EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THE DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER OF A CLAIM OR INTEREST FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS WRITTEN TO SUPPORT THE PROMOTION OF THE JOINT PLAN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON SUCH HOLDER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### A.     U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS

For U.S. federal income tax purposes, the Debtors do not believe that there will be any tax consequences to them caused by the Confirmation of the Joint Plan.

### B.     U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS

The U.S. federal income tax consequences to Holders of Claims arising from the distributions to be made in satisfaction of their claims pursuant to a bankruptcy plan of reorganization may vary, depending upon, among other things: (a) the type of consideration received by the holder of a claim in exchange for the indebtedness it holds; (b) the nature of the indebtedness owed to it; (c) whether the holder has previously claimed a bad debt or worthless security deduction in respect of its claim against the Debtors; (d) whether such claim constitutes a security; (e) whether the holder of a claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. federal income tax on a net

income basis; (f) whether the holder of a claim reports income on the accrual or cash basis; and (g) whether the holder of a claim receives distributions under the Joint Plan in more than one taxable year. For tax purposes, the modification of a claim may represent an exchange of the claim for a new claim, even though no actual transfer takes place. This deemed exchange may result in the recognition of gain or loss by the holder and the creation of original issue discount. In addition, where gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the claim constitutes a capital asset in the hands of the holder and how long it has been held or is treated as having been held, whether the claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction with respect to the underlying claim.

The consideration received under the Joint Plan by Holders of Claims is netted against the amount of the Claim which is discharged under the Joint Plan. The net amount is the amount of the Holder's loss. In the event the Holder of the Claim previously took a loss for the full amount of his or her discharged Claim, the Holder would have to realize income in the year that he or she receives Distributions under the Joint Plan.

Each Holder of an Allowed Claim who receives Cash on the Effective Date in partial satisfaction of his or her Allowed Claim should recognize gain or loss on the Effective Date equal to the difference between (a) the amount of Cash received and (b) the Holder's adjusted tax basis in the Allowed General Unsecured Claim exchanged therefore. The character of any gain or loss as capital or ordinary and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (a) the nature and origin of the Allowed Claim; (b) the tax status of the Holder of the Allowed Claim; (c) whether the Allowed Claim has been held for more than one year; and (d) the extent to which the Holder previously claimed a loss, bad debt reduction or charge to a reserve for bad debts with respect to the Allowed Claim. Each Holder of an Allowed Claim is urged to consult his or her tax advisor as to the applicability of these other factors to such Holder.

A loss generally is treated as sustained in the taxable year for which there has been a closed and completed transaction, and no portion of a loss with respect to which there is a reasonable prospect of reimbursement may be deducted until it can be ascertained with reasonable certainty whether or not such reimbursement will be recovered.

**Holders of Claims and Interests should consult with their own tax advisors as to the matters discussed in this section concerning character and timing of recognition of gain or loss.** Because a loss will be allowed as a deduction only for the taxable year in which the loss was sustained, a Holder of a Claim is entitled a loss in the wrong taxable year risks denial of such loss altogether. In the case of certain categories of Claims, consideration should be given to the possible availability of a bad debt deduction under section 166 of the Tax Code for a period prior to the Effective Date. In addition, a portion of any Distributions received after the Effective Date may be taxed as ordinary income under the imputed interest rules.

Certain payments, including certain payments of Claims pursuant to the Joint Plan, including payments of interest, may be subject to information reporting to the IRS. Moreover, such reportable payments may be subject to backup withholding unless the taxpayer: (a) comes within certain exempt categories (which generally include corporations) or (b) provides a correct taxpayer identification number and otherwise complies with applicable backup withholding provisions. In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are

urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Joint Plan would be subject to these regulations and require disclosure in the Holder's tax returns.

## XII.    VOTING BY HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE

The Claims and Interests in the following Classes are Unimpaired under the Joint Plan, and are deemed to have accepted the Joint Plan under the provisions of section 1126(f) of the Bankruptcy Code: PR Class 1 (Other Priority Claims against PR); PR Class 3 (Other Secured Claims against PR); PR Class 6 (Litigation Claims against PR); PFS Class 1 (Other Priority Claims against PFS); PFS Class 3 (Other Secured Claims against PFS); PFS Class 5 (Interests in PFS); PI Class 1 (Other Priority Claims against PI); PI Class 3 (Other Secured Claims against PI); and PI Class 5 (Interests in PI). The Plan Sponsors will not solicit acceptances of the Joint Plan from Holders of Claims or Interests in foregoing Classes.

The Claims in the following Classes are Impaired under the Joint Plan: PR Class 2 (Atalaya Secured Claim against PR); PR Class 4 (Convenience Claims against PR); PR Class 5 (General Unsecured Claims against PR); PR Class 7 (Interests in PR); PFS Class 2 (Atalaya Secured Claim against PFS); PFS Class 4 (General Unsecured Claims against PFS); PI Class 2 (Atalaya Secured Claim against PI); and PI Class 4 (General Unsecured Claims against PI). The Impaired Classes are collectively referred to hereinafter as the "Voting Classes." A Class of Claims has "accepted" the Joint Plan if the Joint Plan has been accepted by the Holders of Claims in the Class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims that have cast Ballots to accept or reject the Joint Plan. A Class of Interests has "accepted" the Joint Plan if the Joint Plan has been accepted by Holders of Interests in the Class that hold at least two-thirds (2/3) in amount of the Allowed Interests that have cast Ballots to accept or reject the Joint Plan. The Interests in the Joint Plan are Unimpaired, and are not entitled to vote. (For a more detailed description of the requirements for Confirmation of the Joint Plan, see Article VIII of the Disclosure Statement, entitled "Confirmation and Consummation Procedures.") If one or more Classes entitled to vote on the Joint Plan votes to reject the Joint Plan, the Debtors reserve the right to amend the Joint Plan or request Confirmation pursuant to the "cram-down" provisions contained section 1129(b) of the Bankruptcy Code. If at least one Class of Claims that is Impaired under the Joint Plan has accepted the Joint Plan (determined without including acceptance of the Joint Plan by insiders), section 1129(b) of the Bankruptcy Code permits Confirmation notwithstanding its rejection by one or more Impaired Classes. Under section 1129(b), the Joint Plan may be confirmed by the Bankruptcy Court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting Impaired Class.

The following is a summary of the voting procedures adopted in the Confirmation Procedures Order that is attached to the Disclosure Statement as **Exhibit B**. BMC Group, Inc. (the "Voting Agent") was retained by the Debtors pursuant to an Order entered on October 24, 2012 (Docket #244) (authorizing appointment as Voting Agent).

<div style="border:1px solid black; text-align:center; font-weight:bold">

THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS 5:00 P.M., PREVAILING CENTRAL TIME, ON _____, 2013.

</div>

The Bankruptcy Court has set _____, 2013, as the Voting Record Date. (Confirmation Procedures Order, **Exhibit B**.)  If you are a Holder of a Claim as of the Voting Record Date, and if you are entitled to vote to accept or reject the Joint Plan, a Ballot is enclosed for the purpose of voting on the Joint Plan. If you are a Holder of a Claim or Interest that is entitled to vote and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning the procedures for voting on the Joint Plan, please contact the Voting Agent at 1-888-909-0100.

**THE BALLOT MAY NOT BE USED FOR ANY PURPOSE OTHER THAN TO VOTE TO ACCEPT OR REJECT THE JOINT PLAN.**  Holders of Claims in the Voting Classes will receive a Ballot and a return envelope addressed directly to the Voting Agent. B**allots must be *received* by the Voting Agent by the Voting Deadline of _____ at _____ p.m. Prevailing Central Standard Time.**  If a Ballot is received after the Voting Deadline, it will not be counted.  Complete the Ballot by providing all the information requested, and sign, date and return the Ballot by mail, overnight courier or personal delivery to the Voting Agent at one of the following address:

| By U.S. Mail: | By Delivery or Courier: |
|---|---|
| **BMC Group, Inc.** | **BMC Group, Inc.** |
| **Attn: Piccadilly Restaurants, LLC** | **Attn: Piccadilly Restaurants, LLC** |
| **Ballot Processing** | **Ballot Processing** |
| **PO Box 3020** | **18675 Lake Drive East** |
| **Chanhassen, MN 55317-3020** | **Chanhassen, MN 55317** |

ANY EXECUTED BALLOT THAT FAILS TO INDICATE AN ACCEPTANCE OR REJECTION OF THE JOINT PLAN WILL NOT BE COUNTED. **BALLOTS RETURNED TO THE VOTING AGENT WILL NOT BE ACCEPTED BY THE VOTING AGENT BY FACSIMILE TRANSMISSION OR ANY OTHER ELECTRONIC MEANS**.

The Disclosure Statement and Exhibits A through E, the Joint Plan and Plan Exhibits can be downloaded, without charge, at the internet site with the address www.bmcgroup.com/piccadilly.

## XIII.  CONCLUSION AND RECOMMENDATION

This Disclosure Statement is intended to assist Holders of Claims against and Interests in the Debtors to make an informed decision regarding the acceptance of the Joint Plan. If the Joint Plan is confirmed, all Holders of Claims and Interests will be bound by its terms. The Debtors believe that Confirmation and implementation of the Joint Plan is preferable to any of the alternatives described above and respectfully urges each Holder of a Claim against and Interests in the Debtors to review the Disclosure Statement carefully and the enclosed copy of the Joint Plan, to accept the Joint Plan, and to evidence such acceptance by returning their Ballots on or before the date to be fixed by the Bankruptcy Court.

Date:  As of July 8, 2013

*/s/ Elizabeth J. Futrell*

R. PATRICK VANCE (#13008)
ELIZABETH J. FUTRELL (#05863)
MARK A. MINTZ (#31878)
Jones Walker LLP
201 St. Charles Avenue, 51st Floor
New Orleans, LA 70170
Telephone: (504) 582-8000
Direct Facsimile:  (504) 589-8194
Email:  pvance@joneswalker.com
Email:  efutrell@joneswalker.com
Email:  mmintz@joneswalker.com

**Attorneys for Piccadilly Restaurants, LLC,
Piccadilly Food Service, LLC and
Piccadilly Investments, LLC**

# THE JOINT PLAN AND THE PLAN EXHIBITS

# EXHIBIT A

{N2660688.1}

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **IN RE:** | * **CASE NO. 12-51127** |
| | * |
| | * **(JOINT ADMINISTRATION)** |
| **PICCADILLY RESTAURANTS, LLC,** | * |
| *ET AL.,* | * **CHAPTER 11** |
| | * |
| **DEBTORS** | * **JUDGE ROBERT** |
| | **SUMMERHAYS** |

**JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PICCADILLY
RESTAURANTS, LLC, PICCADILLY FOOD SERVICE, LLC, AND PICCADILLY
INVESTMENTS, LLC, PROPOSED BY THE DEBTORS AND YUCAIPA
CORPORATE INITIATIVES FUND I, L.P., DATED AS OF JULY 8, 2013**

**R. PATRICK VANCE (LA 13008)**
**ELIZABETH J. FUTRELL (LA 05863)**
**MARK A. MINTZ (LA 31878)**
Jones Walker LLP
201 St. Charles Avenue, 51st Floor
New Orleans, LA 70170
Telephone: (504) 582-8000
Email: pvance@joneswalker.com
Email: efutrell@joneswalker.com
Email: mmintz@joneswalker.com

**Attorneys for Piccadilly Restaurants, LLC,
Piccadilly Food Service, LLC and
Piccadilly Investments, LLC, the
Debtors and Debtors-in-Possession**

**ROBERT KLYMAN**
Latham & Watkins, LLP
355 South Grand Avenue
Los Angeles, CA 90071-1560
Telephone: (213) 485- 1234
Email: ROBERT.KLYMAN@lw.com

**WILLIAM H. PATRICK, III (LA 10359)**
**TRISTAN E. MANTHEY (LA 24539)**
Heller, Draper, Patrick & Horn
650 Poydras Street, Suite 2500
New Orleans, LA 70130-6103
Telephone: (504) 299-3300
Email: wpatrick@hellerdraper.com
Email: tmanthey@hellerdraper.com

**Attorneys for Yucaipa Corporate
Initiatives Fund I, L.P.**

# TABLE OF CONTENTS

**ARTICLE I - DEFINED TERMS AND RULES OF INTERPRETATION** ........................1

Section 1.1    "Administrative Claim". ....................................................................1
Section 1.2    "Administrator" ...............................................................................1
Section 1.3    "Administrative Claim Bar Date"......................................................1
Section 1.4    "Administrative Claim Bar Date Order"............................................1
Section 1.5    "Administrative Trade Claim"...........................................................1
Section 1.6    "Affiliate" . ....................................................................................1
Section 1.7    "Allowed"....................................................................................1-2
Section 1.8    "Allowed Merchants 503(b)(9) Claim". ...........................................2
Section 1.9    "Atalaya".........................................................................................2
Section 1.10   "Atalaya Collateral" .......................................................................2
Section 1.11   "Atalaya Loan Documents" ..........................................................2-3
Section 1.12   "Atalaya Secured Claim" .................................................................3
Section 1.13   "Atalaya Adversary Proceeding".....................................................3
Section 1.14   "Ballot".............................................................................................3
Section 1.15   "Bankruptcy Cases" .........................................................................3
Section 1.16   "Bankruptcy Causes of Action"........................................................3
Section 1.17   "Bankruptcy Code"...........................................................................3
Section 1.18   "Bankruptcy Court"..........................................................................4
Section 1.19   "Bankruptcy Rules" .........................................................................4
Section 1.20   "Bar Date".......................................................................................4
Section 1.21   "Bar Date Order"..............................................................................4
Section 1.22   "BP Tort Claims"..............................................................................4
Section 1.23   "BP and Other Tort Claims".............................................................4
Section 1.24   "BP and Other Tort Claim Proceeds". ..............................................4
Section 1.25   "Business Day". ...............................................................................4
Section 1.26   "Cash" .............................................................................................4
Section 1.27   "Causes of Action" ..........................................................................4
Section 1.28   "Claim" ...........................................................................................4
Section 1.29   "Class" .............................................................................................4
Section 1.30   "Clerk" .............................................................................................4
Section 1.31   "Collateral".......................................................................................4
Section 1.32   "Confirmation". ...............................................................................4
Section 1.33   "Confirmation Date".........................................................................5
Section 1.34   "Confirmation Hearing"...................................................................5
Section 1.35   "Confirmation Order"......................................................................5
Section 1.36   "Confirmation Procedures Order" ...................................................5
Section 1.37   "Convenience Claim" ......................................................................5
Section 1.38   "Creditors' Committee"....................................................................5
Section 1.39   "Cure Amount Claim" .....................................................................5
Section 1.40   "Debtors" .........................................................................................5
Section 1.41   "DIP Agent" .....................................................................................5
Section 1.42   "DIP Financing Facility". .................................................................5

i

Section 1.43 "DIP Financing Claim"................................................................5
Section 1.44 "DIP Financing Stipulation"........................................................5
Section 1.45 "DIP Financing Final Order"........................................................6
Section 1.46 "DIP Lenders"...............................................................................6
Section 1.47 "Disbursing Agent".......................................................................6
Section 1.48 "Disclosure Statement"..................................................................6
Section 1.49 "Disputed".....................................................................................6
Section 1.50 "Distribution".................................................................................6
Section 1.51 "Distribution Record Date"...........................................................6
Section 1.52 "District Court"..............................................................................6
Section 1.53 "Docket".........................................................................................6
Section 1.54 "Document Website"......................................................................6
Section 1.55 "Effective Date".............................................................................6
Section 1.56 "Entity"..........................................................................................7
Section 1.57 "Estate"..........................................................................................7
Section 1.58 "Excess Cash Flow Sweep"..........................................................7
Section 1.59 "Executory Contract".....................................................................7
Section 1.60 "Exculpated Parties".....................................................................7
Section 1.61 "File," "Filed" or "Filing"..........................................................7
Section 1.62 "Final Order".................................................................................7
Section 1.63 "General Unsecured Claim"..........................................................7
Section 1.64 "General Unsecured Claim Effective Date Payment"...................7
Section 1.65 "General Unsecured Claim Note"..................................................7
Section 1.66 "General Unsecured Claim Note Documents".............................7
Section 1.67 "General Unsecured Distribution Account"..................................8
Section 1.68 "Holder".........................................................................................8
Section 1.69 "Interests".......................................................................................8
Section 1.70 "Impaired".....................................................................................8
Section 1.71 "Intermediate Holdco"..................................................................8
Section 1.72 "Intermediate Holdco Equity Interests".......................................8
Section 1.73 "IRS"..............................................................................................8
Section 1.74 "Joint Plan"....................................................................................8
Section 1.75 "Lien".............................................................................................8
Section 1.76 "Litigation Claims".......................................................................8
Section 1.77 "Management Services Fee Claim"............................................8-9
Section 1.78 "Material Adverse Change"...........................................................9
Section 1.79 "Minimum Liquidity Covenant"...................................................9
Section 1.80 "New Atalaya Secured Note".......................................................9
Section 1.81 "Order"..........................................................................................9
Section 1.82 "Ordinary Course Professionals Order".......................................9
Section 1.83 "Other Priority Claim"..................................................................9
Section 1.84 "Other Secured Claim"..................................................................9
Section 1.85 "Pari Passu"...................................................................................9
Section 1.86 "Petition Date"..............................................................................9
Section 1.87 "PFS"............................................................................................9

ii

Section 1.88 "PFS Plan". ............................................................................10
Section 1.89 "Piccadilly Investments" ........................................................10
Section 1.90 "PI". .......................................................................................10
Section 1.91 "PI Plan" ...............................................................................10
Section 1.92 "Piccadilly Restaurants" ........................................................10
Section 1.93 "Plan Exhibits" ......................................................................10
Section 1.94 "Plan Sponsors" ....................................................................10
Section 1.95 "Post-Petition Atalaya Liens". ...............................................10
Section 1.96 "PR" ......................................................................................10
Section 1.97 "PR Plan" ..............................................................................10
Section 1.98 "Priority Tax Claim" ..............................................................10
Section 1.99 "Professional" .......................................................................10
Section 1.100 "Professional Fee Claims" ...................................................10
Section 1.101 "Proof of Claim" ..................................................................10
Section 1.102 "Pro Rata Share" ..................................................................11
Section 1.103 "Released Parties" ................................................................11
Section 1.104 "Reorganized Debtors" ........................................................11
Section 1.105 "Reorganized PI" .................................................................11
Section 1.106 "Reorganized PR" ................................................................11
Section 1.107 "Schedules" .........................................................................11
Section 1.108 "Secured Claim" ..................................................................11
Section 1.109 "Section 503(b)(9) Claim". ..................................................11
Section 1.110 "Stipulation of Amount and Nature of Claim" .....................11
Section 1.111 "Tax" ...................................................................................11
Section 1.112 "Tax Claim" .........................................................................12
Section 1.113 "Unexpired Lease". ..............................................................12
Section 1.114 "Unimpaired" .......................................................................12
Section 1.115 "U.S. Trustee Fees" .............................................................12
Section 1.116 "Voting Record Date". .........................................................12
Section 1.117 "Yucaipa" ............................................................................12
Section 1.118 "Yucaipa Advance" . ............................................................12
Section 1.119 "Yucaipa Advance Documents". ...........................................12
Section 1.120 "Yucaipa Expense Claim" ....................................................12
Interpretation; Application of Definitions and Rules of Construction ........ 12-13

**ARTICLE II - CLASSIFICATION OF CLAIMS AND INTERESTS** ...........................13

Section 2.1     Division of Claims.  ...........................................................13
Section 2.2     The Joint Plan includes the PR Plan, the PFS Plan and
               the PI Plan.  ......................................................................13
Section 2.3     No Interest After the Petition Date Unless Otherwise Provided.  ...........13
Section 2.4     Allowed Claims and Interests.  ...........................................13

Section 2.5     Classification of Claims and Interests with Respect to the PR Plan. ........13
               (a) PR Class 1 consists of Other Priority Claims against PR ......................13

iii

(b)  PR Class 2 consists of the Atalaya Secured Claim against PR.. ...........................13
(c)  PR Class 3 consists of Other Secured Claims against PR, if any. ......................13
(d)  PR Class 4 consists of Convenience Claims against PR......................................13
(e)  PR Class 5 consists of General Unsecured Claims against PR. . ..........................14
(f)  PR Class 6 consists of the Litigation Claims against PR......................................14
(g) PR Class 7 consists of the Interests in PR. ........................................................14

Section 2.6      Classification of Claims and Interests with respect to the PFS Plan. ........14
(a)  PFS Class 1 consists of Other Priority Claims against PFS, if any.. ......................14
(b)  PFS Class 2 consists of the Atalaya Secured Claim against PFS... .........................14
(c)  PFS Class 3 consists of the Other Secured Claims against PFS, if any.................14
(d)  PFS Class 4 consists of General Unsecured Claims against PFS, if any., .............14
(e)  PFS Class 5 consists of the Interests in PFS.........................................................14

Section 2.7      Classification of Claims and Interests with respect to the PI Plan.  ........14
(a)  PI Class 1 consists of Other Priority Claims against PI, if any..............................14
(b)  PI Class 2 consists of the Atalaya Secured Claim against PI.. ..............................14
(c)  PI Class 3 consists of the Other Secured Claims against PI, if any........................14
(d)  PI Class 4 consists of General Unsecured Claims against PI, if any.. ....................14
(e)  PI Class 5 consists of the Interests in PI.. ...........................................................14

ARTICLE III.... - TREATMENT OF CERTAIN UNCLASSIFIED ADMINISTRATIVE
CLAIMS, CERTAIN FEES AND TAXES ........................................................................15

Section 3.1      Administrative Claims. ........................................................................15
(a)  Generally.. ........................................................................................................15
(b)  Ordinary Course Liabilities. ..............................................................................15
(c)  The DIP Financing Claim. ..................................................................................15
(d)  Yucaipa Expense Claim.  ..................................................................................15
(e)  U.S. Trustee Fees. .............................................................................................16

Section 3.2      Bar Dates for Administrative Claims.........................................................16
(a)  General Bar Date Provisions.. ............................................................................16
(b)  Bar Dates for Certain Administrative Claims. ....................................................16
     (i)    Professional Fee Claims. ..........................................................................16
     (ii)   Ordinary Course Liabilities.......................................................................16
     (iii)  The DIP Financing Claim. .......................................................................16
     (iv)  Yucaipa Expense Claim. ...........................................................................17

Section 3.3      Payment of Priority Tax Claims. ...............................................................17

ARTICLE IV – THE PR PLAN: TREATMENT OF CLASSIFIED CLAIMS AND
INTERESTS .................................................................................................................17

Section 4.1      PR Class 1 Claims (Other Priority Claims). ...............................................17

iv

Section 4.2    PR Class 2 (Atalaya Secured Claim). ......................................................18
Section 4.3    PR Class 3 (Other Secured Claims). .....................................................18
Section 4.4    PR Class 4 (Convenience Claims). ................................................ 18-19
Section 4.5    PR Class 5 (General Unsecured Claims). ........................................ 19-21
Section 4.6    PR Class 6 (Litigation Claims). ..........................................................21
Section 4.7    PR Class 7 (Interests). .........................................................................21

## ARTICLE V- THE PFS PLAN: TREATMENT OF CLASSIFIED CLAIMS AGAINST PFS AND INTERESTS IN PFS ...........................................................................21

Section 5.1    PFS Class 1 Claims (Other Priority Claims). ................................... 21-22
Section 5.2    PFS Class 2 (Atalaya Secured Claim). ................................................22
Section 5.3    PFS Class 3 (Other Secured Claims). .............................................. 22-23
Section 5.4    PFS Class 4 (General Unsecured Claims). ............................................23
Section 5.5    PFS Class 5 (Interests). .......................................................................23

## ARTICLE VI – THE PI PLAN: TREATMENT OF CLASSIFIED CLAIMS AGAINST PI AND INTERESTS IN PI ...............................................................................23

Section 6.1    PI Class 1 Claims (Other Priority Claims)......................................... 23-24
Section 6.2    PI Class 2 (Atalaya Secured Claim).....................................................24
Section 6.3    PI Class 3 (Other Secured Claims). ....................................................24
Section 6.4    PI Class 4 (General Unsecured Claims)................................................25
Section 6.5    PI Class 5 (Interests). .........................................................................25

## ARTICLE VII – MEANS FOR IMPLEMENTATION OF THE JOINT PLAN ............25

Section 7.1    Yucaipa Advance and the Management Services Fee Claim. ............. 25-26
Section 7.2    Intermediate Holdco. ........................................................................26
Section 7.3    Administrator. ............................................................................... 26-27
Section 7.4    Continued Corporate Existence and Re-Vesting of Assets in the
               Reorganized Debtors. .....................................................................27
Section 7.5    Corporate Governance, Managing Members, Officers, Directors, and
               Other Corporate Action...................................................................... 27-28
Section 7.6    Preservation of Causes of Action. ......................................................28
Section 7.7    Release and Waiver of Certain Bankruptcy Causes of Action and
               Preservation of other Bankruptcy Causes of Action................................28
Section 7.8    Stipulation Regarding the Amount and Nature of the Claim from and
               after the Effective Date. ...................................................................28
Section 7.9    Effectuating Documents; Further Transactions; Exemption from
               Certain Transfer Taxes. ...................................................................28
Section 7.10   General Settlement of Claims. ............................................................28
Section 7.11   Cancellation of Notes, Instruments, Certificates and other
               Documents. ................................................................................ 28-29

v

**ARTICLE VIII – PROVISIONS GOVERNING DISTRIBUTIONS AND OBJECTIONS TO CLAIMS** ...................................................................................................**29**

    Section 8.1     Distributions Generally. ................................................................29
    Section 8.2     Delivery of Distributions to Holders of Allowed Claims. ......29
    Section 8.3     Undeliverable Distributions. ........................................................29
        (a)  No Further Attempts at Delivery. ..............................................29
        (b)  Forfeiture. ............................................................................... 29-30
        (c)  No Requirement to Attempt to Locate Holders.....................30

    Section 8.4     Exemption from Securities Laws. ..............................................30
    Section 8.5     Means of Cash Payments.............................................................30
    Section 8.6     Setoffs and Recoupment. .............................................................30
    Section 8.7     Distribution Record Date. ...........................................................30
        (a) Allowed Claim. ...........................................................................30
        (b) Pending Transfers. ......................................................................30

    Section 8.8     Distributions in Complete Satisfaction. ...................................30
    Section 8.9     Objections to Claims. ..................................................................31
    Section 8.10    Estimation of Claims. ..................................................................31

**ARTICLE IX – TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ........................................................................................................**31**

    Section 9.1     Executory Contracts or Unexpired Leases to Be Rejected or Assumed.........................................................................................31
        (a) Generally. .....................................................................................31
        (b) Approval of Assumptions....................................................... 31-32

    Section 9.2     Payments Related to the Assumption of Executory Contracts and Unexpired Leases. ...............................................................32
    Section 9.3     Bar Date for Rejection Damages. ...............................................32
    Section 9.4     Obligations to Indemnify Directors, Officers and Employees. ................32
    Section 9.5     Contracts and Leases Entered into After the Petition Date......................32
    Section 9.6     Insurance Policies and Agreements. ..........................................32
        (a) Assumed Insurance Policies and Agreements. ....................... 32-33
        (b) Reservation of Rights. ................................................................33

    Section 9.7     Compensation and Benefit Programs.........................................33

**ARTICLE X – CONDITIONS TO THE JOINT PLAN BECOMING EFFECTIVE AND IMPLEMENTATION OF THE JOINT PLAN** ..................................................**33**

    Section 10.1    Conditions to the Joint Plan Becoming Effective....................33
    Section 10.2    Waiver of Conditions to the Effective Date. ...........................33

vi

Section 10.3    Filing Notice of Occurrence of the Effective Date. ..................................33

Section 10.4    Effect of Non-Occurrence of Conditions to Consummation. .................34

**ARTICLE XI - DISCHARGE, RELEASES AND INJUNCTION......................................34**

Section 11.1    Discharge of Claims.................................................................................34

Section 11.2    Injunction. ..........................................................................................34-35

Section 11.3    Term of the Automatic Stay. ..................................................................35

Section 11.4    Release of Liens. ....................................................................................35

Section 11.5    No Successor Liability.............................................................................35

Section 11.6    Releases...................................................................................................35

(a)  Releases by the Debtors and the Reorganized Debtors ...............................35-36

(b)  Releases by the Holders of Claims..............................................................36

Section 11.7    Exculpation. .......................................................................................36-37

**ARTICLE XII – RETENTION OF JURISDICTION.....................................................37-38**

**ARTICLE XIII - MISCELLANEOUS ...............................................................................38**

Section 13.1    Creditors' Committee..............................................................................38

Section 13.2    Administrative Consolidation of the Debtors for Joint Plan

                   Purposes Only ...................................................................................38-39

Section 13.3    Modification of the Joint Plan. ................................................................39

Section 13.4    Revocation or Withdrawal of the Joint Plan. ..........................................39

Section 13.5    Severability. ............................................................................................39

Section 13.6    Plan Exhibits ..........................................................................................39

Section 13.7    Service of Certain Plan Exhibits and Disclosure Statement

                   Exhibits. ...........................................................................................39

Section 13.8    Binding Effect. .......................................................................................39

Section 13.9    Substantial Consummation.. ....................................................................40

Section 13.10  Successors and Assigns. .........................................................................40

Section 13.11  Headings. ................................................................................................40

Section 13.12  Governing Law .......................................................................................40

Section 13.13  Notices. ...................................................................................................40

Section 13.14   No Admissions....................................................................................40-41

**ARTICLE XIV - CRAMDOWN ........................................................................................41**

vii

Piccadilly Restaurants, LLC, Piccadilly Food Service, LLC, and Piccadilly Investments, LLC, the debtors and debtors-in-possession herein (collectively, the "<u>Debtors</u>"), and Yucaipa Corporate Initiatives Fund I, L.P. propose the following Joint Chapter 11 Joint Plan of Reorganization (the "<u>Plan</u>") for the resolution of the outstanding claims against and equity interests in the Debtors. The Plan includes (a) with respect to Piccadilly Restaurants, LLC ("<u>PR</u>"), the treatment of the claims against and equity interests in PR (the "<u>PR Plan</u>"), (b) with respect to Piccadilly Food Services, LLC ("<u>PFS</u>"), the treatment of the claims against and equity interests in PFS (the "<u>PFS Plan</u>"), and (c) with respect to Piccadilly Investments, LLC ("<u>PI</u>"), the treatment of the claims against and equity interests in PI (the "<u>PI Plan</u>"). The provisions of the Plan, together with the provisions of the PR Plan, the PFS Plan and the PI Plan, shall be collectively referred to as the "<u>Joint Plan</u>."

# ARTICLE I
# DEFINED TERMS AND RULES OF INTERPRETATION

In addition to such other terms as may be defined in other Sections of the Joint Plan, the following capitalized terms will have the following meanings:

**Section 1.1** "**Administrative Claim**" means a Claim for costs and expenses of administration allowed under sections 503(b), 507(b)(a)(2) or 1114(e)(2) of the Bankruptcy Code, including (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving any Estate and operating one or all of the Debtors' businesses, including the Administrative Trade Claims and DIP Financing Claim, (b) the Professional Fee Claims, (c) the U.S. Trustee Fees, (d) the Cure Amount Claims, (e) any Section 503(b)(9) Claim, and (f) the Yucaipa Expense Claim.

**Section 1.2** "**Administrator**" has the meaning given to such term in Section 7.3.

**Section 1.3** "**Administrative Claim Bar Date**" means the date by which, except as otherwise provided in the Joint Plan, all requests for payment of Administrative Claims are required to be Filed with the Bankruptcy Court.

**Section 1.4** "**Administrative Claim Bar Date Order**" means the Order of the Bankruptcy Court (which may be the Confirmation Order) establishing the Administrative Claim Bar Date.

**Section 1.5** "**Administrative Trade Claim**" means an Administrative Claim in respect of the sale of goods or rendition of services on or after the Petition Date in the ordinary course of the Debtors' businesses, excluding (a) Administrative Claims of employees for ordinary course wages, expense reimbursement and health and welfare benefits, and (b) The Merchants Company d/b/a Merchants Foodservice credit line pursuant to Section 15.02 of that certain Primary Purchase and Distribution Agreement, effective as of October 1, 2012, and approved by Order of the Bankruptcy Court (Docket #412).

**Section 1.6** "**Affiliate**" has the same meaning set forth in section 101(2) of the Bankruptcy Code.

**Section 1.7** "**Allowed**" means, (a) when used with respect to an Administrative Claim, all or any portion of an Administrative Claim (i) that has been adjudicated in favor of the Holder by estimation or liquidation, by a Final Order, or (ii) that is specifically deemed allowed pursuant to the Joint Plan, or (iii) for which a Proof of Claim in a liquidated amount has been timely Filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court, or other applicable bankruptcy law, and as to which no objection to its allowance has been Filed within the periods of limitation fixed by the Joint Plan, the Bankruptcy Code, or any Order of the Bankruptcy Court; or (b)

when used with respect to a Claim other than an Administrative Claim, such Claim or any portion thereof (i) that has been allowed, or adjudicated in favor of the Holder by estimation or liquidation, by a Final Order, or (ii) as to which (x) no Proof of Claim has been Filed, and (y) the liquidated and noncontingent amount of which is included in the Schedules, other than a Claim that is included in the Schedules as Disputed, or (iii) for which a Proof of Claim in a liquidated amount has been timely Filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court, or other applicable bankruptcy law, and as to which no objection to its allowance has been Filed within the periods of limitation fixed by the Joint Plan, the Bankruptcy Code, or any Order of the Bankruptcy Court, or (iv) that is expressly deemed allowed pursuant to the Joint Plan.

Section 1.8 "**Allowed Merchants 503(b)(9) Claim**" means the Claim in the amount of $2,323,585.00 of The Merchants Company d/b/a Merchants Foodservice under section 503(b)(9) of Bankruptcy Code that was Allowed pursuant to an Order entered on December 19, 2012 (Docket #412).

Section 1.9 "**Atalaya**" collectively means the Atalaya Administrative LLC, Atalaya Funding II, LLP, Atalaya Cayman Special Opportunities Fund (Cayman) IV, LP (Tranche B), Atalaya Special Opportunities Fund IV, L.P. (Tranche B), or any of their successors in interest as holders of the Atalaya Secured Claim.

Section 1.10 "**Atalaya Collateral**" collectively means all of the Debtors' property and assets that collateralized and secured the Atalaya Secured Claim as of immediately before the Petition Date, as may be determined by (a) stipulation among the Creditors' Committee and Atalaya resolving the Atalaya Adversary Proceeding approved by Final Order or (b) by any other Final Order in the Atalaya Adversary Proceeding. For the avoidance of doubt, the Atalaya Collateral shall not include the Intermediate Holdco Equity Interests.

Section 1.11 "**Atalaya Loan Documents**" collectively means that certain Amended and Restated Loan and Security Agreement, dated as of July 21, 2006, in favor of Wells Fargo Foothill, Inc., as administrative agent for the lenders, as amended from time to time through that certain Fifth Amendment, dated as of October 15, 2010, by and among PR, as grantor (and others), including, but not limited to the following (a) that certain First Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, dated as of May 10, 2004, by PR, as borrower, in favor of Wells Fargo Foothill, Inc., as administrative agent for the lenders, recorded in Broward County, Florida, on May 27, 2004, at Instrument No. 104035325, at Book 37553, Pages 113-137, (b) that certain Second Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, dated May 10, 2004, by PR, as borrower, in favor of Wells Fargo Foothill, Inc., as administrative agent for the lenders, recorded in Broward County, Florida, on May 2, 2004, at Document No. 104035326, at Book 37553, Pages 138-162, (c) that certain Assignment of First Mortgage, Assignment of Rents, Security Agreement and Fixture, dated May 8, 2012, by Wells Fargo Capital Finance, Inc. (formerly known as Wells Fargo Foothill, Inc.), as assignor, recorded in Broward County, Florida, on Ma 24, 2012, at Document No. 110777689, at Book 49776, Page 1909-1912; (d) that certain Assignment of Second Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, dated August 16, 2012, by Wells Fargo Capital Finance, Inc. (formerly known as Wells Fargo Foothill, Inc.), as assignor, recorded in Broward County, Florida, on August 22, 2012, at Document No. 110956915, at Book 49016, Page 1909-980; (e) that certain First Deed to Secure Debt, Assignment of Rents and Security Agreement, dated May 10, 2004, by PR, as borrower, in favor of Wells Fargo Foothill, Inc., as administrative agent for the lenders, recorded in Houston County, Georgia, on June 7, 2004, at Document No. 006037280024, Book 3036, Pages 82-105; (f) that certain Second Deed to Secure Debt, Assignment of Rents and Security Agreement, dated May 10, 2004, by PR, as borrower, in favor Wells Fargo Foothill, Inc., as administrative agent for the lenders, recorded in Houston County, Georgia, on

- 2 -

June 7, 2004, at Document No. 006037200027, Book 3036, Pages 106-132; (g) that certain Assignment of First Deed to Secure Debt, Assignment of Rents and Security Agreement, dated May 8, 2012, by Wells Fargo Capital Finance, Inc. (formerly known as Wells Fargo Foothill, Inc.), as assignor, recorded in Houston County, Georgia, on May 23, 2012, at Document No. 012458840004, Book 5857, Pages 64-67; (h) that certain Assignment of Second Deed to Secure Debt, Assignment of Rents and Security Agreement, dated August 16, 2012, by Wells Fargo Capital Finance, Inc. (formerly known as Wells Fargo Foothill, Inc.), as assignor, recorded in Houston County, Georgia, on August 20, 2012, at Document No. 012563530004, Book 5940, Page 228-231; and (i) the following UCC-1 Financing Statements (i) that certain Financing Statement in favor of Wells Fargo Foothill, Inc., as Agent, recorded at the Delaware Department of State on April 29, 2004, Filing No. 4120501, (ii) that certain Financing Statement (Continuation) filed by Wells Fargo Foothill, Inc., as Agent, recorded at the Delaware Department of State on January 6, 2009, at Amendment 2009-0205135, (iii) that certain Financing Statement Amendment filed by Wells Fargo Capital Finance, Inc., as Agent, recorded at the Delaware Department of State on May 19, 2010, to reflect name change, at Amendment 2010-17532, (iv) that certain Financing Statement (Assignment) filed by Atalaya Administrative LLC, as agent for itself and the other lenders, recorded at the Delaware Department of State on May 3, 2012, at File No. 20121782346, and (iv) a Financing Statement (Assignment) filed by Atalaya Administrative LLC, as agent for itself and the other lenders, recorded at the Delaware Department of State on May 3, 2012, at File No. 2012178353.

Section 1.12 "**Atalaya Secured Claim**" means all Secured Claims arising under or in connection with the Atalaya Loan Documents, which is treated in PR Class 2, PFS Class 2 and PI Class 2 of the Joint Plan.

Section 1.13 "**Atalaya Adversary Proceeding**" means the adversary proceeding initiated on March 19, 2013, by the Creditors' Committee against Atalaya Administrative LLC, Atalaya Funding II, LLP, Atalaya Cayman Special Opportunities Fund (Cayman) IV, LP (Tranche B), Atalaya Special Opportunities Fund IV, L.P. (Tranche B), in case no. 13-0059 on the docket of the Bankruptcy Court.

Section 1.14 "**Ballot**" means the forms of ballots to be distributed with the Disclosure Statement to each Holder of an Impaired Claim entitled to vote on the Joint Plan on which the Holder shall indicate, among other things, acceptance or rejection of the Joint Plan.

Section 1.15 "**Bankruptcy Cases**" means the procedurally consolidated bankruptcy cases in the Bankruptcy Court under chapter 11 of the Bankruptcy Code, captioned *In re Piccadilly Restaurants, LLC*, 12-51127 (Bankr. W.D. La. 2012), *In re Piccadilly Food Service, LLC*, 12-51128 (Bankr. W.D. La. 2012), and *In re Piccadilly Investments, LLC*, 12-51129 (Bankr. W.D. La. 2012).

Section 1.16 "**Bankruptcy Causes of Action**" means all rights, claims, causes of action, avoiding powers, suits and proceedings of or brought by or which may be asserted by the Debtors under chapter 5 of the Bankruptcy Code, including by way of illustration and not limitation, under Sections 510, 541, 544, 547, 548, 549, 550, 553 and 554 of the Bankruptcy Code, together with any claims, rights, remedies or demands that may be asserted by a creditor or representative of creditors under similar applicable state or other law, and claims in the nature of substantive consolidation, successor liability, veil piercing or alter ego.

Section 1.17 "**Bankruptcy Code**" means title 11 section 101 *et seq.* of the United States Code, as amended from time to time.

**Section 1.18 "Bankruptcy Court"** means the United States Bankruptcy Court for the Western District of Louisiana, Lafayette Division, having jurisdiction over the Bankruptcy Cases, or if such court ceases to exercise jurisdiction over the Bankruptcy Cases, such court or adjunct thereof that exercises jurisdiction over the Bankruptcy Cases.

**Section 1.19 "Bankruptcy Rules"** mean the Federal Rules of Bankruptcy Procedure as provided by the United States Supreme Court under section 2075 of title 28 of the United States Code, and any Local Rules of the Bankruptcy Court.

**Section 1.20 "Bar Date"** means the last day for Filing proofs of claim, as established by the Bankruptcy Court in the Bar Date Order, which is March 15, 2013.

**Section 1.21 "Bar Date Order"** means the Order (Docket #477) that established the Bar Date, as the same may have been amended.

**Section 1.22 "BP Tort Claims"** mean the commercial tort claims and Causes of Action owned by the Debtors arising out of the 2010 Deepwater Horizon explosion and oil spill in the Gulf of Mexico.

**Section 1.23 "BP and Other Tort Claims"** mean the commercial tort claims owned by the Debtors, including but not limited to the BP Tort Claims.

**Section 1.24 "BP and Other Tort Claim Proceeds"** means any and all proceeds of the BP Tort and Other Claims.

**Section 1.25 "Business Day"** means any day other than a Saturday, Sunday, or other day on which commercial banks in Lafayette, Louisiana are required or authorized to close by law or executive order.

**Section 1.26 "Cash"** means legal tender of the United States of America and equivalents thereof.

**Section 1.27 "Causes of Action"** collectively means, without limitation, any and all actions, causes of action, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, claims and demands whatsoever, whether known or unknown, in law, equity or otherwise, excluding the Bankruptcy Causes of Action.

**Section 1.28 "Claim"** has the same meaning as set forth in section 101(5) of the Bankruptcy Code.

**Section 1.29 "Class"** means a category of Holders of Claims or Interests, as more fully described in Article II of the Joint Plan.

**Section 1.30 "Clerk"** means the Clerk of the Bankruptcy Court.

**Section 1.31 "Collateral"** means any property or interest in property of any Estate subject to an unavoidable Lien securing the payment or performance of a Claim.

**Section 1.32 "Confirmation"** means the entry of an Order by the Bankruptcy Court confirming the Joint Plan.

- 4 -

**Section 1.33 "Confirmation Date"** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the Docket.

**Section 1.34 "Confirmation Hearing"** means the hearing held by the Bankruptcy Court to consider Confirmation of the Joint Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

**Section 1.35 "Confirmation Order"** means the Order of the Bankruptcy Court confirming the Joint Plan pursuant to section 1129 of the Bankruptcy Code.

**Section 1.36 "Confirmation Procedures Order"** means the Order granting the Debtors' Motion for Entry of an Order Approving (I) Disclosure Statement, and (II) with Respect to the Joint Plan of Reorganization, (A) the Confirmation Hearing Notice, the Manner of Mailing and Service of the Solicitation Package and Confirmation Notice and Publication of the Confirmation Hearing Date, (B) the Voting Agent and Procedures for Voting and Tabulation of Ballots, (C) the Forms of Ballots, and (D) the Procedures for Allowing Claims for Voting Purposes (Docket #____).

**Section 1.37 "Convenience Claim"** means any Allowed General Unsecured Claim or Allowed Litigation Claim that (a) is equal to or less than $2,500, or (b) exceeds $2,500 and the Holder thereof elects, in writing on its Ballot or otherwise in writing before the Confirmation Hearing, to reduce such Claim to $2,500. The Convenience Claims are treated in PR Class 4 of the Joint Plan.

**Section 1.38 "Creditors' Committee"** means the Official Committee of Unsecured Creditors of the Debtors, as appointed by the U. S. Trustee pursuant to section 1102 of the Bankruptcy Code, on October 23, 2012.

**Section 1.39 "Cure Amount Claim"** means any Claim based upon the one of Debtor's defaults on an Executory Contract or Unexpired Lease that exist at the time that such Executory Contract or Unexpired Lease is assumed pursuant to section 365 of the Bankruptcy Code.

**Section 1.40 "Debtors"** has the meaning set forth in the introductory paragraph of the Joint Plan.

**Section 1.41 "DIP Agent"** means Atalaya Administrative LLC, in its capacity as the DIP Agent, as set forth in the DIP Financing Stipulation.

**Section 1.42 "DIP Financing Facility"** means the money borrowed by the Debtors under the credit facility established pursuant to the DIP Financing Stipulation.

**Section 1.43 "DIP Financing Claim"** means the Claims arising from or with respect to the DIP Financing pursuant to the DIP Financing Stipulation.

**Section 1.44 "DIP Financing Stipulation"** means that certain Stipulation and Final Order (a) Authorizing Post-Petition Financing, (b) Authorizing Use of Cash Collateral, (c) Granting Superpriority Security Interests and Administrative Claims Pursuant to 11 U.S.C. § 364, (d) Granting Adequate Protection to Pre-Petition Lenders, (e) Granting Limited Relief from the Automatic Stay and (f) Granting Related Relief (Docket #391), which DIP Financing Stipulation was approved by the Bankruptcy Court in the DIP Financing Final Order.

**Section 1.45 "DIP Financing Final Order"** collectively means that certain Final Order entered on December 19, 2012 (Docket #418) that approved the DIP Financing Stipulation.

**Section 1.46** "**DIP Lenders**" has the meaning ascribed to it in the DIP Financing Stipulation (Docket #391).

**Section 1.47 "Disbursing Agent"** means the Reorganized Debtors or an Entity designated by the Reorganized Debtors to act as a Disbursing Agent pursuant to the Joint Plan; *provided, however*, that the Administrator shall be the Disbursing Agent with respect to all Distributions to Holders of Allowed General Unsecured Claims, as provided in Sections 4.5 and 7.3 of the Joint Plan.

**Section 1.48 "Disclosure Statement"** means the disclosure statement, as the same may be amended from time to time, Filed by the Debtors that relates to the Joint Plan, including, without limitation, all exhibits thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

**Section 1.49 "Disputed"** means, as to any Administrative Claim or Claim against or Interest in the Debtors, (a) any Claim, proof of which was required to be Filed by Order of the Bankruptcy Court, but as to which a Proof of Claim was not timely or properly Filed, (b) any Claim which was timely and properly Filed, but which has been or hereafter is listed on the Schedules as unliquidated, disputed, contingent, at zero, or in an unknown amount (c) any Administrative Claim, Claim or Interest which is disputed under the Joint Plan, or (d) any Administrative Claim, Claim or Interest, to which the Debtors, Yucaipa, the Creditors' Committee or, if not prohibited by the Joint Plan, any other party in interest, has interposed a timely objection, which objection has not been withdrawn or determined by a Final Order. Any Claim that is deemed Allowed pursuant the Joint Plan is not Disputed within the meaning of this definition.

**Section 1.50** "**Distribution**" means a payment a payment in Cash, or distribution of General Unsecured Claim Note or the New Atalaya Secured Note, as applicable, made by the Disbursing Agent to the Holder of an Allowed Claim on account of such Allowed Claim pursuant to the terms and conditions of the Joint Plan.

**Section 1.51** "**Distribution Record Date**" means the first Business Day after the Confirmation Date.

**Section 1.52** "**District Court**" means the United States District Court for the Western District of Louisiana, Lafayette Division.

**Section 1.53 "Docket"** means the docket in the Bankruptcy Cases maintained by the Clerk.

**Section 1.54 "Document Website"** means the internet site with the address http://www.bmcgroup.com/piccadilly, at which the Joint Plan, the Plan Exhibits, the Disclosure Statement, and the exhibits to the Disclosure Statement will be available, without charge, to any party in interest and the public.

**Section 1.55 "Effective Date"** means the first Business Day after which the conditions specified in Section 10.1 of the Joint Plan have been satisfied or waived in accordance with Section 10.2.

**Section 1.56 "<u>Entity</u>"** means any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, unincorporated organization, estate, trust, governmental unit or other entity, including the Debtors and the Office of the U.S. Trustee, whether singular or plural.

**Section 1.57 "<u>Estate</u>"** means the estate of each Debtor as created upon the commencement of the Bankruptcy Cases by section 541 of the Bankruptcy Code.

**Section 1.58 "<u>Excess Cash Flow Sweep</u>"** has the meaning given to such term in Section 4.5(b)(v) of the Joint Plan.

**Section 1.59 "<u>Executory Contract</u>"** means a contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

**Section 1.60 "<u>Exculpated Parties</u>"** collectively means Released Parties.

**Section 1.61 "<u>File</u>," "<u>Filed</u>" or "<u>Filing</u>"** means file, filed or filing with the Bankruptcy Court or its authorized designee in the Bankruptcy Cases.

**Section 1.62 "<u>Final Order</u>"** means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction, as entered on the Docket in the Bankruptcy Cases, or on the docket of any other court of competent jurisdiction, as applicable, the operation or effect of which has not been stayed, reversed, modified or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing or leave to appeal has expired and as to which no appeal or petition for review or rehearing or leave to appeal was filed or, if filed, no appeal or petition for review or rehearing remains pending; *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not cause such order or judgment not to be a Final Order.

**Section 1.63 "<u>General Unsecured Claim</u>"** means any Claim that arose before the Petition Date that is not an Administrative Claim, Cure Amount Claim, Priority Tax Claim, Other Priority Claim, Atalaya Secured Claim, Convenience Claim, or Litigation Claim. General Unsecured Claims are treated in PR Class 5, PFS Class 4 and PI Class 4 of the Joint Plan.

**Section 1.64 "<u>General Unsecured Claim Effective Date Payment</u>"** means the Distribution that the Administrator shall make on the Effective Date, pursuant to Sections 4.5(b)(ii), 5.4 or 6.4 of the Joint Plan.

**Section 1.65 "<u>General Unsecured Claim Note</u>"** means the promissory note to be executed in favor of the Administrator, on behalf of the Holders of the Allowed General Unsecured Claims in PR Class 5, PFS Class 4 and PI Class 4, pursuant to Sections 4.5, 5.4 or 6.4 of the Joint Plan, substantially in the form of **<u>Plan Exhibit 1.65</u>**, and otherwise in form and substance acceptable to Yucaipa.

**Section 1.66 "<u>General Unsecured Claim Note Documents</u>"** means the security agreement and any other documents to be executed in connection with the General Unsecured Claim Note, substantially in the form of **<u>Plan Exhibit 1.66</u>**, and otherwise in form and substance acceptable to Yucaipa.

- 7 -

**Section 1.67** "**General Unsecured Distribution Account**" means the bank account, established on the Effective Date by PR at Capital One Bank, held in the name of Piccadilly Restaurants, LLC, as a Reorganized Debtor.

**Section 1.68** "**Holder**" means any Entity that holds a Claim or Interest.

**Section 1.69** "**Interests**" collectively means a legal, equitable, or contractual Claim arising from any membership interest or other instrument evidencing an ownership in any one of the Debtors, and any options, warrants, rights, convertible securities, liquidation preference or other right to acquire such membership interests, or the right to payment or compensation based on such ownership or membership interests, including but not limited to, Claims arising from rescission of the purchase or sale of such ownership or membership interest, or damages arising from the purchase or sale of ownership or membership interest, or for reimbursement or contribution on account of such Claim. Interests are treated in PR Class 7, PFS Class 5 and PI Class 5 of the Joint Plan.

**Section 1.70** "**Impaired**" means, with respect to any Claim or Interest, that such Claim or Interest is impaired within the meaning of section 1124 of the Bankruptcy Code.

**Section 1.71** "**Intermediate Holdco**" has the meaning given to such term in Section 7.2 of the Joint Plan. The limited liability agreement will be substantially in the form of **Plan Exhibit 1.71**, and otherwise in form and substance acceptable to Yucaipa.

**Section 1.72** "**Intermediate Holdco Equity Interests**" means the equity interests in Intermediate Holdco.

**Section 1.73** "**IRS**" means the Internal Revenue Service of the Department of Treasury of the United States of America.

**Section 1.74** "**Joint Plan**" means, as applicable, each and all of the Chapter 11 Joint Plan of Reorganization, collectively, as set forth in the Joint Plan of Reorganization Filed by each of the Debtors herein, as the same may be amended, modified, or supplemented from time to time, together with the Plan Exhibit.`

**Section 1.75** "**Lien**" has the same meaning as set forth in section 101(37) of the Bankruptcy Code.

**Section 1.76** "**Litigation Claims**" collectively means the specific Claims that are listed on **Plan Exhibit 1.76**, *provided, however*, any Claim settled, compromised or otherwise resolved before the Effective Date shall not constitute a Litigation Claim. Litigation Claims are treated in PR Class 6 of the Joint Plan.

**Section 1.77** "**Management Services Fee Claim**" means the Allowed Claim for compensation for services due to PI's Managing Member, or its assignee, in administering PR, calculated in accordance with Section 5.3 of that certain Limited Liability Agreement of Piccadilly Investments, LLC, dated as of March 16, 2004. The Management Services Fee Claim that accrued before the Petition Date shall constitute an Allowed General Unsecured Claim that is treated in PR Class 5, and the Management Services Fee Claim that has accrued on and after the Petition Date through the Confirmation Date shall constitute an Allowed Administrative Claim; *provided, however*, that the

- 8 -

payment of each such Allowed Claim shall be subordinated to the payment of Allowed General Unsecured Claims as provided in Section 7.1(c) of the Joint Plan.

Section 1.78 "**Material Adverse Change**" means the occurrence of an event or series of events that causes significant asset or property damage or a significant reduction in the Debtors' customer base or any event or circumstance (or series of events or circumstances) that, in the reasonable judgment of Yucaipa, is likely to have a material adverse effect on the Debtors' financial condition, business, performance, operations or properties of the Debtors, or (b) the Debtors' or Reorganized Debtors' ability to perform its obligations under the Joint Plan.

Section 1.79 "**Minimum Liquidity Covenant**" means the covenant, to be contained in the General Unsecured Claim Note Documents, requiring the Reorganized Debtors to use commercially reasonable efforts to maintain aggregate liquidity of not less than $1,500,000 at the end of each quarter.

Section 1.80 "**New Atalaya Secured Note**" means the New Atalaya Secured Note, in an initial principal allowed equal to the Allowed amount of the Atalaya Secured Claim, as provided for in PR Class 2 of the Joint Plan, substantially in the form of **Plan Exhibit 1.80**, and otherwise in form and substance satisfactory to Yucaipa.

Section 1.81 "**Order**" means an order or judgment of the Bankruptcy Court as entered on the Docket.

Section 1.82 "**Ordinary Course Professionals Order**" collectively means (a) the Order (Docket #232) that approved the Debtors' Application for an Order *Nunc Pro Tunc* Authorizing Employment and Compensation of Certain Professionals Utilized in the Ordinary Course of the Debtors' Business pursuant to section 327(a) of the Bankruptcy Code (Docket #141), (b) the Order (Docket #388) that approved the Debtors' Second Application for an Order *Nunc Pro Tunc* Authorizing the Employment and Compensation of Certain Professionals Utilized in the Ordinary Course of the Debtors' Business (Docket #322), and (c) any subsequent Order approving a subsequent application Filed by the Debtors for an Order authorizing the employment and compensation of professionals utilized in the ordinary course of the Debtors' businesses.

Section 1.83 "**Other Priority Claim**" means any Claim, other than an Administrative Claim or a Priority Tax Claim, that is entitled to priority in right of payment pursuant to section 507(a) of the Bankruptcy Code. Other Priority Claims are treated in PR Class 1, PFS Class 1 and PI Class 1 of the Joint Plan.

Section 1.84 "**Other Secured Claim**" means any Secured Claim other than the Atalaya Secured Claim and the DIP Financing Claim. Other Secured Claims are treated in PR Class 3, PFS Class 3 and PI Class 3 of the Joint Plan.

Section 1.85 "**Pari Passu**" means of equal priority.

Section 1.86 "**Petition Date**" means September 11, 2012.

Section 1.87 "**PFS**" means Piccadilly Food Services, LLC, one of the Debtors.

**Section 1.88 "PFS Plan"** means the means the Chapter 11 Joint Plan of Reorganization Filed by PFS herein, as the same may be amended, modified, or supplemented from time to time, together with the Plan Exhibits.

**Section 1.89 "Piccadilly Investments"** means Piccadilly Investments, LLC, one of the Debtors. Piccadilly Investments owns all of the Interests of PFS and Piccadilly Restaurants. Piccadilly Investments is also referred to as PI.

**Section 1.90 "PI"** means Piccadilly Investments, LLC, one of the Debtors. Piccadilly Investments owns all of the Interests of PFS and Piccadilly Restaurants.

**Section 1.91 "PI Plan"** means the Chapter 11 Joint Plan of Reorganization Filed by PI herein, as the same may be amended, modified, or supplemented from time to time, together with the Plan Exhibits.

**Section 1.92 "Piccadilly Restaurants"** means Piccadilly Restaurants, LLC, one of the Debtors. Piccadilly Restaurants is also referred to as PR.

**Section 1.93 "Plan Exhibits"** mean the exhibits that are attached to the Joint Plan, or will be Filed no later than ten (10) Business Days before the commencement of the Confirmation Hearing, which shall be in form and substance satisfactory to Yucaipa.

**Section 1.94 "Plan Sponsors"** mean the sponsors of this Joint Plan, including the Debtors and Yucaipa.

**Section 1.95 "Post-Petition Atalaya Liens"** means the Liens and security interests on the Debtors' properties created pursuant to the DIP Financing Claim.

**Section 1.96 "PR"** means Piccadilly Restaurants, LLC, one of the Debtors.

**Section 1.97 "PR Plan"** means the Chapter 11 Joint Plan of Reorganization Filed by PR herein, as the same may be amended, modified, or supplemented from time to time, together with the Plan Exhibits.

**Section 1.98 "Priority Tax Claim"** means a Claim arising under United States federal, state or local Tax laws that is entitled to priority in payment pursuant to sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**Section 1.99 "Professional"** means any professional employed in the Bankruptcy Cases pursuant to sections 327 or 1103 of the Bankruptcy Code or any professional or other Entity seeking compensation or reimbursement of expenses in connection with the Bankruptcy Cases pursuant to section 503(b) of the Bankruptcy Code.

**Section 1.100 "Professional Fee Claims"** mean the Claims of (a) any Professional in the Bankruptcy Cases pursuant to sections 330 or 1103 of the Bankruptcy Code, or (b) any Professional or other Entity seeking compensation or reimbursement of expenses in connection with the Bankruptcy Cases pursuant to sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

**Section 1.101 "Proof of Claim"** means a proof of claim that was Filed in the Bankruptcy Cases.

**Section 1.102 "Pro Rata Share"** means, on any Distribution Date, that share of the Cash to be distributed on account of all Allowed General Unsecured Claims, including PR Class 5, PFS Class 4 and PI Class 4, so that the ratio of (a)(i) the amount of such Cash distributed on account of the particular Allowed General Unsecured Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the aggregate amount of such Cash distributed on account of all Allowed General Unsecured Claims in such Classes to (ii) the aggregate amount of all Allowed General Unsecured Claims in such Classes.

**Section 1.103 "Released Parties"** means any of (or collectively, all of) (a) the Creditors' Committee, (b) the Debtors, (c) CB Investments, LLC, (d) Yucaipa, and any Affiliate of Yucaipa, (e) any member of PI, and (f) each of the foregoing parties' respective former and current officers, directors, managers, partners, stockholders, employees, agents, members (in their capacity as such), financial advisors, attorneys and other representatives.

**Section 1.104** "**Reorganized Debtors**" any of (or collectively, all of) the Debtors on and after the Effective Date, or any successor thereto.

**Section 1.105** "**Reorganized PI**" means PI on and after the Effective Date, or any successor thereto.

**Section 1.106 "Reorganized PR"** means PR on and after the Effective Date, or any successor thereto.

**Section 1.107 "Schedules"** collectively means the schedules of assets and liabilities, the list of Holders of Interests and the statement of financial affairs Filed by the Debtors under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments and modifications thereto through the Confirmation Date.

**Section 1.108 "Secured Claim"** means an Allowed Claim that is secured by a Lien on the property of the Estates, as provided in section 506(a) of the Bankruptcy Code, which is valid, perfected and enforceable and not avoidable, to the extent of the value of such Lien, as determined by a Final Order of the Bankruptcy Court pursuant to section 506 of the Bankruptcy Code, or as otherwise agreed in writing by the applicable Debtor or Reorganized Debtor, Yucaipa, and the Holder of such Claim.

**Section 1.109** "**Section 503(b)(9) Claim**" means any Claim against any of the Debtors arising under section 503(b)(9) of the Bankruptcy Code for payment of goods received by any of the Debtors within twenty (20) days prior to the Petition Date, including the Allowed Merchants 503(b)(9) Claim.

**Section 1.110 "Stipulation of Amount and Nature of Claim"** means (a) before the Effective Date, a stipulation or other agreement between the applicable Debtor, Yucaipa and a Holder of a Claim that is approved by an Order of the Bankruptcy Court or (b) from and after the Effective Date, a stipulation or other agreement between the applicable Reorganized Debtor (with the consent of Yucaipa), and a Holder of a Claim.

**Section 1.111** "**Tax**" means (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, property, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority, or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated,

consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

Section 1.112 "**Tax Claim**" means any Claim of a governmental unit, whether federal, state or local, for recovery of a tax of any kind whatsoever (including any interest, penalty or addition thereto) incurred or arising before the Effective Date, including but not limited to Claims of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

Section 1.113 "**Unexpired Lease**" means a lease to which any one or more of the Debtors is a party that is subject to assumption, assumption and assignment or rejection under section 365 of the Bankruptcy Code.

Section 1.114 "**Unimpaired**" means, with respect to any Claim or Interest, that such Claim or Interest is not impaired within the meaning of section 1124 of the Bankruptcy Code.

Section 1.115 "**U.S. Trustee Fees**" collectively means all fees and charges assessed against any of the Estates under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930.

Section 1.116 "**Voting Record Date**" means the date, as established in the Confirmation Procedures Order for determining the Holders of Claims and Interests, who are entitled to vote on the Joint Plan, in accordance with Bankruptcy Rule 3017(d).

Section 1.117 "**Yucaipa**" means Yucaipa Corporate Initiatives Fund I, L.P., a member of Piccadilly Investments, and a proponent of the Joint Plan.

Section 1.118 "**Yucaipa Advance**" means the Cash advanced on or before the Effective Date by Yucaipa to the Debtors as provided in Section 7.1(a) and (b) of the Joint Plan in order to fund Distributions and other payments on the Effective Date.

Section 1.119 "**Yucaipa Advance Documents**" means the note, security agreement and any other documents to be executed in connection with the Yucaipa Advance, substantially in the form of **Plan Exhibit 1.119**, and otherwise in form and substance acceptable to Yucaipa and the Debtors.

Section 1.120 "**Yucaipa Expense Claim**" means the costs and expenses of Yucaipa (including but not limited to the fees and expenses of Latham & Watkins, LLP and Heller, Draper, Patrick & Horn, LLP) incurred in connection with the Bankruptcy Cases and as a Plan Sponsor.

**Interpretation; Application of Definitions and Rules of Construction.** Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Joint Plan. A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code. The headings in the Joint Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Joint Plan.

Any reference in the Joint Plan to a document or instrument being in a particular form means that the document or instrument shall be in substantially such form. Any reference in the Joint Plan to an existing document or instrument means such document or instrument as it may have been amended,

- 12 -

modified or supplemented from time to time. Unless otherwise specified, all Section, Article, schedule or exhibit references in the Joint Plan are to the respective Section in, Article of, schedule to, or exhibit to, the Joint Plan. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Joint Plan as a whole and not to any particular Section or clause contained in the Joint Plan. All Plan Exhibits are incorporated into the Joint Plan, and shall be deemed to be included in the Joint Plan, regardless of when such Plan Exhibits are Filed.

In computing any period of time prescribed or allowed by the Joint Plan, the provisions of Bankruptcy Rule 9006(a) shall apply as though the Joint Plan is an Order of the Bankruptcy Court.

# ARTICLE II
# CLASSIFICATION OF CLAIMS AND INTERESTS

**Section 2.1 <u>Division of Claims</u>**.  For all purposes, including organization, voting, Confirmation and Distributions pursuant to the Joint Plan, except as otherwise provided herein, all Claims (except for Administrative Claims and Priority Tax Claims) and Interests are classified as provided in Articles II through VI of the Joint Plan.

**Section 2.2 <u>The Joint Plan includes the PR Plan, the PFS Plan and the PI Plan</u>**.  For purposes of voting on the Joint Plan and receiving Distributions under the Joint Plan, votes will be tabulated separately for the PR Plan, the PFS Plan and the PI Plan, and Distributions will be made to each separate Class as provided in the PR Plan, the PFS Plan and the PI Plan, except as otherwise provided in Section 13.2 of the Joint Plan.

**Section 2.3 <u>No Interest After the Petition Date Unless Otherwise Provided</u>**.  Unless otherwise specifically provided for in the Joint Plan or the Confirmation Order, no Holder of a Claim shall be entitled to interest after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**Section 2.4 <u>Allowed Claims and Interests</u>**.  A Claim or Interest is treated in a particular Class only to the extent such Claim or Interest is Allowed.

**Section 2.5 <u>Classification of Claims and Interests with Respect to the PR Plan</u>**. Claims and Interests are classified in the PR Plan as follows:

(a) PR Class 1 consists of **Other Priority Claims against PR**. This Class of Claims is Unimpaired, and the Holders are not entitled to vote with respect to such Claims.

(b) PR Class 2 consists of the **Atalaya Secured Claim against PR**. This Class of Claims is Impaired, and the Holders are entitled to vote with respect to such Claims.

(c) PR Class 3 consists of **Other Secured Claims against PR**, if any. This Class of Claims is Unimpaired, and the Holders are not entitled to vote with respect to such Claims.

(d) PR Class 4 consists of **Convenience Claims against PR**. This Class of Claims is Impaired, and the Holders are entitled to vote with respect to such Claims

- 13 -

(e) PR Class 5 consists of **General Unsecured Claims against PR**. This Class of Claims is Impaired, and the Holders are entitled to vote with respect to such Claims.

(f) PR Class 6 consists of the **Litigation Claims against PR**. This Class of Claims is Unimpaired, and the Holders are not entitled to vote with respect to such Claims.

(g) PR Class 7 consists of the **Interests in PR**. This Class of Interests is Impaired. The Holders are entitled to vote with respect to such Interests.

**Section 2.6 <u>Classification of Claims and Interests with respect to the PFS Plan</u>**. Claims and Interests are classified in the PFS Plan as follows:

(a) PFS Class 1 consists of **Other Priority Claims against PFS**, if any. This Class of Claims is Unimpaired, and the Holders in this Class are not entitled to vote with respect to such Claims.

(b) PFS Class 2 consists of the **Atalaya Secured Claim against PFS**. This Class of Claims is Impaired, and the Holders are entitled to vote with respect to such Claims.

(c) PFS Class 3 consists of the **Other Secured Claims against PFS**, if any. This Class of Claims is Unimpaired, and the Holders are not entitled to vote with respect to such Claims.

(d) PFS Class 4 consists of **General Unsecured Claims against PFS**, if any. This Class of Claims is Impaired, and the Holders are entitled to vote with respect to such Claims.

(e) PFS Class 5 consists of the **Interests in PFS**. This Class of Interests is Unimpaired, and the Holders are not entitled to vote with respect to such Interests.

**Section 2.7 <u>Classification of Claims and Interests with respect to the PI Plan</u>**. Claims and Interests are classified in the PI Plan as follows:

(a) PI Class 1 consists of **Other Priority Claims against PI**, if any. This Class of Claims is Impaired, and the Holders are entitled to vote with respect to such Claims.

(b) PI Class 2 consists of the **Atalaya Secured Claim against PI**. This Class of Claims is Impaired, and the Holders are entitled to vote with respect to such Claims.

(c) PI Class 3 consists of the **Other Secured Claims against PI**, if any. This Class of Claims is Unimpaired, and the Holders are not entitled to vote with respect to such Claims.

(d) PI Class 4 consists of **General Unsecured Claims against PI**, if any. This Class of Claims is Impaired, and the Holders are entitled to vote with respect to such Claims.

(e) PI Class 5 consists of the **Interests in PI**. This Class of Interests are Unimpaired, and the Holders are not entitled to vote with respect to such Interests.

- 14 -

# ARTICLE III
## TREATMENT OF CERTAIN UNCLASSIFIED
## ADMINISTRATIVE CLAIMS, CERTAIN FEES AND TAXES

**Section 3.1 <u>Administrative Claims.</u>**

(a) **Generally**. Except as otherwise provided herein or unless otherwise agreed in a written agreement by and among the Holder of an Administrative Claim, the applicable Debtor and Yucaipa, each Holder of an Allowed Administrative Claim will receive from the Reorganized Debtors, in full satisfaction of its Administrative Claim, Cash equal to the Allowed amount of such Administrative Claim either (A) on the Effective Date or as soon as practicable thereafter, or (B) if the Administrative Claim is not Allowed on or before the Effective Date, within thirty (30) days after the date on which (i) an Order that Allows such Administrative Claim becomes a Final Order, or (ii) a Stipulation of Amount and Nature of Claim is executed.

(b) **Ordinary Course Liabilities.** Allowed Administrative Claims based on liabilities incurred by any one of the Debtors in the ordinary course of their businesses (including Administrative Trade Claims, Administrative Claims of governmental units for Taxes, including Tax audit Claims related to tax years commencing after the Petition Date, and Allowed Administrative Claims arising from Executory Contracts and Unexpired Leases of the kind described in Section 9.5 of the Joint Plan, other than Cure Amount Claims) may be paid by the Reorganized Debtor, in the discretion of the Debtors or the Reorganized Debtors (as applicable), pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims. Allowed Cure Amount Claims will be paid in accordance with Section 9.2 of the Joint Plan, without any further action by the Holders of such Claims.

(c) **The DIP Financing Claim.** Unless otherwise agreed in written agreement by and among the DIP Agent, PR and Yucaipa, on the Effective Date, the DIP Financing Claim will be paid in full in Cash in full satisfaction, settlement, release, and discharge of the DIP Financing Claim, without any further action by the DIP Agent. Unless Disputed by the Debtors, the Allowed amount of the DIP Financing Claim as of the Effective Date will be the amount reflected in a writing to be provided by the DIP Lender to the Debtors no later than two (2) Business Days after receiving the Debtors' notice of proposed Effective Date. Thereafter, if the DIP Lender fails to provide such a writing to the Debtors within the two (2) Business Day period, the Allowed amount of the DIP Financing Claim shall be the amount reflected on the Debtors' books and records. The Bankruptcy Court will resolve any Dispute regarding the amount of the DIP Financing Claim; *provided, however*, that if the DIP Lender Disputes the amount of the Distribution it receives on account of the DIP Financing Claim where the Distribution is based on the Debtors' books and records, the DIP Lender must File a pleading with the Bankruptcy Court to preserve such Dispute within three (3) Business Days of receipt of such payment, unless a written extension of time is granted by the Debtors or Reorganized Debtors. Immediately upon full payment of the DIP Financing Claim, without the necessity of any further notice or Order, the Post-Petition Atalaya Liens will be dissolved and released, and until the DIP Financing Claim is fully paid the Post-Petition Atalaya Liens will remain in full force and effect.

(d) **Yucaipa Expense Claim**. The Yucaipa Expense Claim will be Allowed on the Effective Date, without the necessity of Filing any Claim under Section 3.2 of the Joint Plan or any other application or motion. On the Effective Date, the Reorganized Debtors will make a Distribution to Yucaipa in Cash in an equal to the Allowed amount of the Yucaipa Expense Claim.

- 15 -

**(e) U.S. Trustee Fees.** On or before the Effective Date, fees payable pursuant to 28 U.S.C. § 1930(a)(6) will be paid by the Debtors or the Disbursing Agent in Cash. All fees payable pursuant to 28 U.S.C. § 1930(a)(6) will be paid by the Reorganized Debtors in accordance therewith until the closing of the Bankruptcy Cases pursuant to section 350(a) of the Bankruptcy Code.

## Section 3.2 Bar Dates for Administrative Claims.

**(a) General Bar Date Provisions**. Except as otherwise provided in the Joint Plan or the Administrative Claim Bar Date Order, requests for payment of Administrative Claims must be Filed on or before the Administrative Claim Bar Date and served pursuant to the procedures specified in the Administrative Claim Bar Date Order. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by such date will be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors, or their respective properties, and such Administrative Claims will be deemed waived and released as of the Effective Date. Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (i) one hundred and twenty (120) days after the Effective Date, and (ii) sixty (60) days after the Filing of the applicable request for payment of Administrative Claims.

**(b) Bar Dates for Certain Administrative Claims.**

**(i) Professional Fee Claims.** Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other Order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claims within sixty (60) days after the Effective Date; *provided, however*, that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court review or approval, pursuant to the Ordinary Course Professionals Order. Objections to any Professional Fee Claims, including any objections by the U.S. Trustee, must be Filed and served on the Reorganized Debtors and the requesting party by the later of (A) ninety (90) days after the Effective Date, and (B) thirty (30) days after the Filing of the applicable request for payment of the Professional Fee Claims. To the extent necessary, the Confirmation Order will amend and supersede any previously entered Order of the Bankruptcy Court, regarding the payment of Professional Fee Claims.

**(ii) Ordinary Course Liabilities.** Holders of Administrative Claims based on liabilities incurred by any one of the Debtors in the ordinary course of their businesses that are paid by the Debtors or the Reorganized Debtors (as applicable) pursuant to Section 3.1(b) of the Joint Plan will not be required to File or serve any request for payment of such Administrative Claims.

**(iii) The DIP Financing Claim**. Neither the DIP Lenders nor the DIP Agent will be required to File or serve any request for payment of the DIP Financing Claim except pursuant to Section 3.1(c) of the Joint Plan, and such Claim will be treated as an Allowed Claim and satisfied pursuant to Section 3.1(c) of the Joint Plan.

- 16 -

**(iv) Yucaipa Expense Claim**.  Yucaipa will not be required to File or serve any request for payment of the Yucaipa Expense Claim, and such Claim will be treated as an Allowed Claim pursuant to Section 3.1(d) of the Joint Plan.

**Section 3.3 <u>Payment of Priority Tax Claims</u>.**  Unless otherwise agreed in a written agreement by and among the Holder of a Priority Tax Claim, in full satisfaction of the Holder's Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will be paid, at the option of the Debtors and Yucaipa, (a) Cash in an amount equal to the such Holder's Allowed Priority Tax Claim on the later of the Effective Date or when such Allowed Claim becomes due, or (b) in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code, equal quarterly Cash payments in arrears in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the rate(s) specified in, and accordance with, applicable federal or state law, over a period through the fifth anniversary of the Petition Date, with the first such payment being made on the earlier of the Effective Date or when such Allowed Claim becomes due. No Holder of an Allowed Priority Tax Claim will be entitled to any payments on account of any pre-Effective Date interest accrued on or penalty arising after the Petition Date with respect to or in connection with any Allowed Priority Tax Claim. If the Holder's Priority Tax Claim is not Allowed on or before the Effective Date, the Disbursing Agent will make the Distribution to such Holder within fifteen (15) days after the earlier of the date on which (a) an Order allowing the Priority Tax Claim becomes a Final Order, or (b) execution of a Stipulation Regarding the Amount and Nature of the Claim, or upon such other terms determined by the Bankruptcy Court to provide the Holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim, with all such payments attributable first to payment of the principal balance due on trust fund taxes.

# ARTICLE IV
# THE PR PLAN:  TREATMENT OF CLASSIFIED
# CLAIMS AND INTERESTS

**Section 4.1 <u>PR Class 1 Claims (Other Priority Claims)</u>**.

(a) <u>Classification</u>:  Class 1 consists of the Other Priority Claims against PR.

(b) <u>Treatment</u>: Unless otherwise agreed in a written agreement by and among the Holder of an Other Priority Claim, PR and Yucaipa, on the Effective Date, in full satisfaction of the Holder's Other Priority Claim, each Holder of an Other Priority Claim will receive Cash in an amount equal to the Allowed amount of such Holder's Other Priority Claim.  If the Holder's Other Priority Claim is Allowed on or before the Effective Date, the Disbursing Agent will make the Distribution to such Holder within fifteen (15) days of the Effective Date. If, however, the Holder's Other Priority Claim is not Allowed on or before the Effective Date, the Disbursing Agent will make the Distribution to such Holder within fifteen (15) days after the earlier of the date on which (a) an Order allowing the Other Priority Claim becomes a Final Order, or (b) a Stipulation Regarding the Amount and Nature of the Claim is executed.

(c) <u>Voting</u>:  PR Class 1 is Unimpaired by the Joint Plan. No Holder of an Allowed Other Priority Claim against PR is entitled to vote on the Joint Plan on account of such Holder's Other Priority Claim in PR Class 1.

**Section 4.2 <u>PR Class 2 (Atalaya Secured Claim)</u>.**

(a) <u>Classification</u>: Class 2 consists of the Atalaya Secured Claim against PR.

(b) <u>Treatment</u>: On the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for the Atalaya Secured Claim, the New Atalaya Secured Note will be executed and delivered to Atalaya by the Debtors. The New Atalaya Secured Note will provide for interest, commencing on the Effective Date, at the rate of 4.75% per annum, payable quarterly in Cash. The New Atalaya Secured Note will mature on the fifth anniversary of the Effective Date. The New Atalaya Secured Note shall be secured by the Atalaya Collateral.

(c) <u>Voting</u>: PR Class 2 is Impaired by the Joint Plan. Each Holder of an Atalaya Secured Claim against PR is entitled to vote on the Joint Plan on account of such Holder's Atalaya Secured Claim in PR Class 2.

**Section 4.3 <u>PR Class 3 (Other Secured Claims)</u>.**

(a) <u>Classification</u>: Class 3 consists of the Other Secured Claims against PR.

(b) <u>Treatment</u>: Except as otherwise agreed, in writing, by the Holder of an Other Secured Claim, PR and Yucaipa, on the Effective Date, each Holder of an Allowed Other Secured Claim will be entitled to receive treatment on account of such Allowed Other Secured Claim in the manner set forth in either Option A or B below, at the election of PR and Yucaipa. PR and Yucaipa will be deemed to have elected Option B, except with respect to any Allowed Other Secured Claim as to which they elect Option A in a certification Filed within fifteen (15) days before the commencement of the Confirmation Hearing.

> Option A: Each Holder with an Allowed Claim in Option A will receive, in satisfaction of its Allowed Claim, Cash equal to the Allowed amount of such Claim, and will release all Liens on any Collateral in exchange for the receipt of such Cash.

> Option B: Each Holder with an Allowed Claim in Option B will be otherwise Unimpaired within the meaning of section 1123 of the Bankruptcy Code.

If the Holder's Other Secured Claim is not Allowed on or before the Effective Date, the Disbursing Agent will make the Distribution to such Holder within fifteen (15) days after the earlier of the date on which (a) an Order allowing the Other Secured Claim becomes a Final Order, or (b) a Stipulation Regarding the Amount and Nature of the Claim is executed.

(c) <u>Voting</u>: PR Class 3 is Unimpaired by the Joint Plan. No Holder of an Allowed Other Secured Claim against PR is entitled to vote on the Joint Plan on account of such Holder's Other Secured Claim in PR Class 3.

**Section 4.4 <u>PR Class 4 (Convenience Claims)</u>.**

(a) <u>Classification</u>: Class 4 consists of the Convenience Claims against PR.

(b) <u>Treatment</u>: On the later of the Effective Date and the date on which the Convenience Claim is Allowed, each Holder of an Allowed Claim will be entitled to receive Cash equal to 100% of the Allowed

- 18 -

amount of such Claim; *provided*, however, the aggregate Allowed amount of Convenience Claims shall not exceed $500,000 (or a higher amount determined by Yucaipa in its sole discretion).

(c)  Voting:  PR Class 4 is Impaired by the Joint Plan. Each Holder of an Allowed Convenience Claim against PR is entitled to vote on the Joint Plan on account of such Holder's Convenience Claim in PR Class 4.

### Section 4.5  PR Class 5 (General Unsecured Claims).

(a)  Classification:  Class 5 consists of the General Unsecured Claims against PR.

(b)  Treatment:  Unless otherwise agreed in a written agreement by and among the Holder of an Allowed General Unsecured Claim and the Plan Sponsors, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed General Unsecured Claim, each Holder of a General Unsecured Claim will receive the following (subject to Section 13.2 of the Joint Plan):

(i)  *General Unsecured Claim Note*.  On the Effective Date, the Reorganized Debtors shall execute the General Unsecured Claim Note, in an amount equal to 100% of the face amount of the Allowed General Unsecured Claims in PR Class 5, PFS Class 4 and PI Class 4.  The General Unsecured Claim Note shall bear interest at the fixed per annum rate of nine percent (9%), until paid in full, and shall mature and become due and payable twenty-four (24) months after the Effective Date. Accrued interest on the General Unsecured Claim Note shall be payable to the Administrator, on behalf of the Allowed General Unsecured Claims in PR Class 5, PFS Class 4 and PI Class 4, on the first Business Day of each quarter after the Effective Date, until repaid in full.  On the first Business Day of each quarter after the Effective Date, the Reorganized Debtors shall deposit into the General Unsecured Distribution Account an amount equal to the accrued interest on the Allowed General unsecured Claims in PR Class 5, PFS Class 4 and PI Class 4, which the Administrator shall immediately distribute to the Holders of Allowed General Unsecured Claims (based on such Holder's Pro Rata Share).

(ii)  *General Unsecured Claim Effective Date Payment*.  On the Effective Date, the Reorganized Debtors shall deposit the General Unsecured Claim Effective Date Payment of $700,000 into the General Unsecured Distribution Account, from which the Administrator shall (A) pay the reasonable and documented expenses of the Administrator in performing its duties (as may be limited by Section 7.3 of the Joint Plan) and (B) thereafter pay to each Holder of an Allowed General Unsecured Claim in PR Class 5, PFS Class 4 and PI Class 4 an amount of Cash that is equal to each such Holder's Pro Rata Share of the balance.

(iii)  *Security for the General Unsecured Claim Note*.  On the Effective Date, the Reorganized Debtors shall also execute the General Unsecured Claim Note Documents, pursuant to which  the General Unsecured Claim Note shall be secured by (A) a first priority Lien on the Intermediate Holdco Equity Interests, (B) a first priority Lien on the BP and Other Tort Claims and the proceeds thereof, to the extent such BP and Other Tort Claims are not encumbered by the Atalaya Secured Claim, as determined by Final Order or by consensual resolution of the Atalaya Adversary Proceeding, (C) Liens on any other property of the Reorganized Debtors that do not serve as Collateral for the New Atalaya Secured Note, and (D) Liens on any property of the Reorganized Debtors that serves as Collateral for the New Atalaya Secured Note, which Liens shall be junior to (1) the Liens that secure the New Atalaya Secured Note, (2) the Liens that

- 19 -

secure the Yucaipa Advance, and (3) any Liens that may be granted on the Effective Date to secure the Allowed Merchants 503(b)(9) Claim.

(iv) *Proceeds of the BP Tort Claim*. To the extent the BP Tort Claim and proceeds thereof are not encumbered by the Atalaya Secured Claim, as determined by Final Order or by consensual resolution of the Atalaya Adversary Proceeding, then: (A) if the proceeds of the BP Tort Claim are made available to the Reorganized Debtors prior to the full payment of the General Unsecured Claim Note, such proceeds shall be used to prepay the General Unsecured Claim Note; and (B) to effect the foregoing, upon receipt of any of the BP Tort Claim proceeds, the Reorganized Debtors shall immediately deposit the same in the General Unsecured Distribution Account.

(v) *Excess Cash Flow Sweep*. Beginning on the first Business Day of each quarter after the Effective Date, in the event that the Reorganized Debtors have unapplied Cash that exceeds the aggregate amount of $1.5 million, as provided in the General Unsecured Claim Note Documents, the Reorganized Debtors will deposit such excess into the General Unsecured Distribution Account.

(vi) *Maturity of the General Unsecured Claim Note*. Upon the earlier of (A) twenty-four (24) months after the Effective Date or (B) the accumulation of sufficient funds in the General Unsecured Distribution Account, the Administrator shall make a lump sum payment on account of each Allowed General Unsecured Claim in an amount sufficient to pay the balance due on the General Unsecured Claim Note. Any funds remaining in the General Unsecured Distribution Account after payment of Allowed General Unsecured Claims in full shall be immediately returned to Reorganized PR.

(vii) *No Prepayments*. Until such time as the General Unsecured Claim Note is fully paid, the Reorganized Debtors shall not make any prepayment on account of any of the New Atalaya Secured Note, any other secured debt, or the Yucaipa Advance; *provided, however*, the Reorganized Debtors shall have the right to refinance the New Atalaya Secured Note on terms equal to or better than (from the perspective of the Reorganized Debtors) the terms of the New Atalaya Secured Note.

(viii) *Minimum Liquidity Covenant*. The General Unsecured Claim Note shall contain the Minimum Liquidity Covenant; *provided, however,* failure by the Reorganized Debtors to comply with the Minimum Liquidity Covenant shall not confer any default-related rights or remedies upon the Administrator or the Holder of any General Unsecured Claim so long as the Reorganized Debtors are in compliance with their obligations to make payments to the Administrator, on behalf of the Allowed General Unsecured Claim Note, as and when such payments come due pursuant to the Joint Plan. For the avoidance of any doubt, the Minimum Liquidity Covenant shall not impose any obligation on Yucaipa to cause the Reorganized Debtors to maintain a minimum liquidity.

(ix) *Debtors' Satisfaction of Obligations*. The Reorganized Debtors' obligations to make payments to the Holders of Allowed General Unsecured Claims hereunder shall be satisfied upon the Reorganized Debtors' transfer of Cash into the General Unsecured Distribution Account, without regard to whether such Holders actually receive such Cash.

(x) Funds on deposit in the General Unsecured Distribution Account shall be available only as set forth in this Section 4.5(b) of the Joint Plan and shall not be available for

Distribution to the Holders of any other Claims or Interests, including but not limited to the Holders of Litigation Claims and Convenience Claims.

If a Holder's General Unsecured Claim is not Allowed on or before the Effective Date, the Administrator will make the Distribution to such Holder within fifteen (15) days after the earlier of the date on which (a) an Order allowing the General Unsecured Claim becomes a Final Order, or (b) a Stipulation Regarding the Amount and Nature of the Claim is executed, to the extent there is available Cash in the General Unsecured Claim Distribution Account.

(c)   Voting:  PR Class 5 is Impaired by the Joint Plan. Each Holder of an Allowed General Unsecured Claim against PR is entitled to vote on the Joint Plan on account of such Holder's General Unsecured Claim in PR Class 5.

**Section 4.6 PR Class 6 (Litigation Claims)**.

(a)   Classification:  Class 6 consists of the Litigation Claims against PR.

(b)   Treatment:  The Litigation Claims will not be discharged, and the Joint Plan will not alter the legal, equitable and contractual rights to which such Litigation Claims are entitled under applicable non-bankruptcy law.

(c)   Voting:  PR Class 6 is Unimpaired by the Joint Plan. No Holder of a Litigation Claim against PR is entitled to vote on the Joint Plan on account of such Holder's Litigation Claim in PR Class 6.

**Section 4.7 PR Class 7 (Interests)**.

(a)   Classification:  Class 7 consists of the Interests in PR.

(b)   Treatment:  On the Effective Date, PI, the sole Holder of Interests in PR, will transfer those Interests to Intermediate Holdco in exchange for the Intermediate Holdco Equity Interests, as provided in Section 7.2 of the Joint Plan.

(c)   Voting:  PR Class 7 is Impaired by the Joint Plan.  The Holder of Interests in PR Class 7 is entitled to vote on the Joint Plan.

# ARTICLE V
# THE PFS PLAN:  TREATMENT OF CLASSIFIED CLAIMS AGAINST PFS AND INTERESTS IN PFS

**Section 5.1 PFS Class 1 Claims (Other Priority Claims)**.

(a)   Classification:  Class 1 consists of the Other Priority Claims against PFS.

(b)   Treatment:  Unless otherwise agreed in a written agreement by and among the Holder of an Other Priority Claim, PFS and Yucaipa, in full satisfaction of the Holder's Other Priority Claim, each Holder of an Other Priority Claim will receive Cash in an amount equal to the Allowed amount of such Holder's Other Priority Claim.  If the Holder's Other Priority Claim is Allowed on or before the Effective Date, the Disbursing Agent will make the Distribution to such Holder within fifteen (15)

- 21 -

days of the Effective Date. If, however, the Holder's Other Priority Claim is not Allowed on or before the Effective Date, the Disbursing Agent will make the Distribution to such Holder within fifteen (15) days after the earlier of the date on which (i) an Order allowing the Other Priority Claim becomes a Final Order, or (ii) a Stipulation Regarding the Amount and Nature of the Claim is executed.

(c) <u>Voting</u>: PFS Class 1 is Unimpaired by the Joint Plan. No Holder of an Allowed Other Priority Claim against PFS is entitled to vote on the Joint Plan on account of such Holder's Other Priority Claim in PFS Class 1.

**Section 5.2 <u>PFS Class 2 (Atalaya Secured Claim)</u>.**

(a) <u>Classification</u>: Class 2 consists of the Atalaya Secured Claim against PFS.

(b) <u>Treatment</u>: On the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for the Atalaya Secured Claim, the New Atalaya Secured Note will be executed and delivered to Atalaya by the Debtors. The New Atalaya Secured Note will provide for interest, commencing on the Effective Date, at the rate of 4.75% per annum, payable quarterly in Cash. The New Atalaya Secured Note will mature on the fifth anniversary of the Effective Date. The New Atalaya Secured Note shall be secured by the Atalaya Collateral.

(c) <u>Voting</u>: PFS Class 2 is Impaired by the Joint Plan. Each Holder of an Atalaya Secured Claim against PFS is entitled to vote on the Joint Plan on account of such Holder's Atalaya Secured Claim in PR Class 2.

**Section 5.3 <u>PFS Class 3 (Other Secured Claims)</u>.**

(a) <u>Classification</u>: Class 3 consists of the Other Secured Claims against PFS.

(b) <u>Treatment</u>: Except as otherwise agreed, in writing, by the Holder of an Other Secured Claim, PFS and Yucaipa, on the Effective Date, each Holder of an Allowed Other Secured Claim will be entitled to receive treatment on account of such Allowed Other Secured Claim in the manner set forth in either Option A or B below, at the election of PFS and Yucaipa. PFS and Yucaipa will be deemed to have elected Option B, except with respect to any Allowed Other Secured Claim as to which they elect Option A in a certification File within fifteen (15) days before the commencement of the Confirmation Hearing.

Option A: Each Holder with an Allowed Claim in Option A will receive Cash equal to the Allowed amount of such Claim, and will release all Liens on any Collateral in exchange the receipt of such Cash.

Option B: Each Holder with an Allowed Claim in Option B will be otherwise Unimpaired within the meaning of section 1123 of the Bankruptcy Code.

If the Holder's Other Secured Claim is not Allowed on or before the Effective Date, the Disbursing Agent will make the Distribution to such Holder within fifteen (15) days after the earlier of the date on which (a) an Order allowing the Other Secured Claim becomes a Final Order, or (b) a Stipulation Regarding the Amount and Nature of the Claim is executed.

- 22 -

(c) <u>Voting</u>: PFS Class 3 is Unimpaired by the Joint Plan. No Holder of an Allowed Other Secured Claim against PFS is entitled to vote on the Joint Plan on account of such Holder's Other Secured Claim.

**Section 5.4 <u>PFS Class 4 (General Unsecured Claims)</u>**.

(a) <u>Classification</u>: Class 4 consists of the General Unsecured Claims against PFS.

(b) <u>Treatment</u>: The General Unsecured Claims against PFS, if any, in PFS Class 4, will be treated as if they are Claims against PR, and will receive the same treatment afforded to Claims in PR Class 5 (General Unsecured Claims against PR), under Section 4.5 of the Joint Plan (subject to Section 13.2 of the Joint Plan).

(c) <u>Voting</u>: PFS Class 4 is Impaired by the Joint Plan. Each Holder of an Allowed General Unsecured Claim against PFS is entitled to vote on the Joint Plan on account of such Holder's General Unsecured Claim in PFS Class 4.

**Section 5.5 <u>PFS Class 5 (Interests)</u>**.

(a) <u>Classification</u>: Class 5 consists of the Interests in PFS.

(b) <u>Treatment</u>: The Joint Plan will not alter any of the legal, equitable or contractual rights of the Holder of the Interests in PFS.

(c) <u>Voting</u>: PFS Class 5 is Unimpaired by the Joint Plan. No Holder of Interests in PFS Class 6 is entitled to vote on the Joint Plan on account of such Holder's Interests in PFS Class 5.

# ARTICLE VI
# THE PI PLAN: TREATMENT OF CLASSIFIED CLAIMS AGAINST PI AND INTERESTS IN PI

**Section 6.1 <u>PI Class 1 Claims (Other Priority Claims)</u>.**

(a) <u>Classification</u>: Class 1 consists of the Other Priority Claims against PI.

(b) <u>Treatment</u>: Unless otherwise agreed in a written agreement by and among the Holder of an Other Priority Claim, PI and Yucaipa, in full satisfaction of the Holder's Other Priority Claim, each Holder of an Other Priority Claim will receive Cash in an amount equal to the Allowed amount of such Holder's Other Priority Claim. If the Holder's Other Priority Claim is Allowed on or before the Effective Date, the Disbursing Agent will make the Distribution to such Holder within fifteen (15) days of the Effective Date. If, however, the Holder's Other Priority Claim is not Allowed on or before the Effective Date, the Disbursing Agent will make the Distribution to such Holder within fifteen (15) days after the earlier of the date on which (a) an Order allowing the Other Priority Claim becomes a Final Order, or (b) a Stipulation Regarding the Amount and Nature of the Claim is executed.

- 23 -

(c) <u>Voting</u>: PI Class 1 is Unimpaired by the Joint Plan. No Holder of an Allowed Other Priority Claim against PI is entitled to vote on the Joint Plan on account of such Holder's Other Priority Claim in PI Class 1.

**Section 6.2 <u>PI Class 2 (Atalaya Secured Claim)</u>**.

(a) <u>Classification</u>: Class 2 consists of the Atalaya Secured Claim against PI.

(b) <u>Treatment</u>: On the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for the Atalaya Secured Claim, the New Atalaya Secured Note will be executed and delivered to Atalaya by the Debtors. The New Atalaya Secured Note will provide for interest, commencing on the Effective Date, at the rate of 4.75% per annum, payable quarterly in Cash. The New Atalaya Secured Note will mature on the fifth anniversary of the Effective Date. The New Atalaya Secured Note shall be secured by the Atalaya Collateral.

(c) <u>Voting</u>: PI Class 2 is Impaired by the Joint Plan. Each Holder of an Allowed Atalaya Secured Claim against PI is entitled to vote on the Joint Plan on account of such Holder's Atalaya Secured Claim in PI Class 2.

**Section 6.3 <u>PI Class 3 (Other Secured Claims)</u>**.

(a) <u>Classification</u>: Class 3 consists of the Other Secured Claims against PI.

(b) <u>Treatment</u>: Except as otherwise agreed, in writing, by the Holder of an Other Secured Claim, PI an Yucaipa, on the Effective Date, each Holder of an Allowed Other Secured Claim will be entitled to receive treatment on account of such Allowed Other Secured Claim in the manner set forth in either Option A or B below, at the election of PI and Yucaipa. PI and Yucaipa will be deemed to have elected Option B, except with respect to any Allowed Other Secured Claim as to which they elect Option A in a certification Filed within fifteen (15) days before the commencement of the Confirmation Hearing.

Option A: Each Holder with an Allowed Claim in Option A will receive, in satisfaction of its Allowed Claim, Cash equal to the Allowed amount of such Claim, and will release all Liens on any Collateral in exchange the receipt of such Cash.

Option B: Each Allowed Claim with an Allowed Claim in Option B will be otherwise Unimpaired within the meaning of section 1123 of the Bankruptcy Code.

If the Holder's Other Secured Claim is not Allowed on or before the Effective Date, the Disbursing Agent will make the Distribution to such Holder within fifteen (15) days after the earlier of the date on which (a) an Order allowing the Other Secured Claim becomes a Final Order, or (b) a Stipulation Regarding the Amount and Nature of the Claim is executed.

(c) <u>Voting</u>: PI Class 3 is Unimpaired by the Joint Plan. No Holder of an Allowed Other Secured Claim against PI is entitled to vote on the Joint Plan on account of such Holder's Allowed Other Secured Claim in PI Class 3.

**Section 6.4 <u>PI Class 4 (General Unsecured Claims)</u>.**

(a) <u>Classification</u>: Class 4 consists of the General Unsecured Claims against PI.

(b) <u>Treatment</u>: The General Unsecured Claims against PI, if any, in PI Class 4, will be treated as if they are Claims against PR, and will receive the same treatment afforded to Claims in PR Class 5 (General Unsecured Claims against PR), under Section 4.5 of the Joint Plan (subject to Section 13.2 of the Joint Plan).

(c) <u>Voting</u>: PI Class 4 is Impaired by the Joint Plan. Each Holder of an Allowed General Unsecured Claim against PI is entitled to vote on the Joint Plan on account of such Holder's General Unsecured Claim in PI Class 4.

**Section 6.5 <u>PI Class 5 (Interests)</u>.**

(a) <u>Classification</u>: Class 5 consists of the Interests in PI.

(b) <u>Treatment</u>: The Joint Plan will not alter any of the legal, equitable or contractual rights of the Holder of the Interests in PI.

(c) <u>Voting</u>: PI Class 5 is Impaired by the Joint Plan. Each Holder of Interests in PI Class 5 is entitled to vote on the Joint Plan on account of such Holder's Interests in PI Class 5.

# ARTICLE VII
# <u>MEANS FOR IMPLEMENTATION OF THE JOINT PLAN</u>

**Section 7.1 <u>Yucaipa Advance and the Management Services Fee Claim</u>.**

(a) On or before the Effective Date of the Plan, Yucaipa shall advance Cash to the Debtors in the amount of $[_____],[1] which, together with the Cash on the Effective Date held by the Debtors, shall be available to the Reorganized Debtors for the purpose of effectuating the Joint Plan.

(b) The Reorganized Debtors shall pay the principal amount of the Yucaipa Advance, together with accrued interest, on the date that is one month following the maturity date of the New Atalaya Secured Note. In accordance with the Yucaipa Advance Documents, the Yucaipa Advance shall accrue interest, payable in kind, at the fixed rate of nine percent (9%) per annum, and the Reorganized Debtors' obligation to repay the Yucaipa Advance shall be secured by a first priority Lien (which shall be Pari Passu with the Lien securing the New Atalaya Secured Note) on the collateral securing the New Atalaya Secured Note. Payment of the Yucaipa Advance shall be subordinated to the General Unsecured Claim Note in right of payment (but not lien priority) until such General Unsecured Claim Note is paid in full, as provided in Section 4.5 of the Joint Plan and the General Unsecured Claim Note Documents.

(c) The payment of all of the Management Services Fee Claim, whether incurred before or after the Petition Date, shall be subordinated in right of payment (but not lien priority) to the Allowed General

---

[1] The amount of the Yucaipa Advance is subject to further negotiation, and will be disclosed on or before the hearing on the Disclosure Statement.

Unsecured Claims until such General Unsecured Claim Note is paid in full, as provided in Section 4.5 of the Joint Plan and the General Unsecured Claim Note Documents.

**Section 7.2  <u>Intermediate Holdco.</u>**  On or before the Effective Date, PI shall form a wholly-owned direct subsidiary ("<u>Intermediate Holdco</u>"). On the Effective Date, Reorganized PI shall transfer its Interests in PR to Intermediate Holdco. As a result, on the Effective Date, Intermediate Holdco will own 100% of the Interests in Reorganized PR.  On the Effective Date, the Intermediate Holdco Equity Interests will be pledged to secure the payment of the General Unsecured Claim Note, in accordance with Section 4.5 of the Joint Plan and the General Unsecured Claim Note Documents.

**Section 7.3  <u>Administrator.</u>**

(a)  Prior to the Effective Date, an individual (the "<u>Administrator</u>") shall be appointed as set forth in Section 7.3(b) of the Joint Plan, which individual shall be responsible for (i) collecting and disbursing Cash from the General Unsecured Distribution Account strictly in accordance with the Joint Plan, (ii) holding Liens that secure the General Unsecured Claim Note, and (iii) enforcing rights and remedies of the Holders of General Unsecured Claims under the Joint Plan.  The Administrator's rights and powers shall be limited to those expressly set forth in this Joint Plan, and the Administrator shall automatically be discharged upon repayment in full of General Unsecured Claim Note. The Administrator shall have complete control and authority to make deposits and withdrawals of Cash from the General Unsecured Distribution Account in the manner provided by this Joint Plan, and shall be a signatory on the General Unsecured Distribution Account. The Reorganized Debtors shall have no liability for any action or inaction of the Administrator. The Administrator shall not be deemed an officer, employee, representative or agent of the Reorganized Debtors (except to the extent of its position as director of Reorganized PR) and shall have no authority to bind the Reorganized Debtors.

(b)  The Administrator shall be selected by Yucaipa, in Yucaipa's sole discretion, from a list of three (3) individuals reasonably acceptable to Yucaipa that will be provided by the Creditors' Committee no later than ten (10) days before the Effective Date. The identity the Administrator will disclosed in the Notice of Occurrence of the Effective Date, as provided in Section 10.3 of the Joint Plan.

(c)  The Administrator shall be held harmless and indemnified by the Reorganized Debtors for harm relating to collection or the distribution of Cash by the Reorganized Debtors to the General Unsecured Distribution Account pursuant to the Excess Cash Flow Sweep, unless such harm arises from acts or omissions that constitute gross negligence and/or willful misconduct, as provided in the General Unsecured Claim Note Documents. By way of example, the Reorganized Debtors will not hold the Administrator harmless for investment decisions relating to the funds in the General Unsecured Distribution Account.

(d)  Until the General Unsecured Claim Note is paid in full as provided for in the Joint Plan, the Reorganized Debtors shall use commercially reasonable efforts to provide financial statements to the Administrator, including a cash flow statement and balance sheet, for each accounting period, on or prior to the business day that is forty-five (45) days after the end of such accounting period; provided, the Reorganized Debtors shall provide period cash balance reports to the Administrator no later than the Reorganized Debtors provide such periodic reports to Yucaipa and Atalaya.

(e)  On the Effective Date, to the extent that the Debtors determine such disclosure would not waive their attorney client, work product or similar privileges, the Debtors shall deliver to the Administrator copies of all pre-Effective Date correspondence regarding the BP Tort Claim, including

- 26 -

any claim filed. The Reorganized Debtors shall copy the Administrator on all correspondence regarding the BP Tort Claim made after the Effective Date (to the extent that the Reorganized Debtors determine doing so would not waive their attorney client, work product or similar privileges). The Reorganized Debtors shall not be entitled to compromise the BP Tort Claim without the written consent of the Administrator (not to be unreasonably withheld or delayed), unless such compromise would be for an amount sufficient to satisfy the General Unsecured Claim Note.

(f)   As compensation for the Administrator's occupancy of a Board of Directors seat and performance of duties arising therefrom, in accordance with Section 7.5(b) of the Joint Plan, the administration of Cash and Distributions to the General Unsecured Creditors, and discharge of other duties under Section 7.3 of the Joint Plan, the Administrator shall receive $10,000 per quarter. The Administrator shall be entitled to reimbursement for its reasonable and documented out of pocket travel expenses (if any).

(g)   The Administrator shall be entitled to retain professionals that the Administrator deems reasonably necessary in his or her sole discretion to carry out the Administrator's duties under the Joint Plan. The Administrator shall be entitled to reimbursement for the reasonable and documented costs of those professionals incurred in connection with (i) the exercise of rights and remedies following the Reorganized Debtors' default, if any, in their obligations to pay the General Unsecured Creditor Note under the Joint Plan, and (ii) monitoring the Reorganized Debtors' compliance with the Excess Cash Flow Sweep. The Administrator's professionals may be paid out of Cash on deposit in the General Unsecured Distribution Account and, if insufficient, shall be paid by the Reorganized Debtors.

**Section 7.4 Continued Corporate Existence and Re-Vesting of Assets in the Reorganized Debtors**.  On and after the Effective Date, the Debtors will continue to exist as the Reorganized Debtors, with all the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable law.  Except as otherwise provided in the Joint Plan, all property of the Debtors' Estates, and any property acquired by the Debtors or Reorganized Debtors under the Joint Plan, will re-vest in the applicable Reorganized Debtor, free and clear of all Claims, Liens, Interests, charges, other encumbrances created prior to the Effective Date.  From and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Joint Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors will pay the charges that it incurs on or after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of fee applications for such Professionals) without application to the Bankruptcy Court.

**Section 7.5 Corporate Governance, Managing Members, Officers, Directors, and Other Corporate Action**.

(a)   The following (which will occur and be deemed effective as of the date specified in the documents effectuating the same or, if no date is so specified, the Effective Date) will be deemed authorized and approved in all respects and for all purposes without any requirement of further action by the Holders of Interests, or the directors of one of the Debtors or Reorganized Debtors or any other person or Entity: (a) the reinstatement of current limited liability agreements for each of the Reorganized Debtors, including the selection of the current managing members of each of the Reorganized Debtors; (b) the selection of officers and the Board of Directors of the Reorganized Debtors and Intermediate Holdco, all as disclosed in **Plan Exhibit 7.5**; and (c) the other matters provided for under the Joint Plan

- 27 -

involving the corporate structure of the Debtors, Reorganized Debtors, Intermediate Holdco, or corporate action to be taken by, or required of, the Debtors, Reorganized Debtors, or Intermediate Holdco.

(b)   The Administrator shall serve on the Board of Directors of Reorganized PR until the General Unsecured Claim Note is paid in full.

**Section 7.6 Preservation of Causes of Action.** Except as provided in the Joint Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Joint Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain and may enforce any claims, demands, rights and Causes of Action that the Debtors or Estates may hold, to the extent not expressly released under the Joint Plan. The Reorganized Debtors may pursue such retained claims, demands, rights or Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. Further, the Reorganized Debtors retain their rights to File and pursue any adversary proceedings against any creditor or vendor related to debit balances or deposits owed to the Debtors.

**Section 7.7 Release and Waiver of Certain Bankruptcy Causes of Action and Preservation of other Bankruptcy Causes of Action.** As of the Effective Date, the Reorganized Debtors shall be deemed to have waived and released any and all Bankruptcy Causes of Action against the Holders of any Allowed General Unsecured Claims.  All other Bankruptcy Causes of Action are preserved by the Reorganized Debtors.

**Section 7.8 Stipulation Regarding the Amount and Nature of the Claim from and after the Effective Date.** From and after the Effective Date, the Reorganized Debtors (with and the consent of Yucaipa) will have authority to enter into a Stipulation Regarding the Amount and Nature of the Claim, without the necessity of obtaining approval of the Bankruptcy Court.

**Section 7.9 Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes.** The Chief Executive Officer or Chief Financial Officer of each Debtor, Reorganized Debtor and Intermediate Holdco will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements and documents and take such actions as may be necessary, appropriate or desirable to effectuate and implement the provisions of the Joint Plan. The Chief Executive Officer of PR will be authorized to certify or attest to any of the foregoing actions. Pursuant to section 1146(c) of the Bankruptcy Code, the following will not be subject to a stamp tax, real estate transfer tax, sales or use tax or similar Tax: (a) the creation of any mortgage, deed of trust, lien or other security interest; (b) the making or assignment of any lease or sublease; and (c) the making or delivery of any deed, bill of sale or other instrument of transfer or assignment or any plan of merger, consolidation, liquidation or dissolution under, in furtherance of or in connection with the Joint Plan.

**Section 7.10 General Settlement of Claims.** Pursuant to Section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases and other benefits provided under this Joint Plan, upon the Effective Date, the provisions of this Joint Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to this Joint Plan.

**Section 7.11 Cancellation of Notes, Instruments, Certificates and other Documents**.  On the Effective Date, except as otherwise specifically provided for in the Joint Plan: (a) the obligations of the Debtors under the DIP Financing Facility, the Atalaya Loan Documents and any other agreement, note, bond, indenture or other instrument or document directly or indirectly evidencing or creating any

- 28 -

indebtedness or obligation of the Debtors shall be cancelled; (b) the obligations of the Debtors under the DIP Financing Facility, the Atalaya Loan Documents shall be fully released, settled, and compromised as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (c) the obligations of the Debtors and the Reorganized Debtors, pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing any agreement, note, bond, indenture or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised.

# ARTICLE VIII
# PROVISIONS GOVERNING DISTRIBUTIONS AND OBJECTIONS TO CLAIMS

   **Section 8.1 Distributions Generally.** Distributions to be made under the Joint Plan to Holders of Claims that are Allowed on or before the Effective Date will be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as is practicable, but in any event within fifteen (15) days after the Effective Date unless (a) such Claim is a Cure Amount Claim associated with an Executory Contract or Unexpired Lease to be assumed pursuant to the Joint Plan about which there is a Dispute, in which case the paying on account of such Claim will be made in accordance with Section 9.2 of the Joint Plan, or (b) such Distribution is returned to the Disbursing Agent as undeliverable in accordance with Section 8.3 of the Joint Plan. If a Claim is Allowed after the Effective Date, a Distribution will be made on account of the Allowed Claim within fifteen (15) days after the earlier of the date on which (a) an Order allowing the Claim becomes a Final Order, or (b) a Stipulation Regarding the Amount and Nature of the Claim is executed. Distributions under the Joint Plan will be made (a) to the Holder of each Allowed Claim at the address of such Holder as listed on the Schedules, unless the Debtors or the Reorganized Debtors have been notified in writing of a change of address, including, without limitation, by the Filing of an amended Proof of Claim by such Holder that provides an address for such Holder different from the address reflected on the Schedules, or (b) pursuant to the DIP Financing Final Order.

   **Section 8.2 Delivery of Distributions to Holders of Allowed Claims.** The Disbursing Agent will make Distributions to the Holders of Allowed Claims. No Distribution will be made with respect to all or any portion of any Disputed, contingent, or unliquidated Claim until the entire Claim becomes an Allowed Claim.

   **Section 8.3 Undeliverable Distributions.**

      **(a) No Further Attempts at Delivery**. If any Distribution to a Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable, then unless and until the Disbursing Agent is notified in writing of the Holder's then-current address: (i) such undeliverable Distributions will remain in the possession of the Disbursing Agent, and no further attempt will be made to deliver such Distribution; and (ii) no attempt will be made to deliver subsequent Distributions to such Holder.

      **(b) Forfeiture**. Any Holder of an Allowed Claim that does not assert a claim for an undeliverable Distribution by delivering to the Disbursing Agent a written notice setting forth such Holder's then-current address within one hundred and eighty (180) days after the later of (i) the Effective Date, and (ii) the last date on which a Distribution was deliverable to the Holder, will have its claim for undeliverable Distributions discharged and will be forever barred from asserting such claim or any claim

- 29 -

for subsequent Distributions against the Debtors, Reorganized Debtors, the Disbursing Agent, or their respective properties.

(c) **No Requirement to Attempt to Locate Holders**. Nothing contained in the Joint Plan will require the Disbursing Agent, the Debtors or Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

**Section 8.4** **Exemption from Securities Laws.** The issuance of the General Unsecured Creditor Note, New Atalaya Secured Note, or any securities that may be deemed issued pursuant to the Joint Plan, shall be exempt from any securities laws registration requirements to the fullest extent permitted by section 1145 of the Bankruptcy Code.

**Section 8.5** **Means of Cash Payments**. Except as otherwise provided in the Joint Plan, Cash payments made pursuant to the Joint Plan will be in United States currency by checks drawn on the account of the Disbursing Agent, or by wire transfer from a domestic bank. If a check included in a Distribution to a Holder of an Allowed Claim is not cashed within one hundred and eighty (180) days of the issuance thereof, the Disbursing Agent will void such check and such Distribution will be treated as undeliverable as provided in Section 8.3 of the Joint Plan.

**Section 8.6** **Setoffs and Recoupment.** The Debtors or Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off or recoup against any Allowed Claim and the Distributions to be made pursuant to the Joint Plan on account of such Claim (before any Distribution is made on account of such Claim) the Claims, rights and Causes of Action of any nature that the Debtors may hold against the Holder of such Allowed Claim (excluding, for the avoidance of doubt, Claims of the Debtors released pursuant to the Joint Plan or any contract, instrument, release, or other agreement or document entered into or delivered in connection with the Joint Plan); *provided, however,* that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtors or Reorganized Debtors of any claims, rights and Causes of Action that the Debtors may possess against such a Holder, which are preserved under the Joint Plan.

**Section 8.7** **Distribution Record Date.**

(a) **Allowed Claim.** The Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the Distribution Record Date and will be entitled for all purposes herein to recognize and make Distributions only to those Holders of Allowed Claims that are Holders of such Claims, or participants therein, as of the Distribution Record Date.

(b) **Pending Transfers.** Except as otherwise provided in a Final Order, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 before the Distribution Record Date will be treated as Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objection to such a transfer has not expired before the Distribution Record Date.

**Section 8.8** **Distributions in Complete Satisfaction**. The payments, Distributions and other treatments provided in respect to each Allowed Claim under this Joint Plan shall be in complete satisfaction, discharge and release of all such Allowed Claims.

**Section 8.9** **Objections to Claims.** Objections to Claims may be Filed until the Effective Date, or such later date as the Bankruptcy Court may Order. The Debtors reserve the right for themselves, Yucaipa, and any other party in interest, to File objections through the Effective Date. The Debtors shall use commercially reasonable efforts to object to and reconcile material General Unsecured Claims and to File books and records and duplicative claims' objections. Neither the Creditors' Committee, the Creditors' Committee's professionals, nor the Administrator shall have any liability or obligation with respect to Claims' objections or reconciliations.

**Section 8.10** **Estimation of Claims.** Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Joint Plan (including for purposes of Distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate Distribution with respect to such Claim.

# ARTICLE IX
## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

**Section 9.1** **Executory Contracts or Unexpired Leases to Be Rejected or Assumed.**

**(a) Generally.** Except as otherwise provided in the Joint Plan or the Confirmation Order, each Executory Contract or Unexpired Lease that is listed on **Plan Exhibit 9.1** will be deemed rejected pursuant to section 365 of the Bankruptcy Code. The Confirmation Order will constitute an Order of the Bankruptcy Court approving each such rejection, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date; *provided, however*, that the Debtors reserve the right to amend Plan Exhibit 9.1, with the prior consent of Yucaipa, to (i) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its assumption pursuant to Article 9.1(b) of the Joint Plan, or (ii) add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to this Section 9.1(a) of the Joint Plan. The Debtors will provide notice of any amendments to Plan Exhibit 9.1 to the Creditors' Committee and the parties to the Executory Contracts or Unexpired Leases affected thereby. Such notice will be sent by overnight delivery or telecopy, and will include a Ballot and a form for Filing a Proof of Claim.

**(b) Approval of Assumptions.** The Confirmation Order will constitute an Order of the Bankruptcy Court approving the assumption as of the Effective Date, pursuant to section 365 of the Bankruptcy Code of each Executory Contract and Unexpired Lease that (i) is not rejected under Section 9.1(a) of the Joint Plan, (ii) has not been previously rejected by the Debtors by Final Order or has been rejected by Order of the Bankruptcy Court as of the Effective Date, which Order becomes a Final Order after the Effective Date, or (iii) is the subject of a motion to assume or reject pending as of the Effective Date. An Order of the Bankruptcy Court entered on or before the Confirmation Date will specify the

- 31 -

procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Joint Plan of: (i) the contract or lease being assumed; (ii) the Cure Amount Claim, if any, that the Debtors believe they would be obligated to pay in connection with such assumption; and (iii) the procedures for such party to object to the assumption of the applicable contract or lease or the amount of the proposed Cure Amount Claim.

**Section 9.2 <u>Payments Related to the Assumption of Executory Contracts and Unexpired Leases</u>.** To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Joint Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the Debtors: (a) by payment of the Cure Amount Claim in Cash on the Effective Date; or (b) on such other terms as are agreed to by any non-Debtor party to such Executory Contract or Unexpired Lease, the applicable Debtor and Yucaipa. If there is a Dispute regarding the amount of any Cure Amount Claim, or any other matter pertaining to assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption.

**Section 9.3 <u>Bar Date for Rejection Damages</u>.** Notwithstanding anything in the Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease pursuant to Article 9.1(a) of the Joint Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim will be forever barred and will not be enforceable against the Debtors, the Reorganized Debtors, the successor of any of them, or the property of any of them, unless a request for payment of such Claim is Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order or any other Order entered on the Docket within thirty (30) days after the Effective Date.

**Section 9.4 <u>Obligations to Indemnify Directors, Officers and Employees</u>.** The obligations of the Debtors or Reorganized Debtors to indemnify any person who is serving or has served as one of its directors, officers or employees by reason of such person's prior or future service in such a capacity or as a director, officer, manager or employee of another corporation, partnership, limited liability company or other legal entity, to the extent provided in the applicable certificates of incorporation, certificate of formation, operating agreement, or bylaws, by statutory law or by written agreement, policies or procedures of or with the Debtors, will be reinstated, shall survive the occurrence of the Effective Date and shall be unaffected by the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before, on or after the Petition Date.

**Section 9.5 <u>Contracts and Leases Entered into After the Petition Date</u>.** Contracts and leases entered into after the Petition Date by the Debtors, including any Executory Contracts or Unexpired Leases assumed by the Debtors, will be performed by the Debtors or Reorganized Debtors liable thereunder in the ordinary course of their businesses. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**Section 9.6 <u>Insurance Policies and Agreements</u>.**

    **(a) Assumed Insurance Policies and Agreements.** Subject to the occurrence of the Effective Date, unless specifically rejected by Order of the Bankruptcy Court, all insurance policies issued to, or insurance agreements entered into by, the Debtors before the Petition Date (including, without limitation, insurance policies for directors, officers and managers maintained by the Debtors as of the Petition Date) shall be assumed by the Reorganized Debtors and shall continue in accordance with their terms. The

- 32 -

entry of the Confirmation Order will constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, their Estates, and all parties in interest in the Bankruptcy Cases. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto before the Effective Date, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such insurance policy or agreement.

**(b) Reservation of Rights.** Nothing contained in the Joint Plan will constitute a waiver of any claim, right or Cause of Action that the Debtors or the Reorganized Debtors may hold against an insurer under any policy of insurance or insurance agreement.

**Section 9.7 Compensation and Benefit Programs**. Except as otherwise provided in a motion Filed before the Effective Date, all employment plans, practices, programs and policies maintained by the Debtors as of the Effective Date shall remain in full force and effect following the Effective Date, subject to any and all rights of the Debtors under applicable non-bankruptcy law to amend or terminate such plans, practices, programs and policies.

# ARTICLE X
# CONDITIONS TO THE JOINT PLAN BECOMING EFFECTIVE AND IMPLEMENTATION OF THE JOINT PLAN

**Section 10.1 Conditions to the Joint Plan Becoming Effective**. The Joint Plan shall not be consummated, and the Effective Date shall not occur, until each of the following conditions has been satisfied or duly waived pursuant to Section 10.2 of the Joint Plan:

(a) The Confirmation Order shall have been entered by the Bankruptcy Court in form and substance that is satisfactory to the Debtors and Yucaipa on or before [DATE], 2013, shall be in full force and effect and shall be a Final Order;

(b) The Debtors receive the Yucaipa Advance;

(c) No Material Adverse Change will have occurred from and after the Confirmation Date;

(d) The Joint Plan and Plan Exhibits, including any amendments, modifications or supplements thereto, shall be in form and substance satisfactory to Yucaipa; and

(e) All consents, actions, documents, certificates and agreements necessary to implement the Joint Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with the applicable laws.

**Section 10.2 Waiver of Conditions to the Effective Date**. One or more of the foregoing conditions to the Effective Date may be waived, in whole or in part, jointly by the Debtors and Yucaipa at any time and without any Order of the Bankruptcy Court.

**Section 10.3 Filing Notice of Occurrence of the Effective Date**. The Debtors shall File a notice of occurrence of the Effective Date within three (3) Business Day of the Effective Date, and such Notice must state that all conditions to the Joint Plan becoming effective have been satisfied. The identity the Administrator will disclosed in the Notice of Occurrence of the Effective Date.

- 33 -

**Section 10.4 <u>Effect of Non-Occurrence of Conditions to Consummation.</u>** If consummation of this Joint Plan does not occur (including, without limitation, if the Confirmation Order is vacated pursuant to a Final Order), then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Joint Plan will be null and void in all respects, and nothing contained in the Joint Plan or Disclosure Statement shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

# ARTICLE XI
# <u>DISCHARGE, RELEASES AND INJUNCTION</u>

**Section 11.1 <u>Discharge of Claims.</u>**

(a)     Except as otherwise expressly provided in the Joint Plan or the Confirmation Order, the rights afforded under the Joint Plan and the treatment of Claims under the Joint Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date.  Except as provided in the Joint Plan or the Confirmation Order, as of the Effective Date, the Joint Plan shall discharge the Debtors from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (i) a Proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code, or (iii) the Holder of such Claim voted to accept the Joint Plan.

(b)     In accordance with the foregoing, except as provided in the Joint Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and liabilities against the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors at any time to the extent that such judgment relates to a discharged Claim.

(c)     The Reorganized Debtors shall not be responsible for any Claims against the Debtors except (i) those payments and Distributions expressly provided for or due under the Join Plan, or (ii) Claims that pass through the Joint Plan Unimpaired pursuant to specific and express provisions of the Joint Plan.  All Entities shall be precluded and forever barred from asserting against the Debtors, the Reorganized Debtors, or their assets, properties, or interests in property, any Claims based upon any act or omission, transaction, or other activity, event, or occurrence of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal basis therefore were known or existed prior to the Effective Date, except for (a) the payments and Distributions expressly provided for or due under the Joint Plan and (b) Claims that pass through the Joint Plan Unimpaired pursuant to specific and express provisions of the Joint Plan.

(d)     The discharge and release of the Debtors as provided in the Joint Plan, and the re-vesting of property in the Reorganized Debtors, will not diminish or impair the enforceability of any insurance policies that may cover Claims against any Debtor or other Entity.

**Section 11.2 <u>Injunction.</u> Except as otherwise expressly provided in the Joint Plan or the Confirmation Order, as of the Effective Date, any Entity that has held, currently holds or may hold a Claim or other debt, liability, or Interest that is discharged, released, waived, settled or deemed satisfied in accordance with the Joint Plan will be permanently enjoined from taking any**

- 34 -

of the following actions on account of any such Claims, debts, liabilities, or Interests: (a) commencing or continuing in any manner any action or Cause of Action or other proceeding against the Debtors, the Reorganized Debtors, the Estates, or the property of any of them, other than to enforce any right that does not comply with, or is inconsistent with, the provisions of the Joint Plan; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, the Reorganized Debtors, the Estates, or the property of any of them, other than as permitted pursuant to (a) above; (c) creating, perfecting or enforcing any Lien or encumbrance of any kind against the Debtors, the Reorganized Debtors, the Estates, or the property of any of them, other than as permitted pursuant to (a) above; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors, Reorganized Debtors, the Estates, or the property of any of them; and (e) commencing or continuing any action or Cause of Action, in any manner, in any place that does not comply with or is inconsistent with the Joint Plan.**

Section 11.3 **Term of the Automatic Stay**.  Unless otherwise provided in the Joint Plan or the Confirmation Order, the automatic stay set forth in section 362 of the  Bankruptcy Code shall remain in full force and effect until the Effective Date.  Nothing in this Section 11.3 of the Joint Plan, however, shall be construed as a limitation of the permanent discharge and injunction provisions provided for in the Joint Plan.

Section 11.4 **Release of Liens.**  Except as otherwise provided in the Joint Plan, Confirmation Order, or in any contract, instrument, release or other agreement or document entered into or delivered, on the Effective Date, all mortgages, deeds of trust, Liens or other security interests or encumbrances of any kind against the property of the Estates will be fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens or other security interests, including any rights to any Collateral thereunder, will revert to the Reorganized Debtors and their respective successors and assigns and the former Holder thereof will, upon request of the Debtors, execute such documents evidencing such release and discharge as the Debtors may reasonably request.

Section 11.5 **No Successor Liability.** The Reorganized Debtors will have no responsibilities for any Claims against or liabilities or obligations of the Debtors relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Confirmation Date; *provided, however*, that the Reorganized Debtors shall have the obligations specifically and expressly provided in the Joint Plan.

Section 11.6 **Releases.**

**(a) Releases by the Debtors and the Reorganized Debtors.**

**AS OF THE EFFECTIVE DATE, THE DEBTORS, ON THEIR OWN BEHALF AND ON BEHALF OF THE REORGANIZED DEBTORS AND THEIR ESTATES, RELEASE, WAIVE AND DISCHARGE ALL OF THE OTHER RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION (INCLUDING BANKRUPTCY CAUSES OF ACTION), AND LIABILITIES HELD BY THE DEBTORS OR THEIR ESTATES, ASSERTABLE ON BEHALF OF THE DEBTORS OR THEIR ESTATES, OR DERIVATIVE OF THE DEBTORS,' OR THEIR ESTATES' RIGHTS, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, DISPUTED OR UNDISPUTED, KNOWN OR UNKNOWN, FORESEEN OR**

- 35 -

UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, IN ANY WAY RELATING TO THE DEBTORS, THE BANKRUPTCY CASES, THE DISCLOSURE STATEMENT, THE JOINT PLAN, THE SUBJECT MATTER OF OR THE TRANSACTIONS OR EVENTS GIVING RISE TO ANY CLAIM OR INTEREST THAT IS TREATED UNDER THE JOINT PLAN, THE TREATMENT OF ANY CLAIM OR INTEREST UNDER THE JOINT PLAN, THE DEBTORS' BUSINESSES OR CONTRACTS WITH ANY OF THE OTHER RELEASED PARTY, ANY NEGOTIATIONS CONCERNING THE JOINT PLAN, THE DEBTORS' MANAGEMENT OR OPERATIONS, THE NEGOTIATION OR CONSUMMATION OF THE JOINT PLAN, OR ANY OTHER EVENTS TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

**(b) Releases by the Holders of Claims.**

<u>EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE JOINT PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, EACH HOLDER OF A CLAIM WHO HAS VOTED TO ACCEPT THIS JOINT PLAN SHALL BE DEEMED TO HAVE UNCONDITIONALLY RELEASED THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE THAT IS IN ANY WAY RELATED TO THE DEBTORS, THEIR PROPERTIES, THE BANKRUPTCY CASES, THE DISCLOSURE STATEMENT OR THE JOINT PLAN;</u> *PROVIDED, HOWEVER*, THAT NOTHING IN THIS SECTION 11.6 OF THE JOINT PLAN WILL OPERATE TO WAIVE OR RELEASE (A) THE RIGHTS OF ANY PARTY TO ENFORCE THIS JOINT PLAN AND THE CONTRACTS, INSTRUMENTS AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THIS JOINT PLAN OR ASSUMED PURSUANT TO THIS JOINT PLAN, OR (B) ANY CLAIM OR RIGHT AGAINST A RELEASED PARTY THAT IS BASED ON THE GROSS NEGLIGENCE, FRAUD OR WILLFUL MISCONDUCT OF SUCH RELEASED PARTY AS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT OR OTHER COURT OF COMPETENT JURISDICTION.

**Section 11.7** <u>Exculpation</u>.

AS OF THE AND SUBJECT TO THE OCCURRENCE OF THE CONFIRMATION DATE, THE EXCULPATED PARTIES (A) SHALL BE DEEMED TO HAVE NEGOTIATED THE JOINT PLAN IN GOOD FAITH AND NOT BY ANY MEANS FORBIDDEN BY LAW, AND (B) SOLICITED ACCEPTANCES OF THE JOINT PLAN IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING SECTION 1125(a) AND (e) OF THE BANKRUPTCY CODE AND ANY APPLICABLE NON-BANKRUPTCY LAW, RULE OR REGULATION GOVERNING THE ADEQUACY OF DISCLOSURE IN

CONNECTION WITH THE SOLICITATION. ADDITIONALLY, NONE OF THE EXCULPATED PARTIES SHALL BE LIABLE TO ANY ENTITY FOR ANY ACTION TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR RELATED TO THE FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION, OR CONSUMMATION OF THE JOINT PLAN, THE DISCLOSURE STATEMENT, EARLIER VERSIONS OF THE SAME, OR ANY CONTRACT, INSTRUMENT, RELEASE, OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO, OR ANY OTHER ACTION TAKEN OR OMITTED TO BE TAKEN, IN CONNECTION WITH THE JOINT PLAN OR THE BANKRUPTCY CASES; *PROVIDED, HOWEVER*, THAT NOTHING IN THIS SECTION 11.7 OF THE JOINT PLAN WILL OPERATE TO WAIVE OR RELEASE (A) THE RIGHTS OF ANY PARTY TO ENFORCE THIS JOINT PLAN AND THE CONTRACTS, INSTRUMENTS AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THIS PLAN OR ASSUMED PURSUANT TO THIS JOINT PLAN, OR (B) ANY CLAIM OR RIGHT AGAINST AN EXCULPATED PARTY THAT IS BASED ON THE GROSS NEGLIGENCE, FRAUD OR WILLFUL MISCONDUCT OF SUCH EXCULPATED PARTY AS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT OR OTHER COURT OF COMPETENT JURISDICTION.

# ARTICLE XII
## RETENTION OF JURISDICTION

Until the entry of a final decree in accordance with Bankruptcy Rule 3022, the Bankruptcy Court shall have jurisdiction of all matters arising under, arising out of or relating to the Bankruptcy Cases including, but not limited to, the following:

(a) to insure that the purpose and intent of the Joint Plan are carried out;

(b) to consider any modification of the Joint Plan under section 1127 of the Bankruptcy Code;

(c) to hear and determine all Claims, controversies, defaults, suits and disputes against the Debtor, including, but not limited to, any Disputed Administrative Claim or Disputed Claim;

(d) to hear, determine and enforce all Claims and Causes of Action of the Debtors that arose, in whole or in part, prior to the Effective Date;

(e) to hear and determine all controversies, suits, defaults and disputes that may arise in connection with the interpretation, execution or enforcement of the Joint Plan;

(f) to hear and determine all requests for compensation and/or reimbursement of expenses for services rendered or expenses incurred before the Effective Date which may be made after the Effective Date;

(g) to hear and determine all objections to Administrative Claims, Claims, controversies, suits and disputes that may be pending at or initiated after the Effective Date, except as provided in the Confirmation Order;

- 37 -

(h)   to consider and act on the compromise and settlement of any Administrative Claim, Claim or Cause of Action on behalf of or against any one of or all of the Debtors;

(i)  to enforce and interpret by injunction or otherwise the terms and conditions of the Joint Plan;

(j)  to enter Final Order concluding and terminating the Bankruptcy Cases;

(k)  to correct any defect, cure any omission, or reconcile any inconsistency in the Joint Plan or Confirmation Order necessary or helpful to carry out the purposes and intent of the Joint Plan;

(l)  to determine all questions and disputes regarding titles to the assets of the Debtors or Reorganized Debtors;

(m)  to classify the Claims or Interests of any Holder and to re-examine Claims allowed for purposes of voting, and to determine objections to Administrative Claims, Claims and Interests;

(n)  to consider and act on such other matters consistent with the Joint Plan as may be provided in the Confirmation Order;

(o)  to enforce any provisions of the Joint Plan relating to disputes between the Administrator and any other person, including the Debtors, the Reorganized Debtors, and Intermediate Holdco;

(p)  to enforce any injunction or stay whether arising under the Bankruptcy Code or Rules, or the Joint Plan; and/or

(q)  to consider the rejection of executory contracts and/or leases that are not discovered before Confirmation and allow Claims for damages with respect to the rejection of any such executory contracts or leases within such future time as the Bankruptcy Court may direct.

# ARTICLE XIII
# MISCELLANEOUS

**Section 13.1 <u>Creditors' Committee</u>**. The Creditors' Committee shall continue to exist until the Effective Date.  On the Effective Date, the Creditors' Committee shall dissolve automatically, and its members shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Bankruptcy Cases; *provided, however*, that the Creditors' Committee shall be deemed to remain in existence solely with respect to the final fee applications Filed in connection with Section 3.2(b)(i) and the Creditors' Committee shall have the right to be heard on all issues relating to such final fee applications

**Section 13.2 <u>Administrative Consolidation of the Debtors for Joint Plan Purposes Only</u>**.  Subject to the occurrence of the Effective Date, solely for the purposes of voting and Distribution under the Joint Plan, the Debtors shall be administratively consolidated.  As a result, with the exception of the Atalaya Secured Claim: (a) each and every Claim filed or to be filed against any of the Debtors shall be deemed filed against the administratively consolidated Debtors and shall be deemed one Claim against, and one obligations of, the Debtors; (b) any and all guarantees executed by one or more of the Debtors with respect to the obligation of any other Debtor or Debtors shall be of no force and effect; (c) all duplicative Claims (identical in amount and subject matter) filed against one or more of the Debtors will be

automatically expunged so that only one Claim survives against the consolidated Debtors; and (d) the consolidated Debtors will be deemed, for purposes of determining the availability of the right of set-off under section 553 of the Bankruptcy Code, to be one Entity, so that, subject to other provisions of section 553 of the Bankruptcy Code, the debts due to a particular Debtor may be offset against the Claims against other Debtor or Debtors. Such administrative consolidation, however, shall not affect (a) the legal and organizational structure or control of the Debtors, (b) any guarantees, Liens, and security interests that are required to be maintained in connection with executory contracts or unexpired leases that were entered into during the Bankruptcy Cases, or that have been or will be assumed pursuant to the Joint Plan, or (c) distributions out of any insurance policies or proceeds of such policies.

**Section 13.3 <u>Modification of the Joint Plan</u>**. Subject to the restrictions on modification set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3019, the Debtors or Reorganized Debtors, as the case may be, reserves the right to alter, amend or modify the Joint Plan before its substantial consummation; *provided, however*, that no modifications may be made without the consent of Yucaipa.

**Section 13.4 <u>Revocation or Withdrawal of the Joint Plan</u>**. The Debtors and Yucaipa each reserve the right to revoke or withdraw the Joint Plan at any time before the Confirmation Date by Filing a notice of withdrawal or revocation. If the Joint Plan is revoked or withdrawn, or if the Effective Date does not occur, then the Joint Plan and all settlements and compromises set forth herein and not otherwise approved by Final Order shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Entity, or prejudice in any manner the rights of Yucaipa or any other Entity in any other further proceedings, or to constitute an admission, acknowledgment, offer or undertaking by Yucaipa as to any matter or thing.

**Section 13.5 <u>Severability</u>**. If, prior to confirmation of the Joint Plan, any term or provision of the Joint Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted; *provided, however,* that any such alteration or interpretation must be in form and substance acceptable to the Debtors and Yucaipa. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Joint Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Joint Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**Section 13.6 <u>Plan Exhibits</u>**. All Plan Exhibits are incorporated by reference and are intended to be an integral part of this document as though fully set forth in the Joint Plan.

**Section 13.7 <u>Service of Certain Plan Exhibits and Disclosure Statement Exhibits</u>**. Because the Plan Exhibits are voluminous, not all of the Plan Exhibits are being served with copies of the Joint Plan and the Disclosure Statement. Any party in interest may obtain the Plan Exhibits from the Document Website.

**Section 13.8 <u>Binding Effect</u>.** The Joint Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the Holders of Claims and Interests, together with their respective successors and assigns.

**Section 13.9 <u>Substantial Consummation</u>.** The Joint Plan will be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code upon the Reorganized Debtors' Distribution of the General Unsecured Claim Effective Date Payment to the General Unsecured Distribution Account.

**Section 13.10 <u>Successors and Assigns</u>.** The rights, benefits and obligations of any Entity named or referred to in the Joint Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

**Section 13.11 <u>Headings</u>.** Headings are used in the Joint Plan for convenience and reference only, and shall not constitute a part of the Joint Plan for any other purpose.

**Section 13.12 <u>Governing Law</u>.** Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under the Joint Plan shall be governed by, and construed and enforced as provided in the laws of the State of Louisiana; *provided, however*, that any documents executed in connection with the Joint Plan, including, but not limited to the Plan Exhibits, shall be governed by the laws of the state chosen therein.

**Section 13.13 <u>Notices</u>.** All notices, requests, elections or demands to or upon the Reorganized Debtors in connection with the Joint Plan shall be in writing and shall be deemed to have been given when received or, if mailed, three (3) days after the date of mailing provided such writing shall have been sent by registered or certified mail, postage prepaid, return receipt requested, and sent to the following:

**To the Debtors or Reorganized Debtors**:

R. PATRICK VANCE
ELIZABETH J. FUTRELL
Jones Walker LLP
201 St. Charles Avenue
New Orleans, Louisiana 70170-5100
Email: pvance@joneswalker.com
Email: efutrell@joneswalker.com

**To Yucaipa:**

Derex Walker
The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, California 90069
Telephone: (310) 789-1791

and

- 40 -

ROBERT KLYMAN
Latham & Watkins, LLP
355 South Grand Avenue
Los Angeles, CA 90071-1560
Telephone: (213) 485- 1234
Email: ROBERT.KLYMAN@lw.com

**To the U.S. Trustee's Office:**

GAIL BOWEN MCCULLOCH
Office of the U.S. Trustee
300 Fannin, Suite 3196
Shreveport, LA 71101
Email: Gail.McCulloch@usdoj.gov

All notices and requests to Holders shall be sent to their last known addresses.

**Section 13.14  No Admissions.** Notwithstanding anything herein to the contrary, nothing contained in the Joint Plan shall be deemed an admission by any Entity with respect to any matter set forth herein.

# ARTICLE XIV
# CRAMDOWN

The Debtors may request Confirmation under section 1129(b) of the Bankruptcy Code, if any Impaired Class does not accept the Joint Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors reserve the right to alter the treatment of any Class to effectuate a cramdown under section 1129(b) of the Bankruptcy Code.

Dated:  As of July 8, 2013

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

- 41 -

**PICCADILLY RESTAURANTS, LLC**

By: _____
Name: **THOMAS J. SANDEMAN**
Its: Chief Executive Officer


**PICCADILLY FOOD SERVICE, LLC**

By: _____
Name: **THOMAS J. SANDEMAN**
Its:  Chief Financial Officer

**PICCADILLY INVESTMENTS, LLC**

By: Yucaipa Corporate Initiatives Fund I,
LLC, its Managing Member

By: _____
    Name: ROBERT P. BERMINGHAM
    Its: Vice President



**R. PATRICK VANCE (LA 13008)**
**ELIZABETH J. FUTRELL (LA 05863)**
**MARK A. MINTZ (#31878)**
Jones Walker LLP
201 St. Charles Avenue, 51st Floor
New Orleans, LA 70170
Telephone: (504) 582-8000
Direct Facsimile: (504) 589-8194
Email: pvance@joneswalker.com
Email: efutrell@joneswalker.com
Email: mmintz@joneswalker.com
Email: trench@joneswalker.com


**Attorneys for Piccadilly Restaurants, LLC,**
**Piccadilly Food Service, LLC and**
**Piccadilly Investments, LLC**

*/s/ Robert Klyman*
**ROBERT KLYMAN**
Latham & Watkins, LLP
355 South Grand Avenue
Los Angeles, CA 90071-1560
Telephone: (213) 485- 1234
Email: ROBERT.KLYMAN@lw.com
and

**WILLIAM H. PATRICK, III (LA 10359)**
**TRISTAN E. MANTHEY (LA 24539)**
Heller, Draper, Patrick & Horn
650 Poydras Street, Suite 2500
New Orleans, LA 70130-6103
Telephone: (504) 299-3300
Email: wpatrick@hellerdraper.com
Email: tmanthey@hellerdraper.com

**Attorneys for Yucaipa Corporate Initiatives
Fund I, L.P.**

## THE CONFIRMATION PROCEDURES ORDER

## EXHIBIT B

## [TO BE PROVIDED]

# FINANCIAL PROJECTIONS

## EXHIBIT C

{N2660688.1}

**Piccadilly Restaurants, LLC**
**5 Year Forecasted Income Statement**

| | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Total 2013 | Total 2014 | Total 2015 | Total 2016 | Total 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Guest Count | 1,130,901 | 1,241,594 | 1,662,616 | 1,268,460 | 1,275,546 | 1,560,381 | 1,224,945 | 1,296,681 | 1,618,314 | 1,329,060 | 1,317,030 | 1,552,023 | 16,477,551 | 17,608,300 | 18,933,798 | 20,700,404 | 22,115,377 |
| CKA | $ 8.18 | $ 8.52 | $ 8.66 | $ 8.51 | $ 8.48 | $ 8.60 | $ 8.38 | $ 8.24 | $ 8.23 | $ 8.09 | $ 8.77 | $ 8.72 | $ 8.46 | $ 8.28 | $ 8.20 | $ 8.16 | $ 8.09 |
| Gross sales | $ 9,252,344 | $ 10,583,840 | $ 14,404,476 | $ 10,796,112 | $ 10,819,912 | $ 13,415,813 | $ 10,264,868 | $ 10,681,164 | $ 13,313,698 | $ 10,746,806 | $ 11,546,404 | $ 13,530,293 | $ 139,355,729 | $ 145,796,525 | $ 155,223,661 | $ 168,812,647 | $ 178,934,415 |
| Net sales deductions | (172,937) | (346,496) | (573,386) | (432,410) | (406,723) | (505,368) | (381,198) | (397,018) | (185,281) | (160,526) | (163,708) | (196,033) | (3,921,084) | (3,551,047) | (3,596,987) | (3,702,228) | (3,688,251) |
| Net sales | 9,079,407 | 10,237,344 | 13,831,089 | 10,363,702 | 10,413,189 | 12,910,446 | 9,883,669 | 10,284,146 | 13,128,418 | 10,586,280 | 11,382,696 | 13,334,261 | 135,434,645 | 142,245,478 | 151,626,675 | 165,110,420 | 175,246,164 |
| Food cost | 2,883,805 | 3,122,434 | 4,026,688 | 3,017,864 | 3,067,894 | 3,761,711 | 2,919,823 | 3,045,033 | 3,821,015 | 2,970,923 | 3,393,986 | 3,758,818 | 39,789,993 | 41,567,197 | 44,916,069 | 49,418,940 | 53,024,594 |
| FC% | 31.2% | 29.5% | 28.0% | 28.0% | 28.4% | 28.0% | 28.4% | 28.5% | 28.7% | 27.6% | 29.4% | 27.8% | 28.6% | 28.5% | 28.9% | 29.3% | 29.6% |
| FC per Guest | $ 2.55 | $ 2.51 | $ 2.42 | $ 2.38 | $ 2.41 | $ 2.41 | $ 2.38 | $ 2.35 | $ 2.36 | $ 2.24 | $ 2.58 | $ 2.42 | $ 2.41 | $ 2.36 | $ 2.37 | $ 2.39 | $ 2.40 |
| Labor cost | 2,227,917 | 2,256,502 | 2,903,861 | 2,319,193 | 2,265,716 | 2,823,427 | 2,196,829 | 2,265,742 | 2,741,633 | 2,254,527 | 2,469,969 | 2,820,387 | 29,545,691 | 30,455,304 | 32,207,580 | 34,904,767 | 37,007,576 |
| LC% | 24.1% | 21.3% | 20.2% | 21.5% | 20.9% | 21.0% | 21.4% | 21.2% | 20.6% | 21.0% | 21.4% | 20.8% | 21.2% | 20.9% | 20.7% | 20.7% | 20.7% |
| LC per Guest | $ 1.97 | $ 1.82 | $ 1.75 | $ 1.83 | $ 1.78 | $ 1.81 | $ 1.79 | $ 1.75 | $ 1.69 | $ 1.70 | $ 1.88 | $ 1.82 | $ 1.79 | $ 1.73 | $ 1.70 | $ 1.69 | $ 1.67 |
| Net margin | 3,967,685 | 4,858,410 | 6,900,540 | 5,026,645 | 5,079,579 | 6,325,308 | 4,767,217 | 4,973,371 | 6,565,770 | 5,360,829 | 5,518,741 | 6,755,065 | 66,099,151 | 70,223,277 | 74,503,026 | 80,786,712 | 85,213,994 |
| Total other operating costs | 2,117,382 | 2,228,500 | 2,763,876 | 2,331,141 | 2,390,066 | 2,723,749 | 2,370,746 | 2,365,260 | 2,550,985 | 2,102,885 | 2,333,681 | 2,657,261 | 28,935,538 | 29,043,094 | 30,241,803 | 32,154,981 | 33,504,241 |
| Unit-level profit | 1,850,302 | 2,629,905 | 4,136,663 | 2,695,504 | 2,689,513 | 3,601,559 | 2,396,471 | 2,608,111 | 4,014,786 | 3,257,944 | 3,185,060 | 4,097,794 | 37,163,613 | 41,180,183 | 44,261,224 | 48,631,731 | 51,709,754 |
| Management compensation | 847,540 | 867,168 | 1,063,335 | 809,193 | 878,576 | 1,078,962 | 848,066 | 848,053 | 1,057,499 | 868,399 | 868,047 | 1,063,405 | 11,098,242 | 11,511,538 | 12,064,006 | 12,696,160 | 13,572,927 |
| Occupancy charges | 970,013 | 923,346 | 909,963 | 860,519 | 911,811 | 924,964 | 791,977 | 796,189 | 802,445 | 798,252 | 805,503 | 821,776 | 10,316,758 | 10,032,746 | 10,337,683 | 10,699,079 | 11,259,067 |
| Unit-level G&A | 56,379 | 57,157 | 19,769 | 45,414 | 50,637 | 51,899 | 44,283 | 45,162 | 43,972 | 47,110 | 46,666 | 46,009 | 554,516 | 576,445 | 615,706 | 678,137 | 788,497 |
| Unit-level EBITDA | (23,630) | 782,235 | 2,143,596 | 980,318 | 848,489 | 1,545,734 | 712,144 | 918,707 | 2,110,869 | 1,544,184 | 1,464,845 | 2,166,605 | 15,194,097 | 19,059,455 | 21,243,829 | 24,558,355 | 26,089,262 |
| Total corporate expenses | 570,805 | 685,862 | 747,463 | 619,306 | 598,440 | 918,881 | 631,661 | 631,599 | 745,158 | 632,493 | 636,581 | 922,030 | 8,340,278 | 9,011,906 | 9,586,550 | 9,724,529 | 9,900,119 |
| Operating EBITDA | (594,436) | 96,373 | 1,396,133 | 361,012 | 250,049 | 626,853 | 80,483 | 287,109 | 1,365,712 | 911,690 | 828,265 | 1,244,576 | 6,853,819 | 10,047,549 | 11,657,279 | 14,833,826 | 16,189,143 |
| (Gain)/Loss Fixed Assets | (15,000) | (89,532) | (10) | (7,000) | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | (300,000) | (383,542) | 84,000 | 84,000 | 84,000 | 84,000 |
| Natural disaster loss | 1,948 | 1,475 | 1,475 | 885 | - | - | - | - | - | - | - | - | 5,783 | - | - | - | - |
| Total EBITDA | (581,383) | 184,429 | 1,394,668 | 367,127 | 246,049 | 622,853 | 76,483 | 283,109 | 1,361,712 | 907,690 | 824,265 | 1,544,576 | 7,231,578 | 9,963,549 | 11,573,279 | 14,749,826 | 16,105,143 |
| Nonrecurring Expenses | 190,454 | 219,046 | 357,326 | 535,982 | 493,107 | 673,277 | 438,851 | 338,000 | 3,105,564 | - | - | - | 6,351,608 | - | - | - | - |
| Debt Refinancing Expenses | 40,010 | 40,010 | 3,095 | 40,010 | 5,500 | 5,500 | 5,500 | - | - | - | - | - | 145,125 | - | - | - | - |
| Unit Pre Opening Expenses | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Unit-level depreciation | 415,638 | 448,110 | 549,139 | 231,187 | 392,940 | 489,682 | 390,047 | 387,115 | 480,806 | 361,959 | 380,703 | 774,923 | 5,322,248 | 5,028,550 | 4,942,628 | 5,017,485 | 5,377,832 |
| GO depreciation | 10,300 | 10,568 | 12,855 | 9,396 | 11,745 | 9,396 | 9,396 | 11,745 | 6,833 | 6,833 | 8,386 | 107,454 | 123,959 | 117,761 | 111,873 | 106,278 |
| Interest expense | 346,930 | 350,962 | 453,902 | 348,602 | 393,130 | 386,047 | 406,118 | 412,042 | 164,454 | 111,494 | 111,494 | 339,243 | 3,824,419 | 2,051,300 | 1,673,750 | 1,513,578 | 1,494,907 |
| Interest income | (12) | (42) | (4,850) | (12) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (8,917) | (6,000) | (6,000) | (6,000) | (6,000) |
| Net Income (loss) | $ (1,594,703) | $ (884,223) | $ 23,201 | $ (798,642) | $ (1,047,525) | $ (942,899) | $ (1,172,928) | $ (868,444) | $ (2,400,358) | $ 407,904 | $ 326,734 | $ 422,523 | $ (8,510,358) | $ 2,765,740 | $ 4,845,180 | $ 8,112,991 | $ 9,132,125 |

Piccadilly Restaurants, LLC
5 Year Forecasted Balance Sheet

($ in millions)

| | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Total 2013 | Total 2014 | Total 2015 | Total 2016 | Total 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | | | | | | | |
| Cash | 2,429 | 2,370 | 1,956 | 1,578 | 1,561 | 351 | 1,096 | 588 | 1,055 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 4,735 | 12,241 | 20,961 |
| Accounts & Notes Receivable | 1,113 | 1,024 | 1,004 | 818 | 1,017 | 1,052 | 1,126 | 1,201 | 1,271 | 1,390 | 1,485 | 1,406 | 1,406 | 1,656 | 2,089 | 2,596 | 3,196 |
| Inventories | 3,690 | 3,644 | 3,607 | 3,529 | 3,511 | 3,447 | 3,386 | 3,264 | 3,261 | 3,390 | 3,328 | 3,586 | 3,586 | 3,642 | 3,723 | 3,811 | 3,926 |
| Other Current Assets | 2,214 | 2,006 | 2,650 | 2,238 | 2,185 | 2,935 | 2,185 | 2,285 | 3,035 | 2,285 | 1,797 | 2,547 | 2,547 | 2,619 | 2,691 | 2,764 | 2,836 |
| **Total Current Assets** | 9,446 | 9,043 | 9,217 | 8,163 | 8,274 | 7,785 | 7,793 | 7,337 | 8,621 | 8,500 | 8,922 | 9,039 | 9,039 | 9,416 | 13,239 | 21,413 | 30,919 |
| Property, Plant & Equipment | | | | | | | | | | | | | | | | | |
| Land | 3,436 | 3,028 | 3,028 | 3,028 | 3,028 | 3,028 | 2,803 | 2,803 | 2,803 | 2,803 | 2,803 | 2,403 | 2,403 | 2,403 | 2,403 | 2,403 | 2,403 |
| Buildings & Leasehold Impr. | 27,792 | 27,424 | 27,546 | 27,712 | 27,935 | 28,232 | 27,689 | 27,872 | 28,079 | 28,292 | 28,505 | 27,515 | 27,515 | 31,021 | 35,271 | 40,177 | 45,083 |
| Furniture & Fixtures | 31,504 | 30,872 | 31,000 | 31,094 | 31,090 | 31,086 | 31,082 | 31,078 | 31,074 | 31,070 | 31,066 | 31,366 | 31,366 | 31,282 | 31,198 | 31,114 | 31,030 |
| Machinery & Equipment | 6,471 | 6,314 | 6,314 | 6,340 | 6,340 | 6,340 | 6,340 | 6,340 | 6,340 | 6,340 | 6,340 | 6,340 | 6,340 | 6,340 | 6,340 | 6,340 | 6,340 |
| Construction-in-progress | 31 | 36 | 108 | 108 | 108 | 108 | 108 | 108 | 108 | 108 | 108 | 108 | 108 | 108 | 108 | 108 | 108 |
| Property, Plant & Equipment | 69,234 | 67,673 | 67,994 | 68,281 | 68,500 | 68,793 | 68,021 | 68,200 | 68,403 | 68,612 | 68,821 | 67,731 | 67,731 | 71,153 | 75,319 | 80,141 | 84,963 |
| Less: Allowance for Deprec. | (45,259) | (44,466) | (44,994) | (45,165) | (45,567) | (46,069) | (46,468) | (46,865) | (47,357) | (47,746) | (48,133) | (48,917) | (48,917) | (54,069) | (59,130) | (64,259) | (69,743) |
| Net Property, Plant, & Equipment | 23,975 | 23,207 | 23,001 | 23,117 | 22,932 | 22,724 | 21,553 | 21,335 | 21,046 | 20,866 | 20,688 | 18,814 | 18,814 | 17,084 | 16,190 | 15,882 | 15,220 |
| Intangible Assets | 6,174 | 6,174 | 6,174 | 6,174 | 6,174 | 6,174 | 6,174 | 6,174 | 6,174 | 6,174 | 6,174 | 6,174 | 6,174 | 6,174 | 6,174 | 6,174 | 6,174 |
| Debt Costs | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Deposits | 477 | 473 | 562 | 545 | 545 | 545 | 545 | 545 | 545 | 545 | 545 | 545 | 545 | 545 | 545 | 545 | 545 |
| **Total Assets** | 40,072 | 38,898 | 38,954 | 37,999 | 37,926 | 37,228 | 36,066 | 35,392 | 36,387 | 36,086 | 36,329 | 34,573 | 34,573 | 33,220 | 36,148 | 44,015 | 52,859 |
| **Liabilities and Member's Equity** | | | | | | | | | | | | | | | | | |
| Accounts Payable | 8,722 | 8,698 | 8,610 | 9,048 | 8,844 | 8,630 | 8,590 | 8,649 | 2,608 | 2,592 | 2,935 | 2,627 | 2,627 | 2,911 | 3,117 | 3,365 | 3,583 |
| Accrued Sal, Ben's, & Tx's | 2,782 | 2,730 | 2,633 | 2,528 | 2,519 | 2,586 | 2,434 | 2,327 | 2,660 | 2,277 | 2,823 | 2,794 | 2,794 | 2,927 | 3,071 | 3,267 | 3,425 |
| Other Current Liabilities | 7,292 | 6,927 | 6,903 | 6,718 | 6,664 | 6,671 | 6,369 | 6,201 | 6,322 | 6,304 | 6,202 | 6,099 | 6,099 | 6,258 | 6,268 | 6,284 | 6,296 |
| Revolving Line of Credit | 11,010 | 11,606 | 11,810 | 11,457 | 11,583 | 11,706 | 11,835 | 11,964 | - | - | - | - | - | - | - | - | - |
| Long Term Debt | 15,751 | 15,306 | 15,344 | 15,382 | 16,498 | 16,759 | 17,135 | 17,415 | - | - | - | - | - | - | - | - | - |
| **Total Current Liabilities** | 45,557 | 45,267 | 45,300 | 45,133 | 46,108 | 46,353 | 46,363 | 46,558 | 11,589 | 11,172 | 11,774 | 11,520 | 11,520 | 12,095 | 12,456 | 12,916 | 13,304 |
| Notes Payable | - | - | - | - | - | - | - | - | 7,096 | 6,806 | 6,121 | 5,703 | 5,703 | 1,722 | 131 | 83 | 36 |
| Long Term Debt | - | - | - | - | - | - | - | - | 31,267 | 31,267 | 31,267 | 29,760 | 29,760 | 29,047 | 28,361 | 27,702 | 27,074 |
| **Total Liabilities** | 45,557 | 45,267 | 45,300 | 45,133 | 46,108 | 46,353 | 46,363 | 46,558 | 49,953 | 49,245 | 49,162 | 46,983 | 46,983 | 42,864 | 40,947 | 40,701 | 40,413 |
| Member's Equity | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 |
| Members' Tax Distribution | (1,726) | (1,726) | (1,726) | (1,726) | (1,726) | (1,726) | (1,726) | (1,726) | (1,726) | (1,726) | (1,726) | (1,726) | (1,726) | (1,726) | (1,726) | (1,726) | (1,726) |
| PY Retained Earnings | (40,173) | (40,173) | (40,173) | (40,173) | (40,173) | (40,173) | (40,173) | (40,173) | (40,173) | (40,173) | (40,173) | (40,173) | (40,173) | (48,684) | (45,918) | (41,073) | (32,960) |
| Net income (loss) | (1,585) | (2,469) | (2,446) | (3,234) | (4,282) | (5,225) | (6,398) | (7,266) | (9,667) | (9,259) | (8,933) | (8,510) | (8,510) | 2,766 | 4,845 | 8,113 | 9,132 |
| **Total Member's Equity** | (5,484) | (6,369) | (6,345) | (7,134) | (8,182) | (9,124) | (10,297) | (11,166) | (13,566) | (13,158) | (12,833) | (12,410) | (12,410) | (9,644) | (4,799) | 3,314 | 12,446 |
| **Total Liabilities and Member's Equity** | 40,072 | 38,898 | 38,954 | 37,999 | 37,926 | 37,228 | 36,066 | 35,392 | 36,387 | 36,086 | 36,329 | 34,573 | 34,573 | 33,220 | 36,148 | 44,015 | 52,859 |

Notes:
Opening cash balance will be reduced by the Yucaipa Expense Claim in an amount to be determined

**Piccadilly Restaurants, LLC**
**5 Year Forecasted Cash Flow Statement**

| | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Total 2013 | Total 2014 | Total 2015 | Total 2016 | Total 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total EBITDA | (581,383) | 184,429 | 1,394,668 | 367,127 | 246,049 | 622,853 | 76,483 | 283,109 | 1,361,712 | 907,690 | 824,265 | 1,544,576 | 7,231,578 | 9,963,549 | 11,573,279 | 14,749,826 | 16,105,143 |
| Nonrecurring Expenses | (190,454) | (219,046) | (357,326) | (535,982) | (493,107) | (673,277) | (438,651) | (338,000) | (3,105,564) | - | - | - | (6,351,608) | - | - | - | - |
| Debt Refinancing Expenses | (40,010) | (40,010) | (3,095) | (40,010) | (5,500) | (5,500) | (5,500) | (5,500) | - | - | - | - | (145,125) | - | - | - | - |
| Interest expense | (346,930) | (350,962) | (453,902) | (348,602) | (393,130) | (386,047) | (406,118) | (412,042) | (164,454) | (111,494) | (111,494) | (339,243) | (3,824,419) | (2,051,300) | (1,673,710) | (1,513,578) | (1,494,907) |
| Interest income | 12 | 42 | 4,850 | 12 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 8,917 | 6,000 | 6,000 | 6,000 | 6,000 |
| Total Non-Recurring Expense / Debt Costs | (577,382) | (609,976) | (809,472) | (924,583) | (891,237) | (1,064,324) | (849,969) | (755,042) | (3,269,518) | (110,994) | (110,994) | (338,743) | (10,312,235) | (2,045,300) | (1,667,710) | (1,507,578) | (1,488,907) |
| Impairment of Property, Plant, & Equipment | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| (Gain)/loss on disposal of assets | (15,000) | (89,532) | (10) | (7,000) | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | (300,000) | (383,542) | 84,000 | 84,000 | 84,000 | 84,000 |
| (Increase)/decrease in accounts receivable | (22,379) | 88,627 | 20,337 | 185,554 | (199,000) | (34,324) | (74,761) | (74,513) | (69,892) | (119,621) | (95,115) | 78,923 | (316,164) | (249,170) | (433,353) | (507,180) | (599,503) |
| (Increase)/decrease in inventories | 105,168 | 46,609 | 36,903 | 77,711 | 17,758 | 63,766 | 61,050 | 122,518 | 2,721 | (64,465) | (814,462) | 554,056 | 209,332 | (55,724) | (81,513) | (88,170) | (114,815) |
| (Increase)/decrease in other current assets | 80,514 | 208,333 | (644,744) | 412,707 | 53,151 | (750,000) | 750,000 | (100,000) | (750,000) | 750,000 | 487,917 | (750,000) | (252,121) | (72,375) | (72,375) | (72,375) | (72,375) |
| (Increase)/decrease in intangibles | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| (Increase)/decrease in deposits | 47,341 | 3,949 | (89,070) | 17,080 | - | - | - | - | - | - | - | - | (20,700) | - | - | - | - |
| Non-cash interest expense | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Increase/(decrease) in accounts payable | 449,264 | (23,749) | (87,930) | 437,792 | (203,949) | (213,942) | (40,485) | 59,367 | (6,041,239) | (16,117) | 343,074 | (308,140) | (5,646,055) | 284,192 | 206,453 | 247,409 | 217,953 |
| Increase/(decrease) in salaries, taxes & benefits payable | 216,441 | (52,289) | (97,190) | (105,066) | (6,855) | 67,650 | (152,075) | (107,188) | 332,426 | (383,077) | 360,933 | 156,993 | 228,703 | 132,198 | 144,237 | 195,734 | 158,500 |
| Accrued S/L rent | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Increase/(decrease) in other accrued expenses | (25,106) | (365,324) | (23,836) | (185,055) | (53,808) | 6,983 | (301,760) | (167,869) | 120,645 | (18,158) | (101,762) | (102,972) | (1,218,021) | 158,659 | 10,083 | 16,460 | 11,450 |
| Other Reconciling Items | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net cash (used) by operating activities | 836,242 | (183,375) | (885,539) | 833,723 | (390,702) | (655,868) | 245,969 | (263,685) | (6,401,338) | 152,562 | 184,585 | (671,140) | (7,398,567) | 281,780 | (142,466) | (124,122) | (314,790) |
| Proceeds from sales of Property, Plant, & Equipment | - | 483,246 | - | - | - | - | 900,000 | - | - | - | - | 1,600,000 | 2,983,246 | - | - | - | - |
| Reclassification - Assets held for sale | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Purchase of property and equipment | (168,039) | (84,792) | (355,511) | (339,924) | (222,167) | (297,167) | (132,500) | (182,500) | (207,500) | (213,000) | (213,000) | (210,000) | (2,626,099) | (3,506,000) | (4,250,000) | (4,906,000) | (4,906,000) |
| Net cash used by investing activities | (168,039) | 398,454 | (355,511) | (339,924) | (222,167) | (297,167) | 767,500 | (182,500) | (207,500) | (213,000) | (213,000) | 1,390,000 | 357,147 | (3,506,000) | (4,250,000) | (4,906,000) | (4,906,000) |
| Member distributions | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Member Contribution | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net increase/(decrease) in Unsecured Debt | - | - | - | - | - | - | - | - | 7,096,313 | (290,771) | (684,855) | (417,692) | 5,702,995 | (3,981,398) | (1,591,077) | (47,461) | (47,461) |
| Net increase/(decrease) in long term debt | 38,361 | (444,885) | 38,361 | 38,361 | 1,115,581 | 261,219 | 375,836 | 280,349 | 13,851,549 | - | - | (1,507,500) | 14,047,734 | (712,630) | (686,767) | (658,576) | (627,848) |
| Net increase/(decrease) in revolving line of credit | 91,577 | 596,141 | 203,860 | (352,718) | 125,790 | 123,069 | 128,522 | 129,934 | (11,964,485) | - | - | - | (10,918,310) | - | - | - | - |
| Net cash provided by financing activities | 129,938 | 151,256 | 242,222 | (314,356) | 1,241,371 | 384,288 | 504,359 | 410,283 | 8,983,377 | (290,771) | (684,855) | (1,924,692) | 8,832,419 | (4,694,028) | (2,277,844) | (706,037) | (675,309) |
| Total Cash Flow | (360,624) | (59,212) | (413,832) | (378,012) | (16,686) | (1,210,217) | 744,342 | (507,836) | 466,732 | 445,487 | 0 | (0) | (1,289,657) | - | 3,235,258 | 7,506,089 | 8,720,136 |
| Beginning Cash | 2,789,657 | 2,429,034 | 2,369,822 | 1,956,190 | 1,578,178 | 1,561,492 | 351,274 | 1,095,617 | 587,781 | 1,054,513 | 1,500,000 | 1,500,000 | 2,789,657 | 1,500,000 | 1,500,000 | 4,735,258 | 12,241,348 |
| Total Cash Flow | (360,624) | (59,212) | (413,832) | (378,012) | (16,686) | (1,210,217) | 744,342 | (507,836) | 466,732 | 445,487 | 0 | (0) | (1,289,657) | - | 3,235,258 | 7,506,089 | 8,720,136 |
| Ending Cash | 2,429,034 | 2,369,822 | 1,956,190 | 1,578,178 | 1,561,492 | 351,274 | 1,095,617 | 587,781 | 1,054,513 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 4,735,258 | 12,241,348 | 20,961,484 |

Notes:
Opening cash balance will be reduced by the Yucaipa Expense Claim in an amount to be determined

# LIQUIDATION ANALYSIS

## EXHIBIT D

**[TO BE PROVIDED]**

**RESERVED CAUSES OF ACTION
AND RESERVED BANKRUPTCY
CAUSES OF ACTION**

**<u>EXHIBIT E</u>**

{N2660688.1}

# EXHIBIT E TO THE DISCLOSURE STATEMENT

# CAUSES OF ACTION

- Claims and Causes of Action related to Deepwater Horizon Explosion and oil spill in the Gulf Of Mexico (the BP Tort Claim).

- Claim and Causes of Action against Dr. Gibson for return of payment of $18,500.

- Claims and Causes of Action asserted in the Twenty-First Judicial Court District, Parish of Livingston, State of Louisiana, against Regions Community Behavioral Health Center, Inc. and its affiliates for failure to pay for goods and services.

# BANKRUPTCY CAUSES OF ACTION

All claims or causes of action of the Debtors against any and all third parties for the recovery of (a) transfers of Cash, offsets, debt forgiveness and other types or kinds of property, or the value thereof, recoverable exclusively pursuant to sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, or otherwise applicable non-bankruptcy law, (b) any claims or causes of action of the Debtors for subordination under section 510 of the Bankruptcy Code or under other applicable laws, and (c) all claims or causes of action that arise under title 11 of the United States Code; *provided, however*, as of the Effective Date, the Reorganized Debtors shall be deemed to have waived and released any and all Bankruptcy Causes of Action against the Holders of any Allowed General Unsecured Claim.